Davis, Judge,
delivered the opinion of the court:
During 1958-1960 the plaintiff — 17 California corporations acting together as a joint venture under the name Eobertson Construction Company — built a 500-unit Cape-hart Act housing project at Fort Hood, Texas. Having collected the original contract price of $8,218,036 plus about $16,000 resulting from 10 formal changes in the contract, the joint venture now seeks almost one and one-half million dollars for alleged breaches by the Government during construction.
This complex case was referred to Trial Commissioner Mastín G. White with directions to make findings of fact and to recommend conclusions of law. Without any objection by the Government, a full trial was had and completed.[1] Not until after the submission by the parties of proposed findings to the commissioner did the defendant move to suspend proceedings here in order to allow an administrative determination by the Armed Services Board of Contract Appeals. The commissioner denied this motion as far too late, and the court sustained that ruling. 177 Ct. Cl. 909 (1966). The subsequent decision in Len Company & Associates v. United States, 181 Ct. Cl. 29, 385 F. 2d 438 (1967), shows that in any event the ASBCA had no jurisdiction of most, probably all, of the claims.
Commissioner White filed a comprehensive, careful, and detailed report based on the trial record and the submissions made to him. Exceptions were filed by the plaintiff,[2] and *417 tibe case was presented to the court on oral argument and briefs. Since the court agrees, in largest part, with the commissioner’s recommendations, we adopt and incorporate, with some deletions and some modifications in language or reasoning and some in result, the bulk of his opinion as Part II of our own. We also accept, with slight alterations, his findings of fact. Before setting forth his opinion (as modified), we touch, in Part I, on some of the points stressed before the court.
I.
A. Releases: The Government argues that general releases (with exceptions) signed by the contractor at the closing of each mortgage are a bar to many of the claims. The difficulty is that the defendant, contrary to our Rule 57 (f) (2),[3] failed to request the specific findings that would require discussion of the releases as they relate to the various claims. The Government’s proposed findings 13-18 (which, for the most part, have been adopted as findings 16-24) are plainly insufficient. Those findings constitute little more than an introductory statement that releases had been executed, plus scattered, general references to them. Rule 57(f)(2) requires “particular findings of fact” (emphasis added), which we interpret as dictating collation of the releases, including their exceptions, with the specific claims (or portions of multi-faceted claims) defendant asserts are barred by the releases. Anything less, especially in a case as complicated as this, would cast too heavy a burden on the commissioner and the court — a task that should be borne by the defendant. Neither the commissioner nor the court should be asked to do the parties’ work for them. The commissioner was entirely justified in declining to make, on his own, specific findings upon which defendant’s legal argument could be rested, and without those specific findings the release defense has no support.
There is another reason for refusing to consider the Government’s argument. Despite numerous extensions, the de *418 fendant failed to make a timely filing of its exceptions to and briefs on the commissioner’s report. Though we allowed the defendant to submit a brief on legal points and authorities, we did not permit, because of its unexcused delinquency, any Government exceptions to the commissioner’s findings. See Buie 57(f) (l).[4] We will not now allow it to avoid this sanction by, in efiect, excepting to the commissioners’ failure to make detailed findings with respect to the releases.[5]
B. Protests to the contracting officer: The Government also says, at this stage, that plaintiff waived claims 1-10, 13-20, and 22-26 by complying with the directives issued by the resident engineer and various government inspectors (requiring plaintiff to do work allegedly not warranted by the contract) without appealing or protesting to the contracting officer. However, when it proposed its findings to Commissioner White, the defendant suggested findings on plaintiff’s failure to appeal, or protest to the contracting officer, only in comiection with claim 5, claim 15, and the “bird blocking” portion of claim 26. Quite properly, the commissioner limited his discussion and findings to those particular aspects, concluding that plaintiff had waived claim 5 but not claims 15 and 26. Plaintiff excepted to this disposition of claim 5, and the findings on claims 15 and 26 provide an adequate basis for the defendant to press its legal disagreement with the adverse recommendations on those parts of the case. For the reasons now to be stated, we hold that the Government’s defense is good only as to claim 15.
Although the details of these claims are set forth in Part II infra and in the findings, we capsule them here for con *419 venience. The plaintiff alleges under claim 5 that the resident engineer misinterpreted the specifications when he ordered the builder, over its objection, to insulate water pipes in the “furred” spaces above the ceilings in the deck and beam houses. As to the other two claims, plaintiff argues that the government’s inspectors called for work not warranted by the contract when they directed, despite remonstrances, that portions of the refrigerant lines be continuous copper tubing and that “bird blocking” not be added to the rafters until after the installation of the dry wall. Assuming for the present that government personnel did misinterpret the specifications in each of these instances, the defense of waiver remains as a potential barrier to plaintiff’s success, since the contractor did not protest the resident engineer’s action to the contracting officer (claim 5) or notify either the contracting officer or the resident engineer of its objection to the inspectors’ orders (claims 15 and 26).
The Government’s primary tack (the essence of which the commissioner adopted in denying recovery on claim 5) is that the plaintiff waived its claim by acquiescing “in the decisions of subordinate Government personnel who were not authorized to alter the terms or conditions of the Housing contract.” The argument leans heavily on cases holding that, because the standard “Changes” article vests the contracting officer or his authorized representative with the exclusive power to modify the contract requirements, a contractor must present to him any claim that defendant’s agents are imposing requirements not sanctioned by the contract (which is, in effect, an assertion that the builder is being subjected to a de facto or “constructive” change in the contract). See General Bronze Corp. v. United States, 168 Ct. Cl. 176, 186-89, 338 F. 2d 117, 123-24 (1964); Fox Valley Engineering, Inc. v. United States, 151 Ct. Cl. 228, 237-38 (1960); Woodcraft Corp. v. United States, 146 Ct. Cl. 101, 103, 173 F. Supp. 613, 614 (1959); J. A. Ross & Co. v. United States, 126 Ct. Cl. 323, 329-30, 115 F. Supp. 187, 190-91 (1953); Globe Indemn. Co. v. United States, 102 Ct. Cl. 21, 36-38 (1944), cert. *420 denied, 324 U.S. 852 (1945); James McHugh Sons, Inc. v. United States, 99 Ct. Cl. 414, 432 (1943) .[6]
This rule, however, is inseparable from the language of the-normal “Changes” clause. The objection must be directed to-the contracting officer (or his authorized representative) because, by the agreement of the parties embodied in that provision, he is only person with the prerogative to alter the contractual requirements. He may actually issue a change-order, or, should he decline to do so while demanding work that an administrative tribunal or court later holds to be-outside the contract, the Government may be liable on the ground that he imposed a “constructive change.” See, e.g., W. G. Cornell Co. v. United States, 179 Ct. Cl. 651, 672-73, 376 F. 2d 299, 313 (1967); J. W. Hurst & Son Awnings, Inc., 59-1 B.C.A. ¶ 2095, at 8964 (No. 4167), and cases cited. Either way, the important point is that the contractor’s claim rests on the contracting officer’s exercise of his contractual privilege to modify the requirements — whether the-result is a formal or a constructive change.
In Len Company & Associates v. United States, 181 Ct. Cl. 29, 385 F. 2d 438 (1967), decided after the commissioner submitted his report, we pointed out some errors that can result from an attempt to divorce a judicial rule from the contractual language in which it is rooted. We held that,, with respect to “changes”, Article 9 (“Changes and Changed Conditions”) of a Capehart Act contract is a different species of provision from the standard “Changes” clause. A Cape- *421 hart Act agreement does not reserve to the contracting officer the power to make unilateral changes in the contractual demands; rather, his authority, shared with the builder, is limited to proposing changes for approval by the Federal Housing Commissioner and the mortgagee. Under that holding, the Government’s assertion that this plaintiff was obligated, by Article 9, to present its claim to an official “authorized to alter the terms” of the agreement has no place in this litigation.[7]
The defendant also looks to our decision in Anthony P. Miller, Inc. v. United States, 172 Ct. Cl. 60, 348 F. 2d 475 (1965), in which we dealt with the problems raised by the the statutory mortgage limitation on Capehart Act projects. As a safeguard, we held that a contractor should insist on a formal change order under Article 9 before undertaking “simple extras” (i.e., work that in the estimation of the parties is not required by the contract). But we laid down a less stringent requisite for instances in which “the claim results from ambiguous specifications.” In that case, though the contractor need not call for a formal change order, his “compliance should be made under protest”; if he does protest, he may recover the excess costs of the Government’s misinterpretation of the specification “unless it is shown that the contracting officer has, in bad faith, ordered the installation of a more elaborate and expensive item than is specified in the contract and that fact is known to the contractor.” 172 Ct. Cl. at page 73, 348 F. 2d at page 483.
Since the three claims with which we are now dealing result from ambiguous specifications and are not simple extras, the fact that the builder failed to obtain a formal change order is irrelevant. The record contains not even a hint of bad faith or collusive action. Protest was made. Nothing in Anthony Miller indicates that the required protest must be directed to the contracting officer. The opinion’s *422 rationale was the prevention of collusive or evasive attempts to sidestep the limitation imposed by Congress, and the builder’s protestations, if made to a government officer authorized to oversee or direct its operations, suffice for that purpose.
The ultimate question then is whether this plaintiff protested to such an officer. Every government contract allocates among federal employees the responsibility for administering the contract and regulating the contractor’s performance, one purpose of which is to save the Government from liability for the unjustified demands of subordinate and unauthorized personnel. See Cauldwell-Wingate Co. v. United States, 109 Ct. Cl. 193, 224 (1947). In Zen we noted that “the contracting officer, as part of his duty to assure compliance by the contractor with the plans and specifications, has the power to order the work done in a manner which is reasonable and proper.” 181 Ct. Cl. at page 39, 385 F. 2d at page 443. But this is a power not necessarily confined, and not ordinarily confined, to the contracting officer himself. Like most government contracts, the present agreement contemplated delegation of the contracting officer’s power.[8] Although a representative need not be designated, the contractor may look to the appointee if the option granted by the contract is exercised. See, e.g., Centre Manufacturing Co. v. United States, ante, at 127-28; Northbridge Electronics, Inc. v. United States, 175 Ct. Cl. 426, 436-40 (1966); Central Construction Co. v. United States, 63 Ct. Cl. 290, 294-96 (1927); cf. New York Shipbuilding Corp. v. United States, 180 Ct. Cl. 446, 385 F. 2d 427 (1967).
Here, the contracting officer designated the Fort Hood resident engineer “Contracting Officer Representative for assuring compliance with the terms of all contracts within your assigned area.” Among the specific functions delegated were: “Inspection, examination and testing of workmanship”; “Rejection of defective material and/or workmanship”; and “Require replacement of defective material and/or workman *423 ship.” [9] This grant empowered the resident engineer to direct the plaintiff, on the basis of his interpretation of the specifications, to insulate the pipe in the deck and beam units (claim 5). Since he was acting within his authority, the plaintiff was not obligated to appeal to the contracting officer, and the Government is liable if the resident engineer erroneously construed the contract.
The claims based on the actions of the defendant’s inspectors (Nos. 15 and 26) pose a different problem. The plaintiff considers it highly significant that in Roberts v. United States, 174 Ct. Cl. 940, 357 F. 2d 938 (1966), we held the Government in breach of contract because its inspector hindered the contractor’s performance even though we did not find that a protest had been lodged with the contracting officer. But the inspector’s conduct in Roberts involved more than a mere directive based on a misinterpretation of a specification. Over a period of more than 15 months he engaged in continual “overzealous supervision” which seriously hampered the contractor’s efforts to perform. See 174 Ct. Cl. at pages 943, 945-46, 950, 972-73, 357 F. 2d at pages 941, 942-43, 945.[10] Similarly, in Adams v. United States, 175 Ct. Cl. 288, 358 F. 2d 986 (1966), the contractor, despite his failure to appeal to the contracting officer, recovered losses ensuing from the “extremely rigid, unreasonable and arbitrary conduct” of an inspector “during a period of approximately 3 months” (175 Ct. Cl. at page 298, 358 F. 2d at page 992), conduct which included substantial deviations from the inspection plan issued by the contracting agency (see 175 Ct. Cl. at pages 290, 294-98, 311-18, 358 F. 2d at pages 990-92). Cf. H. W. Zweig & Co. v. United States, 92 Ct. Cl. 472, 481 (1941). (“The incompetency of this inspector was glaring and wholesale.”). Plaintiff has not pointed to any evidence *424 bringing its case within the Roberts and Adams rationale that the Government cannot impede, hinder, or interfere with the contractor’s work by an improper course of conduct. A mere misinterpretation of a specification, by itself, is not enough.
It follows that the plaintiff can prevail with respect to this defense only if (1) the contract licensed the inspectors to enforce work requirements, or (2) that authority was delegated to them, or (3) their directives were countenanced by the contracting officer or the resident engineer. Nothing in the contract itself empowered inspectors to direct plaintiff’s operations according to their interpretation of the specifications ; and, insofar as the record shows, neither the contracting officer nor the resident engineer delegated that function to them. Cf. Woodcraft Corp. v. United States, 146 Ct. Cl. 101, 173 F. Supp. 613 (1959).
In its proposed findings for claim 26, the plaintiff asserted that the inspector had advised his superiors that the method proposed by the contractor for installing bird-blocking was preferable, but he was overruled. Our examination of the record leads us to conclude that the order probably originated with, or at least was confirmed by, the resident engineer after he was told of the plaintiff’s objections to placing the blocks after the dry wall was in.[11] On that basis we hold that the plaintiff did not waive the bird-blocking portion of claim 26, its exception having been brought to the attention of the contracting officer’s authorized representative. See Centre Manufacturing Co. v. United States, supra, ante, at 127-28; Northbridge Electronics Inc. v. United States, supra, 175 Ct. Cl. at pages 436-40; cf. Globe Indemn. Co. v. United States, 102 Ct. Cl. 21, 38 (1944), cert. denied, 324 U.S. 852 (1945).
Plaintiff made no similar contention in its suggested findings for claim 15. Consequently, it may not recover for the losses resulting from the unauthorized action of the inspector requiring continuous copper tubing in the attic spaces of the housing units.
*425 C. Measure of damages: Because of the inadequate records kept by tbe plaintiff and the paucity of data — both affirmative and rebuttal — on damages, the trial commissioner was hard pressed to determine the extent of the builder’s injuries on claims 16-17 (faulty specifications for heater closets), 22 (concrete), 26 (carpentry), and overhead-interest expenses resulting from Government-caused delay. Convinced that the plaintiff did incur some losses, the commissioner recommended entry of “jury verdicts” on each of those counts. The plaintiff now claims more money, while the defendant contends that the commissioner’s assessments are too munificent.
In the past we have allowed so-called “jury verdicts” if there was clear proof that the contractor was injured and there was no more reliable method for computing damages— but only where “the evidence adduced [was] sufficient to enable a court or jury to make a fair and reasonable approximation.” Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 184, 355 F. 2d 554, 572 (1966); see River Construction Corp. v. United States, 159 Ct. Cl. 254, 271 (1962); Western Contracting Corp. v. United States, 144 Ct. Cl. 318, 320, 333-36 (1958); Brand Investment Co. v. United States, 102 Ct. Cl. 40, 45, 58 F. Supp. 749, 751 (1944), cert. denied, 324 U.S. 850 (1945). Though we agree with the commissioner that the plaintiff was undoubtedly injured, the evidence as to the extent of its losses on the “jury verdict” claims is very loose, and we are not happy to endorse the employment here of a “jury verdict”. However, the parties’ conduct during the litigation, taken together with the age of the case and the great doubt that further proceedings would produce any better foundation for an award, leave us with no alternative but to accept that approach.
The defendant, as noted above, was not, because of its default, permitted to except to the commissioner’s report, and therefore it has no right to object to the commissioner’s computations. The builder, on the other hand, has given us no sound reason for believing it has been undercompensated; instead, it has relied on theories and proof leading to a result even less reliable than a “jury verdict”.
*426 For claims 22 and 26, plaintiff’s submission is the “total cost” standard (the difference between actual expenses and bid or estimated costs). This theory has never been favored by the court and has been tolerated only when no other mode was available and when the reliability of the supporting evidence was fully substantiated. See Turnbull, Inc. v. United States, 180 Ct. Cl. 1010, 1025-26, 389 F. 2d 1007, 1015 (1967); J. D. Hedin Construction Co. v. United States, 171 Ct. Cl. 70, 86-87, 347 F. 2d 235, 246-47 (1965); River Construction Corp. v. United States, supra, 159 Ct. Cl. at pages 270-71; Oliver-Finnie Co. v. United States, 150 Ct. Cl. 189, 200, 279 F. 2d 498, 505-06 (1960) ; F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 510-12, 130 F. Supp. 394, 399-400 (1955). The acceptability of the method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff’s bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses. See J. D. Hedin Construction Co. v. United States, supra, 171 Ct. Cl. at pages 86-87, 347 F. 2d at pages 246-47; Oliver-Finnie Co. v. United States, supra, 150 Ct. Cl. at pages 197, 200, 279 F. 2d at pages 505-06; F. H. McCraw & Co. v. United States, supra, 131 Ct. Cl. at page 511, 130 F. Supp. at page 400.
This case clearly fails some of these tests. A large measure of our present uncertainty is due to the plaintiff’s complete failure to maintain accurate cost records during performance. The only excuse for this lack of diligence was that plaintiff did not expect to become embroiled in litigation over the Fort Hood project. That is feeble justification for taking refuge in the total-cost approach. Cf. Commerce Int'l Co. v. United States, 167 Ct. Cl. 529, 543 n. 10, 338 F. 2d 81, 89 n. 10 (1964). Equally telling is the failure to rebut the Government’s evidence that the increased costs were, in some part, due to plaintiff’s fault. The record clearly shows that it had a great deal of trouble keeping its subcontractors in line. In any event, we would hesitate before concluding that plaintiff sufficiently proved the reasonableness of its estimates or its actual costs. Among other things, it did not *427 produce a reliable breakdown of its overall estimates and the cost of its concrete and carpentry operations. And since we deny (see Part II infra) significant aspects of claims 22 and 26, the plaintiff’s total-cost argument, geared to each claim in its entirety, has little utility.
On its unnumbered claim for overhead and interest costs incurred because of the Government’s delays, the plaintiff urges that its recovery should be the difference between the months it estimated the project would take and the actual time consumed, multiplied by its monthly charges for interest and overhead. A “total time” approach is no less susceptible to inaccuracies than the total-cost theory. See Laburnum Construction Corp. v. United States, 163 Ct. Cl. 339, 342-43, 325 F. 2d 451, 453 (1963). Plaintiff’s presentation does not support its dependability here. There are at least three weaknesses. We are not persuaded that the quantum of delay arrived at through this mode of computation is attributable to the Government rather than the builder or its subcontractors. There is a serious conflict in the evidence as to exactly what the plaintiff’s pre-bid estimate was. The plaintiff’s calculation of monthly overhead and interest is, at best, disputable.[12]
Plaintiff’s exceptions to the “jury-verdict” assessments on claims 16 and 17 rest on the contention that the commissioner erroneously ignored the opinion evidence of its witnesses. We have reviewed that evidence and reject it as inconclusive. See Western Contracting Corp. v. United States, supra, 144 Ct. Cl. at pages 320, 333-34.
The plaintiff having failed to convince us that it has been inadequately compensated for claims 16, 17, 22, 26, and the Government-caused delays, and the defendant having incapacitated itself from excepting to the commissioner’s report, we accept the commissioner’s determination of damages on those claims as reflected in findings 442-43, 447(c), 450(c), *428 and 451. See J. D. Hedin Construction Co. v. United States, supra, 171 Ct. Cl. at pages 75-76, 347 F. 2d at pages 240; Commerce Int'l Co. v. United States, supra, 167 Ct. Cl. at pages 536-87, 338 F. 2d at page 86.[13]
II.
Before setting forth the commissioner’s opinion on the various claims as we have changed it, we summarize, for the convenience of the parties, those modifications having a pecuniary impact: (i) claim 2 — the commissioner’s recommendation has been augmented by $1,655.84 (see note 13 supra); (ii) claim 4 — we reject the plaintiff’s claim for reimbursement of the $2,580 credit it paid the Government; (Hi) claim 5 — the plaintiff is allowed $9,499.46 on the basis of the resident engineer’s misinterpretation of the specifications; (iv) claim 15 — as stated in Part I the plaintiff waived its claim for $597; (v) claim 26 — by our reading of the specifications, the builder is not entitled to the $2,219.38 recommended by the commissioner as the extra cost of using No. 1 (rather than No. 2) lumber for roof joists; (vi) claim 27— we hold that the expenses ($14,612.24) incurred because of the unavailability of the decking prescribed by the contract should be borne by the contractor. As a result of these modifications, the amount for interest and overhead is reduced to $17,562.88. The final result is a decrease in the commissioner’s recommended amount of $319,662 to our total figure of $310,277.48.
The parts of Commissioner White’s opinion passing on the individual claims, as modified by the court, are as follows:[14]
*429 Claim 1 — Hardwood Flooring
In its claim 1, the plaintiff contends that it was compelled to incur extra costs “as a result of unreasonable demands [by the defendant] above all usual industry tolerances in connection with the acceptance of the hardwood flooring.”
Under the contract, the plaintiff was required to furnish and install hardwood flooring in 154 housing units that were commonly referred to as the “officers’ quarters.” In this connection, paragraph 8-30 (b) of the contract specifications provided in part that “Flooring shall * * * be * * * laid with close joints, tightly drawn up, and blind nailed with eight penny cut steel or spiral or screw type flooring nails into each floor bearing. * * * A one-inch space for expansion shall be provided at walls or partitions. * * *”
The oak lumber used for the hardwood flooring under the contract was inspected and approved for the project by the Corps of Engineers.
On July 31, 1959, the plaintiff (through a subcontractor) commenced laying the oak flooring in the first building. The laying of the oak flooring continued until the early part of November 1959, when the initial process of laying the floors in the 154 units of the officers’ quarters had been completed, and the floors were ready for sanding, filling, and finishing.
The oak flooring was initially installed in an acceptable manner, with good workmanship. It was satisfactory from the standpoint of tightness, levelness, and otherwise.[15]
In November 1959, a controversy arose between the plaintiff and the defendant’s resident engineer on the Fort Hood job as to whether certain of the hardwood floors within Mortgage Area 1 were in an acceptable condition. The plaintiff took the position that all of the floors complied with the pertinent specifications. The defendant’s resident engineer, on the other hand, contended that some of the hardwood floors were unacceptable. In this connection, the resident engineer and the defendant’s inspectors took the position that *430 no tolerances as to visible cracks between boards, or as to levelness of the floors, were permissible under the contract.
On December 10, 1959, the resident engineer wrote a letter to the plaintiff, stating in part as follows:
In view of the fact that you are striving to close Mortgage Area Number 1 at the earliest possible date, it is considered advisable to again point out to you that many of the hardwood floors are unacceptable. The floors are unlevel in many areas. Some boards are not sufficiently nailed, and cracks are excessive in size. Filling of wide cracks will not be accepted.
The resident engineer, in letters to the plaintiff dated December 16,1959 and January 19,1960, reiterated his position that some of the oak floors were not acceptable, and that corrective action would be required prior to the final acceptance of Mortgage Area 1.
On J anuary 24,1960, the plaintiff’s principal officer visited the job site and discussed the acceptability of the hardwood flooring in Mortgage Area 1 with the defendant’s resident engineer. They did not reach an agreement on the question of whether all the floors were acceptable.
On January 25,1960, at the request of the plaintiff’s principal officer, a member of the District Engineer’s staff from Galveston visited the job site in connection with the flooring problem. After the staff member arrived at Fort Hood, he and the defendant’s resident engineer and the plaintiff’s principal officer made an inspection of the floors in a number of houses. The general condition of the floors was rather good. However, there were some places in living rooms and bedrooms where the boards were not tight. In several instances, cracks between the boards as wide as % inch were noted. Also, there were places where face-nailing of floor boards (as distinguished from the blind-nailing required by the specifications) was apparent.
On January 26, 1960, the member of the District Engineer’s staff mentioned in the preceding paragraph and the plaintiff’s principal officer met together and reached an agreement on the standards that should be applicable in determining the acceptability of the hardwood floors. This *431 agreement was embodied in a memorandum of understanding, which they both signed, and which stated in part as follows:
Flooring laid tight will have an initial width of 18" per 8 boards. It is recognized that there will be expansion of the boards because of temperature and humidity changes and that the boards will expand to something greater than this initial width. It was also agreed that the maximum -width of 8 consecutive boards would not exceed 18^ie" and that no individual crack would be greater than %2". Any flooring not meeting these tolerances will be repaired as required to come within the above limits. (Although it will be the exception, the Besident Engineer, or his authorized representative, may in individual cases authorize flooring in excess of the above tolerances in obscure areas or at other locations where they feel that repair of floor beyond these tolerances will serve no useful purpose.) The individual floor cracks which exceed %2" tolerance will be repaired in one of two ways. In the event the board can be shifted to leave a crack of less than %2" on either side, the repair may be accomplished in this manner. In the event repair in this manner will not result in a crack of less than %2", individual boards or portions of the floor will be replaced to such an extent as is required to come within these tolerances. It was agreed, that the contractor may in certain instances obtain special milled flooring of greater width than the nominal 2^4".
The question of floor level was discussed and tentative agreement reached that acceptable floor level would be that not exceeding 14" in 10' deformation in areas where furniture might reasonably be expected. However, before confirmation of this tolerance, a representative of the contractor and the Fort Hood Eesident Office will make specific checks of all of the buildings containing hardwood floors to determine how many, if any, of the floors would need to be repaired to meet this criteria. In the event the contractor feels that an unreasonable number of floors would have to be partially tom up and replaced, the matter will be further discussed.
It was also agreed that face nailing would be held to a minimum in conformation with the practices in tongue and groove floor construction.
A few weeks after the memorandum of understanding was signed, a further controversy arose between the plaintiff and *432 the defendant’s resident engineer concerning the acceptability of hardwood floors. The plaintiff’s principal officer went to Fort Hood again in connection with this matter, and conferred with the resident engineer. The plaintiff’s principal officer took the position that all the hardwood floors on the project complied with the standards set out in the memorandum of understanding and were acceptable under the memorandum of understanding. The defendant’s resident engineer, on the other hand, contended that many of the floors were not acceptable because they were not level or because there were too many cracks between the boards.
After talking with the defendant’s resident engineer, the plaintiff’s principal officer telephoned to the District Engineer at Galveston and stated to him that the resident engineer was not abiding by the memorandum of understanding, and that if the District Engineer did not come to the job site immediately, the plaintiff would withdraw from the job. The District Engineer said that he could not come to Fort Hood immediately, but that he would be there two days later.
Two days after the telephone conversation mentioned in the preceding paragraph, the District Engineer went from Galveston to Fort Hood. He was accompanied by the Chief of the Construction Division of the District. At Fort Hood, the District Engineer and the Chief of the Construction Division met the plaintiff’s principal officer and other representatives of the plaintiff. The group made an inspection of several houses that were involved in the controversy between the plaintiff and the defendant’s resident engineer concerning the acceptability of the hardwood floors. The District Engineer determined that the floors in some of the houses had variations in the surface which were in excess of the criterion as to levelness prescribed in the memorandum of understanding. In other instances, the District Engineer determined that floors contained cracks in excess of the tolerances prescribed in the memorandum of understanding. The District Engineer, 'as contracting officer, ruled that the plaintiff must correct some of the deficiencies found by the District Engineer, but in places where the District Engineer believed that the deficiencies would not adversely affect the *433 utilization, of the floors, he decided that the floors would be accepted without any corrective action. Some supposed deficiencies in the hardwood floors previously listed by the resident engineer were determined by the District Engineer to be within the tolerances prescribed in the memorandum of understanding, so that no corrective action by the plaintiff was required concerning such matters.
When the defendant’s resident engineer and inspectors took the position in the fall of 1959 that no tolerances were permissible under the contract, the defendant’s personnel thereby imposed upon the plaintiff standards which were unattainable as a practical matter, and the imposition of such impossibly high standards amounted to erroneous conduct by the defendant. However, it must be noted that the evidence fails to show the taking of corrective action by the plaintiff because of the imposition of the impossibly high standards by the defendant’s personnel on the job. Instead of endeavoring to meet such standards, the plaintiff appealed to higher authority, and the result was the memorandum of understanding. That document prescribed specific tolerances satisfactory to both parties and thus represented a mutual interpretation of the requirements of the contract.
The evidence shows that after the memorandum of understanding was entered into, the defendant’s resident engineer insisted that the plaintiff correct some supposed deficiencies in the hardwood floors which actually were within the tolerances prescribed in the memorandum of understanding. Here, again, the plaintiff, without complying with the resident engineer’s requirements, sought relief from the District Engineer, and the District Engineer upheld the plaintiff as to these particular matters, and did not require the plaintiff to take corrective action.
Basically, the plaintiff is complaining in claim 1 that the defendant’s resident engineer wrongfully attempted to impose unauthorized requirements on the plaintiff, both before and after the memorandum of understanding was entered into on January 26,1960. However, such attempts were unsuccessful, due to actions taken by higher authority on reviewing the resident engineer’s position at the request of the plaintiff, and the plaintiff did not have to take any corrective *434 action because of the resident engineer’s position. Consequently, other than the delay from defendant’s wrongful action (which was computed in the assessment of delay damages in finding 451), plaintiff has failed to prove that it sustained any injury from defendant’s error and is not entitled to recover on this aspect of claim 1. See, e.g., Snyder-Lynch Motors, Inc. v. United States, 154 Ct. Cl. 476, 480, 292 F. 2d 907, 910 (1961).
Claim £ — Kitchen and Bathroom Cabinets
Under the contract, the plaintiff was required to furnish kitchen and bathroom cabinets in all of the 500 housing units constructed at Fort Hood. The exposed surfaces of the cabinets in certain of the units were required to be of a natural-finish material, and these cabinets were to receive a natural finish. The remainder of the cabinets were to be painted, and they were required to be made of paint-grade material.
Masonite Doors
One aspect of claim 2 is a contention by the plaintiff that it was wrongfully prevented by the defendant from using masonite doors on the paint-grade cabinets.
In January 1959, the plaintiff submitted shop drawings and samples of kitchen cabinets prepared by its cabinet subcontractor, the Anderson Cabinet Corporation. In this connection, the specifications required the submission of shop drawings for the kitchen cabinets, but did not require the submission of samples.
Under the date of February 4, 1959, the defendant’s resident engineer at Fort Hood disapproved the shop drawings and samples that had been submitted in January, listing obvious conflicts between them and the specifications.
On or about March 9,1959, the plaintiff submitted a second group of shop drawings and cabinet samples for acceptance.
The sample paint-grade cabinet submitted by the plaintiff on or about March 9, 1959 had a hollow-core masonite door. The shop drawings submitted by the plaintiff indicated that the cabinet doors were hollow-core lip doors, but did not indicate the material to be used in the face of the doors.
*435 Under the date of March 27, 1959, the resident engineer advised the plaintiff in part as follows:
The samples and drawings are approved, with exceptions as noted on the shop drawings, subject to all contractual requirements.
One of the exceptions shown on the drawings in red pencil related to the cabinet doors and stated, “As spec. par. 10-3.”
On June 25, 1959, one of the defendant’s inspectors noted that the cabinet subcontractor was utilizing masonite fronts on the hollow-core doors of the paint-grade cabinets. The subcontractor stated in explanation that the sample paint-grade cabinet submitted on or about March 9, 1959 had contained a masonite door. The subcontractor contended that there were advantages to be realized from the use of masonite on the doors of the paint-grade cabinets, and requested permission for the use of such material.
The defendant’s resident engineer refused to approve the use of masonite doors on the paint-grade cabinets. Accordingly, the plaintiff on July 8,1959 advised its cabinet subcontractor that masonite doors were not approved, and requested the subcontractor to manufacture and ship wooden doors for the cabinets. As a result, doors made of No. 2 birch plywood were provided for the paint-grade cabinets.
As previously indicated, the sample paint-grade cabinet submitted by the plaintiff on or about March 9, 1959 to the defendant for acceptance had a masonite door. Although the resident engineer’s letter of March 27,1959 to the plaintiff stated generally that the samples and drawings were approved, the resident engineer added the phrase, “with exceptions as noted on the shop drawings, subject to all contractual requirements.” One of the exceptions related to the cabinet doors and called the plaintiff’s attention specifically to paragraph 10-3 of the specifications.
Paragraph 10-3 was a part of section 10 of the contract specifications, which related to the furnishing and installation of the kitchen and bathroom cabinets. Paragraph 10-3 provided in part as follows:
10-3. Material; Lumber and Woodwork— * * * At the contractor’s option, lumber for the various uses shall *436 be one of tlie species listed for the purpose and of the grade indicated.
The phrase “At the contractor’s option” has only one reasonable meaning — -that the contractor has the choice as to which of the materials approved by the specifications he will use, not an alternative of using some other product. Therefore, since the table following the quoted portion of paragraph 10-3 prescribes the use of either pine plywood or pine solid stock in the construction of paint-grade cabinets and since it does not list masonite (a manufactured wood-fiber product), the builder had no contractual license for using the latter without the Government’s approval.
Although the evidence in the record indicates that mason-ite is the usual and customary material that is used for doors on paint-grade cabinets, and that a masonite cabinet door has equal utility to a cabinet door made of wood, the pertinent contract specification in this case plainly required that the cabinet doors be made .of plywood or solid stock. This was the Government’s prerogative, and it was a provision to which the plaintiff had agreed when it entered into the contract with the Government. A trade practice in the building industry of using masonite doors on paint-grade cabinets cannot properly be permitted to overcome an unambiguous contract provision. Moore v. United States, 196 U.S. 157, 166 (1905); Ackerlind v. United States, 49 Ct. Cl. 635, 659, 661 (1914), reversed on other grounds, 240 U.S. 531 (1916).
Therefore, when the plaintiff submitted for acceptance a sample paint-grade cabinet that had a masonite door, the plaintiff was impliedly requesting that, under paragraph 10-4,[16] the requirement in paragraph 10-3 of the specifications be changed in this regard. It was entirely optional with the defendant as to whether the plaintiff’s proposed change would be accepted or rejected. The defendant’s resident engineer did not commit any actionable wrong when he rejected the plaintiff’s proposed change by noting on the por *437 tion of the shop drawings relative to the cabinet doors that the plaintiff must comply with paragraph 10-3 of the specifications as to the material used (i.e., that the plaintiff must use plywood or solid stock for the cabinet doors), or when he subsequently required the plaintiff to use doors made of wood instead of masonite for the paint-grade cabinets. In view of the reference to the unambiguous requirement of 10-3, plaintiff should have at least inquired as to the acceptability of masonite before undertaking to use that kind of cabinet door.
Birch Doors
Another facet of claim 2 is a contention by the plaintiff that it was wrongfully required by the defendant’s resident engineer to remove the doors that had been installed on 434 natural-finish cabinets, and replace them with different doors.
It has been noted previously that paragraph 10-3 of the contract specifications, dealing with the materials that could be used in the cabinets, stated that “At the contractor’s option, lumber for the various uses shall be one of the species listed for the purpose and of the grade indicated,” and then set out a table. The table included the following data that are pertinent to this phase of the case:
Type Grade Species
Solid Stock * * * * * *
Natural. A. Birch, Red Maple, White
The plaintiff elected to use birch lumber for the natural-finish cabinets. The doors of these cabinets were made of white birch lumber.
On December 16, 1959, the defendant’s resident engineer wrote a letter to the plaintiff, stating in part as follows:
In view of the fact that effort is being made to set an early closing date on Mortgage Area Number 1, it is considered necessary to advise you of certain items which are not acceptable and which will require corrective action prior to final acceptance.
*****
a.. The natural finish cabinets have doors of a different species of wood than the main cabinets. Only red birch has been approved.
*438 On December 31,1959, the resident engineer wrote another letter to the plaintiff, stating as follows:
Your attention is invited to paragraph “n” of letter this office dated 16 December 1959 wherein it was pointed out that the natural finish cabinets are being installed with doors of a different species of wood than the main cabinets and that only red birch has been approved.
It has been observed that another truck load of cabinet material, including white birch cabinet doors for natural finish, arrived at the jobsite this date. You are again advised that white birch doors will not be accepted on natural finish cabinets.
The plaintiff was subsequently required by the resident engineer to remove from 434 natural-finish cabinets the doors made of white birch that had already been installed, and to replace them with doors made of red birch.
As previously indicated, paragraph 10-3 of the specifications used the following arrangement of words in listing the species of solid-stock lumber that could be used in the natural-finish cabinets:
Birch, Eed Maple, White
It seems to be the plaintiff’s contention that each of the words “Eed” and “White” in this arrangement related to “Birch,” so that the plaintiff was merely exercising a choice vested in it by the specification when it used doors made of white birch on the natural-finish cabinets.
This contention is not correct. The placement of the four words indicated that “Eed” related to — and only to— “Birch,” beside which it was placed, and, similarly, that “White” related only to “Maple,” beside which it was placed. Hence, the plaintiff’s option in selecting material for the doors on the natural-finish cabinets was to make a choice between red birch and white maple. The range of permissible choice did not extend to white birch (or red maple).
The evidence indicates that the doors which the defendant’s resident engineer required the plaintiff to remove from 434 natural-finish cabinets were similar to the door that was on the sample natural-finish cabinet which the plaintiff sub *439 mitted to the defendant on or about March 9,1959 for acceptance. It has been noted previously that the defendant’s resident engineer on March 27, 1959 advised the plaintiff that “The samples [of natural-finish and paint-grade cabinets] and drawings are approved, with exceptions as noted on the shop drawings, subject to all contractual requirements”; and that one of the exceptions shown on the drawings in red pencil related to the cabinet doors and stated, “As spec. par. 10-3.” This exception notified the plaintiff that the doors on the sample cabinets (i.e., the masonite door on the paint-grade cabinet and the white birch door on the natural-finish cabinet) were not approved, and that the plaintiff would be required to comply with paragraph 10-3 of the specifications in so far as the materials used in the cabinet doors were concerned.[17]
Accordingly, the resident engineer acted consistently with the specifications when he required the plaintiff to remove the doors made of white birch — an unauthorized material that had been installed as part of 434 natural-finish cabinets.
Douglas Fir
The plaintiff’s claim 2 also involves a contention that the defendant improperly refused to permit the plaintiff to use Douglas fir in the manufacture of the cabinets.
The sample paint-grade cabinet which the plaintiff submitted to the defendant on or about March 9, 1959 for acceptance had a back made of Douglas fir plywood, and it had pine shelving. The accompanying shop drawings showed the cabinet back as made of 14-inch plywood; they did not indicate the type of plywood to be used; and the *440 drawings did not indicate the material that was to be used for the cabinet shelves. As indicated earlier, the letter dated March 27, 1959 from the defendant’s resident engineer approved this sample and the accompanying drawings, “with exceptions as noted on the shop drawings, subject to all contractual requirements.” The exceptions shown on the drawings did not refer to the cabinet back or shelves.
On August 17, 1959, the plaintiff advised the defendant’s resident engineer that the plaintiff’s cabinet subcontractor proposed to use Douglas fir lumber for the shelves, the base standards, and the upper wall standards of the paint-grade cabinets. The next day, the resident engineer disapproved the use of Douglas fir lumber in the cabinets, and stated that the cabinets should be constructed of materials listed in section 10 of the specifications.
Sometime during August 1959, the plaintiff delivered to the job site paint-grade cabinets for the first 35 housing units. The resident engineer rejected these cabinets, and one ground for the rejection was that the backs of the cabinets were constructed of Douglas fir. It is reasonable to infer that these cabinets had been fabricated by the cabinet subcontractor prior to the receipt of information regarding the resident engineer’s disapproval of Douglas fir on August 18, 1959.
After the rejection by the resident engineer of the cabinets which had been fabricated for the first 35 housing units, the plaintiff offered to substitute a better grade of Douglas fir than that used for the back of the sample paint-grade cabinet which had been submitted for acceptance on or about March 9, 1959. This offer was rejected by the resident engineer, who required the plaintiff to furnish pine plywood for the backs of the cabinets.
As previously indicated, paragraph 10-3 of the contract specifications, which governed the subject of the materials that could be used in the manufacture of the cabinets, referred to several designated species of pine, birch, and maple. With respect to the solid-stock portions of paint-grade cabinets, the permissible species of lumber listed in paragraph 10-3 were northern pine, white pine, Norway pine, sugar pine, *441 and ponderosa pine, while the permissible species listed in paragraph 10-3 for the plywood portions of paint-grade cabinets were Idaho pine, northern pine, white pine, Norway pine, sugar pine, and ponderosa pine. Douglas fir was not mentioned in paragraph 10-3 among the permissible species of lumber that could be used in the manufacture of the cabinets.
Therefore, when the plaintiff submitted for acceptance a sample paint-grade cabinet that had a back made of Douglas fir, the plaintiff was impliedly requesting that a change be made in the pertinent specification to this extent. The resident engineer approved the sample cabinet. It is true that the resident engineer added to his approval the phrase, “with exceptions as noted on the shop drawings, subject to all contractual requirements,” but the exceptions noted on the shop drawings did not include any indication that the Douglas-fir back on the sample paint-grade cabinet was objectionable.
Because of the events previously summarized in this portion of the opinion, the plaintiff and its cabinet subcontractor were justified in believing, when the cabinets for the first 35 housing units were fabricated, that the use of Douglas fir for the backs of the cabinets would be satisfactory to the defendant. For that reason, the defendant, rather than the plaintiff or its cabinet subcontractor, ought to bear the financial burden that was occasioned by the resident engineer’s subsequent action in rejecting the cabinets for the 35 units because they contained backs made of Douglas fir, and in requiring that the plaintiff and its cabinet subcontractor furnish pine plywood for the backs of these cabinets.[18]
*442 Pine Shelving
Still another contention made by the plaintiff in claim 2 is to the effect that the plaintiff was wrongfully prevented from using shelves made of No. 2 pine lumber in paint-grade cabinets.
The sample of the paint-grade cabinet which the plaintiff submitted to the defendant on or about March 9, 1959 for acceptance had No. 2 pine shelving. The sample paint-grade cabinet (along with the sample natural-finish cabinet) was approved by the defendant’s resident engineer on March 27, 1959, “with exceptions as noted on the shop drawings, subject to all contractual requirements.” None of the exceptions related to the shelving in the sample paint-grade cabinet.
When the paint-grade cabinets for the first 35 housing units were delivered to the job site in August 1959, these cabinets were equipped with No. 2 pine shelving.
The defendant’s resident engineer rejected the cabinets for the first 35 housing units, and one reason for the rejection was the use of No. 2 pine lumber for the cabinet shelves. In this connection, paragraph 10-3 of the contract specifications, in prescribing the grades that were required for the lumber used in the construction of the cabinets, provided that solid-stock lumber that was to be painted should be of “C. Select” grade. The resident engineer relied upon this provision, and required the plaintiff to furnish grade “C” select pine lumber for the shelving in the paint-grade cabinets.
The No. 2 pine shelving in the paint-grade cabinets for the first 35 housing units did not comply with paragraph 10-3 of the contract specifications as to the grade of the pine lumber used for the shelves. However, it is necessary to note the circumstances that the plaintiff on or about March 9, 1959 submitted for acceptance a sample paint-grade cabinet that was equipped with shelves made of No. 2 pine lumber; that this sample cabinet was approved by the defendant’s resident engineer with certain exceptions; and that none of the exceptions indicated dissatisfaction on the part of the defendant with the No. 2 pine shelving in the sample paint-grade cabinet. Because of these circumstances, the plaintiff *443 and its cabinet subcontractor were led to believe, when the paint-grade cabinets for the first 35 housing units were fabricated, that the use of No. 2 pine shelving in the paint-grade cabinets would be satisfactory to the defendant. See also notes 16 and 18 supra.
Accordingly, it is our opinion that the defendant is liable for the extra expense that was occasioned by the resident engineer’s subsequent action in requiring that the No. 2 pine shelving in the paint-grade cabinets for the first 35 housing units be removed and replaced with grade “C” select pine shelving.
Blocking
Claim 2 incorporates an item covering the cost of installing partitions in a number of kitchen cabinets.
In the early part of January 1960, the defendant’s resident engineer notified the plaintiff that the latter was to install blocking at the ends of the compartments in the upper kitchen cabinets which contained the exhaust fan and recessed light. Pursuant to the resident engineer’s requirement, the plaintiff (through its cabinet subcontractor) proceeded to install the blocking in approximately 150 units.
The plaintiff’s cabinet subcontractor took the position that the plans did not require such blocking, and that its installation would involve an additional cost of $3.50 per house. A letter along this line dated January 15, 1960 from the subcontractor to the plaintiff was forwarded to the resident engineer.
On January 22, 1960, the resident engineer advised the plaintiff that a restudy had been made of the plans, that the blocking was not called for on the plans, and, therefore, that the blocking would not be required in the remainder of the units.
As to this particular item, it is plain that the defendant’s resident engineer imposed on the plaintiff a requirement that went beyond the provisions of the contract. Accordingly, the plaintiff is entitled to be compensated for the costs incurred in complying with such requirement.
*444 Molding
Another item of expense for which the plaintiff seeks compensation in claim 2 relates to 'the use of molding along the sides of the cabinets.
The installation of cabinets can be accomplished by either of two methods: they can be installed by the use of molding, or they can be scribed to the walls. Both methods are generally regarded as acceptable.
The contract specifications in the present case provided in paragraph 10-9 that “Cabinets shall be fitted and scribed to the walls * *
Notwithstanding the specific contract provision quoted in the preceding paragraph, the plaintiff was required by the defendant to use molding in the installation of the cabinets. Accordingly, the plaintiff is entitled to be compensated for the extra cost that was involved in using this method of installing the cabinets pursuant to the defendant’s requirement, instead of scribing the cabinets to the walls in accordance with paragraph 10-9 of the contract specifications.
Tolerances
The plaintiff also complains in connection with claim 2 that the defendant’s resident engineer and inspectors refused to allow the plaintiff and its cabinet subcontractor reasonable tolerances with respect to the squareness of frames and the levelness of doors.
The evidence indicates that, according to the usual and customary trade practice in the building industry, cabinets are considered to be of good workmanship if they appear to be square and level to the naked eye.
In this case, the defendant’s personnel took the position that no tolerances were permissible as to squareness of frames and levelness of doors. The defendant’s resident engineer and inspectors rejected a number of cabinets which appeared to be square and level to the naked eye but which, when subjected to inspection through the use of a 2-foot framing square, were found to be less than perfect as to squareness of frames and levelness of doors.
*445 The personnel of the plaintiff’s cabinet subcontractor endeavored throughout the job to comply with the “zero tolerance” standard imposed by the defendant’s resident engineer and inspectors.
In the absence of contract provisions prescribing a stricter standard, it was reasonable for the plaintiff, in entering into the contract, to believe that the standard as to squareness of frames and levelness of doors customarily applied in the building industry as the usual trade practice would be applied in passing upon the acceptability of cabinets under the contract. Cf. Gholson, Byars and Holmes Construction Co. v. United States, 173 Ct. Cl. 374, 395-396, 351 F. 2d 987, 999-1000 (1965). The defendant (acting through its resident engineer and inspectors) imposed on the plaintiff the unjustifiably strict standard of perfection as to squareness of frames and levelness of doors. Since the “Changes” clause of this Capehart Act contract did not authorize unilateral changes, this amounted to an unwarranted interference with the plaintiff in the performance of the contract. The defendant thereby breached the implied contractual obligation that rested on the Government not to impede the plaintiff’s performance of the work under the contract. See, e.g., Wah Chang Corp. v. United States, 151 Ct. Cl. 41, 49, 282 F. 2d 728, 733-734 (1960).
Consequently, the plaintiff should be compensated for the extra costs incurred in endeavoring to comply with the “zero tolerance” standard imposed by the defendant’s personnel.
Olaim 3 — Bathroom Wall Heaters
In claim 3, the plaintiff asserts that it was forced to incur extra expenses “as a result of the requirements of a bathroom heater more expensive than that called for in the Specifications.”
Paragraph 23-11 of the contract specifications, relating to “Wall Heaters,” provided in part as follows:
The gas-fired, wall heaters shall be of the circulating radiant type with vertical flue, porcelain enameled, on cast-iron heat exchanger. * * *
*446 The plaintiff’s plumbing subcontractor first submitted to the defendant for approval a sample wall heater that contained a baked enamel finish. This sample heater was disapproved by the defendant because of the baked enamel finish. The defendant took the position that only a bathroom wall heater with a porcelain enamel finish would comply with the pertinent specification.
The plumbing subcontractor advised the defendant that the manufacturer from which it had intended to obtain the wall heaters had discontinued making a heater with a porcelain enameled face, but that such heaters could be specially manufactured.
Ultimately, the plumbing subcontractor submitted a sample wall heater with a porcelain enamel finish, and this sample heater was approved by the defendant. The approved type of heater was thereafter used on the job.
The gist of the plaintiff’s complaint in claim 3 seems to be that a bathroom wall heater with a porcelain enamel finish was more difficult and expensive to procure than a wall heater with a baked enamel finish, which the plumbing subcontractor desired, to furnish. However, the pertinent contract specification expressly required the plaintiff to furnish a bathroom wall heater with a porcelain enamel finish, so the defendant did nothing more than require the plaintiff (through its plumbing subcontractor) to comply with this express provision of the contract. The fact that such compliance apparently was more difficult and expensive than the plaintiff and its plumbing subcontractor had originally anticipated does not provide a valid basis for the assertion of a claim against the defendant. Industrial Engineering Co., Inc. v. United States, 92 Ct. Cl. 54, 60 (1940); Rolin v. United States, 142 Ct. Cl. 73, 81, 160 F. Supp. 264, 268 (1958).
Claim 4. — Dishwasher Bough-In
The plaintiff says in claim 4 that it was damaged “as a result of the arbitrary decision of the Eesident Engineer in requiring a dishwasher rough-in with gravity drains and cold-water supply completely beyond the scope of the Specifications.”
*447 The invitation for bids that led up to the contract sought from each bidder not only a basic bid covering the construction of the housing project at Fort Hood, but also bids on a number of “additive alternates.” The furnishing of electric dishwashers was included among the additive alternates. In this connection, paragraph 24-20 of the contract specifications provided in part as follows:
24r-20. Electric Dishwasher. — This item of equipment is not included in the basic bid. The plumbing rough-in will be bid under the Base Bid as noted on the drawings and bidding schedule. Furnishing and installing the equipment and connections shall be bid under the additive alternates.
* * * * ❖
(f) Drain. — The machine shall be either gravity-drain type or pump type. * * *
*****
(i) Standard, Product. — Each dishwasher furnished shall be the latest standard catalog model of the manufacturer as sold commercially for residential use.
The plaintiff’s bid for the furnishing of dishwashers as an additive alternate was not accepted by the defendant, and the plaintiff received a timely notification that it would not be required to furnish dishwashers under the contract. Nevertheless, paragraph 24-20 of the contract specifications required the plaintiff, under its basic bid, to provide in each housing unit a plumbing rough-in for an electric dishwasher.
The plaintiff decided to provide a plumbing rough-in for a pump type dishwasher, in fulfilling its obligation under paragraph 24-20 of the contract specifications. After such a rough-in had been completed in one of the buildings, the plaintiff and the plaintiff’s plumbing subcontractor asked for an inspection by the resident engineer. A number of deficiencies were noted upon such inspection, and the plumbing subcontractor was required to correct the deficiencies and re-do the rough-in several times before the inspectors approved the rough-in installation, which, as previously stated, was for a pump type dishwasher.
After receiving approval of the rough-in installation in the building previously mentioned, the plumbing subcon *448 tractor proceeded to complete rough-in installations for a pump type dishwasher in a total of 13 units, and again requested a complete inspection. Upon receiving approval of the 13 units, the plumbing subcontractor proceeded with the plumbing rough-in in accordance with the procedures and standards approved by the defendant’s personnel with respect to the first 13 units, and completed the rough-in plumbing in a total of 154 units. As of April 30,1959, 86 of the 154 units had been inspected and approved, and the concrete slabs for these 86 units had been poured.
On April 30, 1959, the Government’s inspectors, upon a further inspection, took the' position that the plumbing rough-in must be suitable for a gravity-drain type dishwasher as well, as for a pump type dishwasher. The plaintiff’s principal officer informally appealed to the District Engineer (i.e., the contracting officer) in Galveston, and the District Engineer upheld the then-current position of the defendant’s personnel on the job.
Upon the basis of the District Engineer’s determination, the parties negotiated a modification of the contract with respect to the 86 units for which the concrete slabs had already been poured. The contract modification allowed the Government an equitable credit of $2,580 ($30 per unit) because the 86 units did not have a plumbing rough-in that was suitable for a gravity-drain type dishwasher as well as for a pump type dishwasher. This modification was signed by both parties.
For the 414 units where the concrete slabs had not been poured, the plaintiff provided a plumbing rough-in that was suitable for both the gravity-drain type dishwasher and the pump type dishwasher. This required a re-doing of the rough-in that had already been installed in 68 units.
If the contract had included, as an additive alternate, the furnishing of electric dishwashers, either a gravity-drain type dishwasher or a pump type dishwasher would have been acceptable to the defendant under subparagraph (f) of paragraph 24-20 of the contract specifications; and a common-sense interpretation of paragraph 24-20 would have required the contractor to provide the type of plumbing *449 rough-in that was suitable for the type of dishwasher to be furnished.
Since the evidence indicates that, at the time, all the standard types of dishwashers available on the market for residential use were pump type dishwashers, as opposed to gravity-drain type dishwashers, it must be concluded that the plaintiff’s initial decision to provide a plumbing rough-in suitable for a pump type dishwasher amomited to a reasonable interpretation of the ambiguous contract specification. This court has held many times that where a contract drafted by one party (the Government in this instance) contains an ambiguous provision and the other party (the plaintiff in this case) proceeds upon the basis of a reasonable interpretation of the ambiguous provision, the court will accept such interpretation as fixing the rights and obligations of the parties. E.g., WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, 6, 323 F. 2d 874, 876 (1963), and cases cited.
Furthermore, the plaintiff’s interpretation of the pertinent specification was impliedly approved by the defendant’s resident engineer and inspectors in the early stages of the plumbing work, and such approval was relied on by the plaintiff and the plumbing subcontractor in connection with the rough-in installations in 154 units.
When the defendant’s inspectors, in effect, reversed the position that had previously been taken by the defendant’s personnel on the j ob respecting the acceptability of the rough-in installations for a pump type dishwasher, the plaintiff’s principal officer took the matter up with the contracting officer. The contracting officer’s determination that paragraph 24-20 of the specifications required the plaintiff to provide rough-in installations that were suitable for both a gravity-drain type dishwasher and a pump type dishwasher resolved the question for the plaintiff at the time, and, as a practical matter, it was necessary for the plaintiff to accommodate itself to the contracting officer’s determination.
Were this the smn of the matter we would grant plaintiff recovery for the damages it suffered by virtue of the requirement that it comply with the defendant’s interpretation— rather than its own reasonable interpretation — of an ambigú *450 ous contract provision, especially since the resident engineer (the authorized representative of the contracting officer) initially indicated that the plaintiff’s interpretation was acceptable. Cf. Northbridge Electronics, Inc., v. United States, 175 Ct. Cl. 426, 438-40 (1966).
However, shortly after the contracting officer’s determination, the plaintiff and its subcontractor proposed changes in the contract that would allow plaintiff to leave, with some modification, the existing rough-in at the 154 units where the work had been completed and to finish the remainder of the houses in a like manner. The proposals included equitable credits for the Government. The resident engineer rejected the propositions as to all units but the 86 where the slab had been poured. After some negotiation over the amount of the credit, he accepted an offer with a $30 per unit credit (aggregating $2,580). A construction change order was executed, properly approved, and later incorporated into the contract through a supplemental agreement. Plaintiff now seeks to avoid its agreement to pay the credit[19] and to recover the $2,580 on the ground that it was coerced into signing the change order and the supplemental agreement.
The only plausible bases in the record for the allegation of duress are the plaintiff’s managing partner’s bald assertion that he had no alternative but to sign the modification and the hint that he was afraid that the resident engineer would require dismantling of the rough-ins in the houses with concrete slabs — presumedly a difficult and expensive task.[20] If this be plaintiff’s position, it has omitted proof that its fear had any substance.
Though the case-law provides but an uncertain guideline for detecting coercion, it requires at a minimum that the fear driving the complaining party to agreement have some foundation in the other party’s conduct or in other external circumstances. Fruhauf Sw. Garment Co. v. United States, *451 126 Ct. Cl. 51, 62, 111 F. Supp. 945, 951 (1953). Compare Aircraft Associates & Manufacturing Co. v. United States, 174 Ct. Cl. 886, 892-98, 357 F. 2d 373, 376-80 (1966); Rough Diamond Co. v. United States, 173 Ct. Cl. 15, 351 F. 2d 636 (1965), cert. denied, 383 U.S. 957 (1968); Commonwealth Engineering Co. v. United States, 148 Ct. Cl. 330, 180 F. Supp. 396, cert. denied, 364 U.S. 820 (1960); Universal Sportswear, Inc. v. United States, 145 Ct. Cl. 209, 213-16, 180 F. Supp. 391, 394-95 (1959); Bloedel Donovan Lumber Mills v. United States, 109 Ct. Cl. 720, 750-51, 74 F. Supp. 470, 475-76 (1947), cert. denied, 335 U.S. 814 (1948); Struck Construction Co. v. United States, 96 Ct. Cl. 186, 220-22 (1942); Hazelhurst Oil Mill & Fertilizer Co. v. United States, 70 Ct. Cl. 334, 351-55 (1930).
Plaintiff has not offered to show that the defendant’s personnel threatened to make it tear out the work it had done in the first 86 units. The GoYernment’s correspondence certainly does not evidence such a threat, and plaintiff’s witnesses did not testify that a verbal warning had been issued or in any other way verify the plaintiff’s fear. In the circumstances it is as reasonable to assume that plaintiff agreed to the equitable credit in order to terminate the dispute as rapidly as possible as it is to conclude that the change order and contract modification were exacted under duress.
Since at bottom the plaintiff’s claim is little more than an assertion that it was “coerced” into agreement by the resident engineer’s insistence that his interpretation was correct, upholding plaintiff’s claim would undermine nearly every consensual resolution of a controversy over contract interpretation, a result that would be particularly undesirable in litigation over Capehart Act projects. Cf. Anthony P. Miller, Inc. v. United States, 172 Ct. Cl. 60, 348 F. 2d 475 (1965). We conclude therefore that the plaintiff was not coerced into its agreement to pay the Government money in return for the non-installation of gravity drains in the houses with concrete slabs. The fact that the contract, reasonably interpreted, did not require installation is irrelevant in this context because, as to those units, the plaintiff voluntarily acceded to the defendant’s contrary reading.
*452 Our bolding that plaintiff is not entitled to recover the credit does not dispose of its claim for increased costs flowing from the resident engineer’s requirement as to the remaining 414 units. The change order and modification do not cover those units, and, as indicated above, the defendant rejected a similar proposal that would have covered them. Since the correspondence on both propositions, as well as other documentation, fails to indicate — and, in fact, negates — any inference that plaintiff agreed with the contracting officer’s assessment of the specifications, we do not believe that either the change actually made or the unsuccessful proposals for changes represent a contemporaneous interpretation of the contract. Plaintiff is entitled to recover damages for the excess costs it incurred in following the resident engineer’s erroneous instructions.
Olaim S — Pipe Insulation
In claim 5, the plaintiff contends that the defendant’s personnel “misinterpreted the specifications for pipe insulation” and required the plaintiff to incur extra costs for work that was beyond the scope of the contract.
Paragraph 24-18 of the contract specifications provided in part as follows:
24-18. Insulation. — All hot- and cold-water lines in outside walls or in attic space shall be insulated with %-inch thick non-conducting wool felt or mineral wool conforming to Federal Specification HH-I-567 or HH-I_564. * * *
Sometime in June 1959, a question arose about placing insulation on the water pipes in the deck and beam houses. Nearly all the deck and beam houses had furred-down ceilings, and water lines were run into those furred spaces. In this connection, it should also be mentioned that the plaintiff was required under a change order to provide “access to furred attic spaces through panels * *
The furred spaces above the ceilings in the deck and beam houses were considered by the defendant’s personnel to be attic spaces, and the plaintiff’s plumbing subcontractor was directed to furnish insulation for water pipes in the furred areas.
*453 On June 15, 1959, the plaintiff’s plumbing subcontractor requested additional compensation for insulating the water lines in the furred spaces above the ceilings in the deck and beam houses. The request was sent to the defendant’s resident engineer.
In reply to the plumbing subcontractor’s request mentioned in the preceding paragraph, the defendant’s resident engineer wrote a letter on June 18, 1959, stating in part as follows:
Paragraph 24 — 18 of the contract specifications states that all hot and cold water lines in outside walls or attic space shall be insulated.
The definition of an attic space is that space just below the roof. The fact that this space is ventilated or not ventilated has nothing to do with whether it is an attic space or not.
The space in question is an attic space and has been all along. Therefore, the hot and cold water piping installed in this space requires insulating * * *.
In view of the above, your request for an increase in contract price is denied.
On July 8, 1959, the plaintiff forwarded to the resident engineer a written communication from the plumbing subcontractor, stating (among other things) that the subcontractor would “only install pipe insulation in furred spaces on deck and beam units under protest * *
On July 10, 1959, the resident engineer wrote a letter to the plaintiff, again stating that it was his view that the furred spaces above the ceilings in the deck and beam houses were attic spaces and, accordingly, that pipe installed in such a space “must receive insulation as specified for attic piping.” The concluding paragraph of the resident engineer’s letter stated as follows:
In view of the above, your request for an increase in contract price is denied. Any further discussion concerning this matter should be handled in accordance with Article 8, “Disputes”, of the housing contract.
No protest against the resident engineer’s letter of July 10, 1959 was made by the plaintiff to the contracting officer, except for the filing of claim 5 at the final closing of each mortgage area in 1960.
*454 The piping in the furred spaces above the ceilings in the deck and beam houses was insulated by the plumbing subcontractor pursuant to the resident engineer’s insistence.
The evidence in the record indicates that, according to trade custom in the building industry, the furred space above a furred-down ceiling is not considered to be an attic space. Consequently, since the contract did not expressly define the term “attic space” in connection with the requirement that “All hot- and cold-water lines * * * in attic space shall be insulated,” and there being uncertainty as to whether in common parlance the term “attic space” includes the furred space above the ceiling in a deck and beam house, it was proper for the plaintiff and its plumbing subcontractor to rely on the trade meaning of the term “attic space” in the building industry when they interpreted the quoted contract provision. W. H. Edwards Engineering Corp. v. United States, 161 Ct. Cl. 822, 328 (1963); Gholson, Byars and Holmes Construction Co. v. United States, 173 Ct. Cl. 374, 395-396, 351 F. 2d 987, 999 (1965). On that basis, the position taken by the plaintiff and the plumbing subcontractor to the effect that the furred spaces above the ceilings in the deck and beam houses were not attic spaces, and, accordingly, that piping in such spaces was not required to be insulated under paragraph 24-18 of the contract specifications, was a reasonable one.
Accordingly, since in Paid I supra we disposed of defendant’s argument that plaintiff waived its claim by failing to appeal or protest the resident engineer’s determination to the contracting officer, plaintiff is entitled to recover.
Olaim 6 — Compression Stops
In claim 6, the plaintiff contends that the defendant required the plaintiff to incur extra costs for an “extra plumbing installation in conformity to amended Federal Specifications which became effective two months after the effective date of the Contract Specifications.”
Paragraph 24 — 2 of the contract specifications incorporated by reference Federal Specification WW-P-541b for plumbing fixtures. Paragraph 17.1.3.1 of Federal Specification *455 WW-P-541b, as originally promulgated for plumbing fixtures, allowed three types of supply connections to be used ? type PV (pipe, threaded), type TV (tube, soldered joint), and type EV (pipe with tube riser).
However, after the plaintiff had submitted its bid and the letter of acceptability had been issued to the plaintiff by the defendant, Federal Specification WW-P-541b was amended so as to require the use of type PV supply connections only.
The plaintiff’s plumbing subcontractor, relying on the original provisions of Section 17.1.3.1 of Federal Specification WW-P-541b, intended to use type EV supply connections on the job. However, the defendant required that only type PV connections be used.
When paragraph 24-2 of the contract specifications incorporated by reference the provisions of Federal Specification WW-P-541b, it did so with reference to the provisions of the Federal Specification as of the time when the letter of acceptability was issued to the plaintiff by the defendant. The issuance of the letter of acceptability resulted in a contractual relationship between the parties. Anthony P. Miller, Inc. v. United States, 161 Ct. Cl. 455, 468 (1963), cert. denied, 375 U.S. 879 (1963); Black, Raber-Kief & Associates v. United States, 174 Ct. Cl. 302, 304-05, 357 F. 2d 355, 356 (1966). The plaintiff contracted with the defendant in the light of the then-existing provisions of Federal Specification WW-P-541b. It would obviously be unfair to permit the defendant retroactively and unilaterally to change the provisions of the contract at a later date by amending Federal Specification WW-P-541b.
The plaintiff is entitled to recover on claim 6.
Claim 7 — Earth Fill Under Concrete Slabs
This claim presents for determination the question whether, when earth fill to a greater depth than 6 inches was required beneath concrete slabs for housing units, it was necessary that all such fill have a plasticity index of 9 or lower, or whether it was only necessary for the top 6 inches of the earth fill to have a plasticity index of 9 or lower.
*456 The plasticity index (frequently referred to in the building industry as “PI”) of soils measures the difference between the behavior of soils in the presence of moisture or liquids and in a solid state. The plasticity index is important in connection with the load-bearing quality of soil, the water-retention quality of soil, and the amount of soil movement to be expected under load conditions or wet conditions. The higher the plasticity index, the more unfavorable are the characteristics of the soil with respect to its weight-hearing quality; and the lower the plasticity index, the better the soil is for weight-bearing.
Paragraph 1-4 of the contract specifications related to the subject of “Fill” and provided in part as follows:
Where concrete slabs are placed on grade; all humus, grass, weeds, loam, and organic or other undesirable material as determined by the contracting officer, shall be removed before fill or drainage fill is placed. Fill (in addition to the.drainage fill required in paragraph 1-6) necessary to raise the sufograde for concrete slabs shown on the foundation plan to the elevations indicated, shall comply with the requirements and shall be tested in the same manner as required for fill in Section 35 * * *
In addition to the drainage fill required in paragraph 1-6, at least six inches of the above specified fill material shall be placed under all slabs shown on the foundation plan, even though this requirement may necessitate cut of existing undisturbed earth. (Minimum fill under any slab shall be 10 inches: 4 inches drainage fill over 6 inches fill).
Paragraph 1-6 of the contract specifications covered the subject of “Drainage Fill” and provided in part as follows:
The top 4 inches of fill under slabs for the Eesidence Proper and the Exterior Storage shall be porous, free-draining material such as broken stone, gravel, or cinders, with not more than 10 percent passing the No. 10 sieve and having a maximum permissible size of 2 inches. * * *
Section 35 of the contract specifications, referred to in paragraph 1-4, contained a paragraph numbered 35-9 dealing with “Fill Material,” which provided in part as follows:
* * * The plasticity index of fill to be used under pavements or slabs shall not exceed 9.
*457 The bulk of the soil material at Fort Hood is called caliche, which has a relatively high plasticity index, i.e., higher than PI-9. However, soil material with a plasticity index of 9 or lower is available in certain areas at Fort Hood, near hills and along creek beds. The areas where PI-9 (or better) soil material can be found are generally situated at considerable distances from the site of the housing project that is involved in the present case.
Shortly after the plaintiff’s excavation subcontractor commenced the excavation work, the plaintiff’s superintendent and personnel of the excavation subcontractor discussed the pertinent specifications with personnel of the Government. The Government’s representatives interpreted the specifications to mean that all fill under the house slabs was required to have a plasticity index of 9 (or less).
On December 17, 1958, the plaintiff’s principal officer conferred in Galveston with the District Engineer (who was also the contracting officer). The plaintiff’s principal officer took the position that the pertinent specifications should be interpreted to require that only the top 6 inches of earth fill beneath a concrete slab must necessarily have a plasticity index of 9 (or lower); and that if any additional earth fill was required below the 6-inch layer of PI-9 material, the plaintiff could properly use earth fill with a plasticity index higher than 9. During this conference, the parties discussed a possible change in the contract so as expressly to provide that whenever more than 6 inches of earth fill beneath a concrete slab was required, the plaintiff must use PI-9 (or better) material for the top 6 inches, and then might use soil material with a plasticity index higher than 9 for the remainder of the earth fill.
Following the conference, the contracting officer on January 7, 1959 wrote a letter to the plaintiff, and in it made the following determination (among others):
a. Of primary concern to you was a proposal to permit fill material under buildings of other than the specified selected material now called for by the contract. I have agreed to such a change and have so advised my Eesident Engineer, provided an equitable credit is offered to the Government. It will be permissible to place suitable *458 material from the excavated areas as fill material and to place tiie PI 9 selected material specified on only the top six inches of the fill.
However, the plaintiff did not offer an equitable credit to the Government. The defendant thereafter required that all earth fill beneath concrete slabs, irrespective of the depth of the fill, must have a plasticity index of 9 or less.
The usual and customary practice in the construction industry is to balance the cut and fill areas to the extent that this is practicable, and to use the excavated material as fill so as to avoid the hauling of dirt from and to the site. Consequently, the inability of the plaintiff on this job to use as fill beneath the concrete slabs dirt excavated from nearby cut areas, and the requirement that the plaintiff haul from distant borrow areas (see the discussion under claim 8) dirt having a plasticity index of 9 or lower to meet all the needs of the job for earth fill beneath concrete slabs, had an adverse effect on the plaintiff’s operations in the performance of the contract.[21]
The provision previously quoted from paragraph 35-9 of the contract specifications is crucial with respect to claim 1. That provision stated in plain, unequivocal language that “The plasticity index of fill to be used under pavements or slabs shall not exceed 9.” In the absence of some word or phrase limiting the word “fill” in this provision, it clearly meant that all fill used under pavements or slabs must have a plasticity index of 9 or less.
The plaintiff seems to rely on the second subparagraph of paragraph 1-4 of the contract specifications, as previously quoted. However, the language of that subparagraph actually is not helpful to the plaintiff, because it merely says that at least 6 inches of earth fill shall be placed under all concrete slabs, and that the mmirrivm fill under any slab shall be 10 inches (4 inches of drainage fill over 6 inches of earth fill). This subparagraph is obviously stating a minimum require *459 ment with respect to the amount of fill that must be placed beneath concrete slabs. It does not modify in any way the requirement found in paragraph 35-9 of the contract specifications. Moreover, the language upon which the plaintiff relies must be read in conjunction with the last sentence of the first subparagraph of 1-4, which says that any fill other than drainage fill must meet the quality requirements of section 35.
It is our opinion, therefore, that the defendant’s personnel did not make any error in interpreting the pertinent specifications as requiring that all earth fill used beneath concrete slabs must have a plasticity index of 9 or lower.
Claim 7 also involves a contention by the plaintiff that it was required to place PI-9 earth fill outside the perimeter of the housing slabs. The evidence with respect to this aspect of the claim indicates that the plaintiff was required to lay out stakes and markers for the preparation of the pads for the housing units, including the placement of fill. The plaintiff employed a private engineering firm to do the staking work. The firm laid out the stakes, which were then used to mark out the sites of the housing pads and 'as guides for the placement of the PI-9 fill. The stakes were set by the engineering firm on a 5-foot offset, i.e., the stakes were set 5 feet outside the actual lines of the prospective buildings. Thereafter, the PI-9 fill was placed and rolled, using the stakes as reference points. As a consequence, the pads of PI-9 material were extended out approximately 5 feet beyond the building lines.
As summarized in the preceding paragraph, the evidence in the record does not establish that the extension of the pads of PI-9 material outside the building lines was attributable to any requirement that was imposed by the defendant or its personnel on the plaintiff.
Therefore, the plaintiff is not entitled to recover on either aspect of claim 7.
Claim 8 — Handing of PI-9 Material
Claim 8 seems to be based upon the theory that personnel of the defendant misled the plaintiff with respect to- the lb- *460 cation of borrow areas from which the plaintiff could obtain the PI-9 material that was needed for nse as fill beneath the concrete slabs.
The subject of “Borrow” was covered by paragraph 1-7 of the contract specifications, which provided in part as follows:
Borrow material for filling beneath the concrete slabs shall be obtained from borrow areas on the military reservation selected by the contractor subject to the approval of the contracting officer. No borrow shall be obtained within the limits of the project site without prior written approval of the contracting officer. Borrow material shall conform to the requirements for fill as specified in paragraph 1-4 above. * * *
On October 3, 1958 (which was after the issuance by the Government of the letter of acceptability accepting the plaintiff’s bid), the plaintiff wrote to the contracting officer regarding the designation of borrow areas. The plaintiff’s letter stated in part as follows:
We request that you designate borrow areas within the limits of the military reservation of approved material for fill beneath the concrete slabs. We feel that this is only reasonable and is standard procedure. These borrow areas should be within a reasonable distance from the project site on the reservation. * * *
Under the date of October 23,1958, the contracting officer responded to the plaintiff’s letter of October 3, 1958. The contracting officer enclosed a marked-up drawing that showed two locations where borrow could be obtained. These borrow area sites were both situated on the Fort Hood military reservation. Borrow Area No. 1 was approximately 6 or 7 miles from the job site. Borrow Area No. 2 was along the same road and was approximately 8 or 10 miles from the job site.
During the initial period of construction, the plaintiff obtained PI-9 material from the area marked as Borrow Area No. 1 on the map mentioned in the preceding paragraph. However, after the plaintiff had constructed approximately 13 house pads, .the material in this borrow area turned “spotty.”
*461 Shortly thereafter, personnel of the defendant and personnel representing the plaintiff and its subcontractor made a survey of the military reservation in an attempt to locate an adequate supply of PI-9 material for use as earth fill.
The first area visited by the survey party was Borrow Area No. 2, as designated on .the map previously mentioned. The subcontractor’s representative did not wish to obtain borrow from this area because the stripping of unsuitable surface soil to an average depth of about 2 feet would be necessary in order to reach the PI-9 material.
The survey party then went to a third site on the military reservation, where there seemed to be an adequate supply of PI-9 material. This third borrow area was situated 16 miles from the job site. However, the PI-9 material at this third area appeared to be easier and cheaper to excavate than that at Borrow Area No. 2, because the material at the third site was uniform in quality and no top stripping was necessary.
The material from the third borrow area, as described in the preceding paragraph, was used as fill under the concrete slabs by the plaintiff for the remainder of the construction.
This evidence shows that there was no actionable misrepresentation by personnel of the defendant with respect to the location of borrow areas for PI-9 material.
In the first place, it was clearly the responsibility of the plaintiff, under paragraph 1-7 of the contract specifications, to locate and select the borrow areas. The defendant’s personnel had no obligation to the plaintiff in this respect, except to act reasonably in the matter of approving or disapproving borrow sites located and selected by the plaintiff. When the contracting officer responded to the plaintiff’s request for assistance in October 1958 by furnishing a map that showed a couple of prospective borrow areas, the contracting officer was rendering a gratuitous courtesy to the plaintiff, rather than discharging a contractual obligation that rested upon the defendant. The defendant is not chargeable with a breach of contract in connection with an act which is not required by the contract, which is done for the benefit of the contractor, and which is taken advantage of by the contractor. B-W Construction Co. v. United States, 97 Ct. Cl. *462 92, 122 (1942); Vogt Brothers Mfg. Co. v. United States, supra, 160 Ct. Cl. at page 697.
It should be noted, furthermore, that the alleged misrepresentation involved in this claim occurred after the plaintiff had submitted its bid and the Government had issued a letter of acceptability to the plaintiff in June 1958. The issuance of the letter of acceptability created a contractual relationship between the parties. Anthony P. Miller, Inc. v. United States, supra, 161 Ct. Cl. at page 468. Consequently, the contractual rights and obligations of the parties were fixed prior to the time when the contracting officer, in response to the plaintiff’s request for assistance in locating areas where suitable fill material could be obtained, furnished the information which, according to the plaintiff, amounted to a misrepresentation. Even if the plaintiff were correct in so characterizing the information furnished by the contracting officer, it could not be held that the plaintiff was misled to any extent by such misrepresentation in preparing its bid or in entering into the contract.
It follows that the plaintiff is not entitled to recover on claim 8.
Olaim 9 — Paving of Streets
The plaintiff asserts in claim 9 that it sustained damages “as a direct result of the arbitrary, capricious and wrongful coercive tactics utilized by the Resident Engineer in refusing Plaintiff the right to pave the streets timely in the regular sequence of construction.”
Under the provisions of the contract, the plaintiff was required to construct the streets on which the housing units built by the plaintiff were located. This involved the preparation of the subgrade, the laying of a rock base, the application of a bituminous prime coat on the base course (i.e., priming the streets), and paving the streets with a hot-mix pavement on the previously primed coat.
Paving the streets immediately after the completion of the priming steps is the customary practice in the construction industry, and is recognized as the sound manner in which to construct streets. In the building of a housing *463 project, the paved streets are customarily used by the vehicles of the contractor and subcontractors in hauling materials within the limits of the project. Such use of the streets invariably results in some damage to them, so that some patching of the streets before a project is turned over to the owner is inevitable.
In the present case, there was nothing in the contract or in the contract specifications that limited the right of the plaintiff to pave the streets immediately after they were primed. However, paragraph 38-18 of the contract specifications was entitled “Protection of Pavement” and provided as follows:
At the completion of the entire project, the contractor shall repair any damages to pavements or pavement failures, and deliver all pavements to the Government free of damage or pavement failures, and with clean surface, free of accumulations of eroded topsoil or debris accumulating during construction.
Sometime in the early part of April 1959, the defendant’s assistant resident engineer on the Fort Hood job had a discussion with the plaintiff’s superintendent relative to the paving of the streets. The assistant resident engineer advised the superintendent that if the contractor paved the streets at an early stage of the job and allowed the local soil to get on the streets as mud and remain during the construction of the project, the mud would attack the asphalt surface, and, when the mud dried, it would peel off the top surface of the asphalt. The assistant resident engineer explained that a prior contractor operating in an area adjoining Mortage Area 1 had expended a considerable amount of money re-doing streets because of damage done by mud drying on the asphalt surface.
On April 8,1959, the plaintiff’s principal officer conferred with the defendant’s resident engineer relative to the matter of paving the streets. They discussed whether it would be more economical to place the asphalt paving promptly and later repair it, or leave off the top-surface asphalt for placement later on, near the end of the job. The resident engineer explained to the plaintiff’s representative that difficulty had *464 been encountered on other jobs at Fort Hood in connection with streets paved during the early stages of construction and later damaged as a result of mud drying on the asphalt pavement. The resident engineer advised the plaintiff’s representative that he felt it would be more economical for the plaintiff to delay the laying of the asphalt until just prior to the closing of the several mortgage areas.
During the conversations mentioned in the two immediately preceding paragraphs, there was discussion of the probable repairs to the streets that would have to be made by the plaintiff (or its paving subcontractor) if the paving were completed early in the job and the streets were then used during the construction program by trucks and other vehicles, causing mud to accumulate on the streets and damage to be done to the surface of the asphalt as the mud dried. The representatives of the plaintiff were advised by the defendant’s representatives that the Government would not accept skin-patching on the streets as a means of correcting such damage, but that it would be necessary for the plaintiff (or its paving subcontractor) to cut into the asphalt with a power saw in order to remove damaged areas and effect proper repairs.
Although the defendant’s representatives, in the conversations previously mentioned, indicated a belief that it would be more economical for the plaintiff to delay the paving of the streets until near the end of the construction program, in order to avoid the necessity of making repairs to the pavement, neither of the Government officials instructed the plaintiff to delay the placing of the hot-mix asphalt. On the contrary, the defendant’s representatives made it plain that the plaintiff had the authority to proceed at once with the paving of the streets if the plaintiff wished to do so, subject to the necessity of properly repairing any damage that might be done to the pavement during the construction program. In this connection, it was made plain by the defendant’s representatives that skin-patching would not be an acceptable means of repairing such damage.
After these conversations, the plaintiff’s principal officer concluded that it would be in the plaintiff’s interest to pro *465 ceed with, the paving of the streets without delay, and he instructed the paving subcontractor to go ahead with the laying of the hot-mix asphalt. However, the paving subcontractor declined to do so, in view of the warning by representatives of the defendant that the Government would not accept streets that contained skin-patching to correct surface peeling caused by drying mud.
It will be seen from the foregoing summary of the evidence concerning claim 9 that the defendant did not expressly refuse to permit the plaintiff to pave the streets at an early stage of the construction program. Eather, it was the paving subcontractor who refused to go ahead with the early paving of the streets, in accordance with the plaintiff’s directive. However, the subcontractor’s refusal was due solely to the position taken by the defendant’s representatives as to what the Government would require in the way of repairs if the streets were paved and the paved surfaces were subsequently damaged by the peeling effect of drying caliche mud.
The position taken by the defendant’s representatives in this respect was not warranted by any provisions of the contract specifications. What was involved here was the probability that the surfaces of streets, if paved early in the construction program, would be slightly damaged as caliche mud brought onto the streets by trucks and other vehicles dried out and peeled off bits of the asphalt topping. The contract specifications anticipated the use by the plaintiff and its subcontractors of paved streets during the construction program, and that some damage to the streets would result from such use.
Paragraph 38-18, supra, did no more than require that repairs commensurate with the nature of the damage done to the streets during the construction program shoxdd be effected by the plaintiff. Therefore, in warning the plaintiff and the paving subcontractor that if the streets were paved at an early stage of the construction program, it would be necessary to remove sections of the pavement to effect repairs in the likely event of slight damage to the surface of the pavement due to the peeling effect of drying caliche mud, the defendant’s representatives were establishing such a harsh *466 penalty for slight damage that they were, in effect, coercing the plaintiff and the paving subcontractor to delay the paving of the streets until after the main construction program on the project had been completed. This was, in our opinion, an unwarranted interference by the defendant with the plaintiff’s performance of the contract and a breach of the implied contractual obligation that rested on the defendant not to impede or hinder the plaintiff’s progress in performing the work under the contract.
Because of the unwillingness of the plaintiff’s paving subcontractor to proceed promptly with the paving of the streets, at the risk of subsequently having to remove and replace sections of the pavement damaged by the peeling effect of drying caliche mud, the laying of the hot-mix asphalt was delayed until near the end of the construction program. The unpaved streets were used by trucks and other vehicles during the course of the construction program.
During the several months of delay in the paving of the streets that ensued, mud penetrated into the pores or voids of the base course at various places. In spots, this penetration was to a depth of 14 inch. Consequently, when the construction of the housing units had been completed and the plaintiff at last began to prepare the unpaved streets for the laying of the hot-mix asphalt paving, the mud film that had penetrated into the pores of the base course created a problem. Due to the penetration, the mud film could not be removed by sweeping. Furthermore, the defendant’s inspector would not permit the hot-mix asphalt to be placed so long as the mud film remained, since the mud film, if covered with asphalt, would subsequently absorb moisture through capillary action and create soft spots in the base, which would result in failure of the pavement.
In order to meet this situation, the plaintiff scarified and removed approximately iy2 inches of the base material, replaced it, reprimed the base, and then completed the paving of the streets with hot-mix asphalt. This difficulty was a consequence of the delay that had occurred in the laying of the hot-mix asphalt after the original preparation and priming of the base course, and it is chargeable to the defendant.
*467 Claim 10 — Boofmg
Claim 10, as set out in tbe petition, is based upon tbe contention that tbe plaintiff sustained damages “as a result of tbe unwarranted rejection of roofing materials and the inequitable credit exacted by tbe Resident Engineer in connection with tbe roofing.” However, tbe plaintiff did not request any findings of fact with respect to tbe allegation relative to the rejection of roofing materials. Consequently, tbe discussion will be limited to tbe matter of tbe credit.
Under the contract, tbe plaintiff was required to install roofing, which included tbe laying of several courses of felt mopped into hot bitumen. Tbe details for tbe method of installation were covered by paragraph 6-6 (c) of tbe contract specifications and plate No. 407 of the contract drawings.
Tbe plaintiff’s roofing subcontractor concluded that there was an inconsistency between paragraph 6-6 (c) of the contract specifications and plate No. 407 of tbe contract drawings with respect to the installation of tbe roofing, and that tbe contract did not prescribe a workable method of installing the roofing. Tbe roofing subcontractor prepared an analysis of tbe problem, and proposed an alternative method for tbe installation of tbe roofing. The analysis and proposal were forwarded to tbe defendant by tbe plaintiff. Tbe roofing subcontractor’s suggestion of a different method for tbe installation of the roofing was approved by tbe defendant.
Commencing on April 26, 1959 and continuing thereafter, the roofing subcontractor proceeded to install tbe roofing in accordance with the modification suggested by tbe subcontractor and approved by tbe defendant.
When tbe installation of tbe roofing was almost complete, a conference occurred between the contracting officer and tbe plaintiff’s principal officer. During tbe course of the conference, the contracting officer referred to tbe modified method for tbe installation of tbe roofing that bad been suggested by tbe roofing subcontractor and approved by tbe defendant; and the contracting officer demanded that the contract price be reduced by $2,560 because of this change. *468 The plaintiff’s principal officer protested to the contracting officer, but ultimately acquiesced in the contracting officer’s demand. Accordingly, on February 17,1960, the plaintiff and the defendant jointly signed a change order which involved a reduction of $2,560 in the contract price because of the change that had been made in the method of installing the roofing. This change was later incorporated into the contract by a supplemental agreement.
As in claim 4, plaintiff argues that it was coerced into an agreement to pay the defendant the equitable credit. Its case on this claim differs, however, in two significant respects. First, the defendant, after acknowledging the inadequacies of the specifications and approving a change, and without in any way indicating that a price change would be expected, waited until roofs had been installed on almost all units before demanding an equitable credit. Second, plaintiff, at the time it signed the change order granting the credit, was faced with an explicit threat that, despite its protests, it would have to tear out the completed roofs if it did not acquiesce in the defendant’s wishes.
If the defendant believed that the contract price should be adjusted downward because of the change in the method of installing the roofing, the defendant, as a matter of fair dealing, should have so informed the plaintiff at the time when the change proposed by the roofing subcontractor was mider consideration by the defendant. The plaintiff could then have determined whether it wished to use the proposed method of installing the roofing in the light of the defendant’s demand. When the defendant approved the alternative method for the installation of the roofing proposed by the roofing subcontractor, without indicating any intention to seek an adjustment downward in the contract price because of the change, the plaintiff and the roofing subcontractor were clearly justified in inferring that the contract price would not be affected by the change. The roofing subcontractor thereafter went ahead and virtually completed the installation of the roofing on the basis of a reasonable understanding that the contract price remained the same.
When the contracting officer, as the roofing job was nearing completion, demanded a downward adjustment of *469 $2,560 in the contract price on account of the change in the method of installing the roofing, the plaintiff obviously was not in a position to bargain over the matter. This type of “ambush” was inherently unfair to the plaintiff, and the plaintiff’s acquiescence was inevitable in light of the defendant’s conduct, which fell far below the standard of good faith required by Universal Sportswear, Inc. v. United States, supra, 145 Ct. Cl. at page 214, 180 F. Supp. at page 394; Bloedel Donovan Lumber Mills v. United States, 109 Ct. Cl. at page 750, 74 F. Supp. at page 475; and Struck Construction Co. v. United States, supra, 96 Ct. Cl. at page 222.
Accordingly, the plaintiff is entitled to recover the amount of the credit, $2,560, improperly exacted in connection with the roofing.
Claim, 11 — Service Stops and Borns
Claim 11 is based upon the plaintiff’s contention that “The resident engineer required the installation of service stops and boxes completely beyond the scope of the specifications,” and that the plaintiff thereby sustained damages.
A service stop on a water line serving a housing unit is used to cut off the water supply for the housing unit. This permits the individual housing unit to be disconnected from the main water-service line in the street, without the necessity of discontinuing water service in other nearby units. A service stop is placed in a service box. A closing of the water line serving the housing unit is effected by opening the box and inserting a handle to operate the stop.
A service stop is to be distinguished from a corporation stop. The latter is a stop which is installed on the water main and which is completely covered by the backfill of earth over the main.
In February 1959, a controversy arose between the plaintiff’s plumbing subcontractor and the defendant’s resident engineer over the question as to whether the contract required the installation of service stops and boxes at the housing units on the Fort Hood project. The matter was referred to the contracting officer, who, in turn, referred it to the Federal *470 Housing Administration. That agency made a determination to the effect that service stops and boxes were required under the contract. Subsequently, the contracting officer, on the basis of the FHA determination, issued findings of fact and a decision to the effect that the installation of service stops and boxes was required under the contract, and the plaintiff was not entitled to any additional compensation by virtue of installing such facilities. No appeal was taken by the plaintiff to the head of the Department from the contracting officer’s findings and decision.
Thereafter, service stops and boxes were installed at the housing units on the Fort Hood project.
The plaintiff asserts that “Service stops are normally utilized for privately-owned subdivisions where individual water meters are installed,” and that “There was no necessity nor reasonable purpose served in providing this project with service stops.” Unfortunately for the plaintiff, however, the contract specifications contained several provisions clearly indicating a requirement for the installation of service stops and boxes. For example, subparagraph (a) of paragraph 31-8 provided that “Service lines shall be connected to the main by a corporation-type stop and a lead or copper goose-neck, with a service stop below the [frost] line”; subdivision (4) of subparagraph (b) of paragraph 31-8 provided in part that “Service stops shall be water-works ground-key type, oval flow way, tee handle, without drain”; and subdivision (5) of subparagraph (b) contained directions with respect to the construction of service boxes.
The plaintiff, having agreed in the contract to install service stops and boxes for the housing units on the Ford Hood project, was obliged to do so, irrespective of whether the plaintiff was or was not correct in its view that such facilities did not serve any reasonable purpose at a housing project on a military reservation.
Olaim 13 — Insulation for Refrigerant Lines
Claim 13 is based upon the plaintiff’s contention that the insulation which the contract specifications prescribed for use on the refrigerant lines actually could not be used for such *471 purpose, and that the resident engineer unduly delayed the approval of a proposal from the plaintiff for the use of a different kind of insulation.
Paragraph 25-17(b) of the contract specifications provided as follows:
(b) Pif es. — The refrigerant suction lines between the cooling coils and the compressors shall be insulated with impregnated mineral-wool pipe covering of light-duty thickness, the equivalent thickness of cellular glass, or other equally suitable material approved by the contracting officer.
Paragraph 27-4(c) of the specifications provided that mineral wool insulation should conform to Federal Specification HH-I-562, Type II. Under paragraph 3.7.2 of the cited Federal Specification, mineral wool insulation for the refrigerant lines used on the Fort Flood job was required to have a minimum thickness of iy2 inches.
Because of the confined nature of the space that was available for the refrigerant lines in the Fort Hood housing units at the vertical drop from the attic down to the connection of the evaporator coil, it was not possible to install 1%-inch insulation on the refrigerant lines there in a satisfactory and workmanlike manner.
On December 2,1958, the plaintiff submitted to the defendant’s resident engineer for approval a 14-inch foam-rubber material called “Eubatex,” which the plaintiff proposed to use as insulation for the refrigerant lines. Eubatex 14-inch in thickness is commonly used in the trade as insulation for refrigerant lines, and is suitable for such purpose. By a letter dated January 8, 1959, the defendant’s resident engineer disapproved the 1,4-inch Eubatex, stating that it was not of sufficient thickness to give insulating properties equivalent to the mineral wool prescribed in the specifications.
The plaintiff on March 6, 1959 resubmitted the same material in the same thickness, together with descriptive data showing its insulating properties and qualities. By a letter dated May 22, 1959, the resident engineer disapproved the 14-inch Eubatex again, stating that it was not of sufficient *472 thickness to give the equivalent in insulating properties to the mineral wool prescribed in the specifications. The resident engineer stated that Eubatex would have to be at least Í.29 inches in thickness to be the equivalent of 1-%-inch mineral wool insulation.
On June 15, 1959, the plaintiff submitted for approval Eubatex insulation having a thickness of % inch. The %-inch Eubatex was disapproved by the resident engineer on June 17,1959.
The plaintiff next submitted Eubatex that was % inch thick. This submission was rej ected by the resident engineer on the ground that %-inch Eubatex was not the equivalent of mineral wool insulation 1% inches thick.
On July 31, 1959, the plaintiff again submitted for approval Eubatex having a thickness of % inch. On the same day, the plaintiff’s submission was approved by the resident engineer.
The %-inch Eubatex did not provide insulating properties equivalent to the 1%-inch mineral wool insulation prescribed by the contract specifications. However, the defendant approved the Eubatex in order to permit the plaintiff to move the job along.
During the period of more than 7 months that elapsed between the original submission of %-inch Eubatex insulation and the subsequent approval of '%-inch Eubatex, work was progressing on the buildings that were being constructed under the contract, and sheetrock was installed on the ceilings of 88 housing units. Because of the delay in the approval of the Eubatex insulation, it was necessary for the workmen who installed the insulation in the 88 units to crawl through small scuttle holes and work on their hands and knees in order to install the refrigerant insulation in those units.
The unusual difficulty involved in the delayed installation of the insulation on the refrigerant lines in the 88 units previously mentioned was ultimately attributable to the defendant’s defective specification, which prescribed insulation of a thickness that actually could not be used on the job because of inadequate space. The Government had impliedly *473 warranted that if its plans and specifications were followed by the plaintiff, a satisfactory performance would result. J. D. Hedin Construction Co. v. United States, 171 Ct. Cl. 70, 76-77, 347 F. 2d 235, 241 (1965); North American Philips Co. v. United States, 175 Ct. Cl. 71, 80, 358 F. 2d 980, 985 (1966); Ithaca Gun Co. v. United States, 176 Ct. Cl. 437, 442-43 (1966). There was a breach of this implied contractual obligation with respect to the insulation prescribed in the specifications for the refrigerant lines and the space available for the insulation.
Accordingly, it is our opinion that the plaintiff should be reimbursed for the extra expense that it incurred because of the defect in the specifications and the consequent delay in installing the insulation in the 88 units previously mentioned.
Claim. Ilf. — Strapping of Refrigerant Lines
It is contended by the plaintiff in claim 14 that “An omission in the plans created a void in the specifications which did not cover the type of strap, location or type of anchor to be used in connection with the refrigerant lines,” and that the plaintiff sustained damages “as a result of the Besident Engineer’s refusal and failure to act timely and prudently when advised of the problem by Plaintiff.”
The plaintiff was required to strap the refrigerant lines that were installed in the housing units constructed under the contract. The contract specifications did not describe the type of strap, or the location or type of anchor, to be used in connection with the refrigerant lines.
However, paragraph 25-3 ('b) of the specifications provided in part that:
As soon as practicable and within 30 days after the date of award of contract and before commencement of installation of any material or equipment, a complete schedule, of the material and equipment proposed for installation shall be submitted for the approval of the contracting officer. * * *
Also, paragraph 25-16 (c) of the specifications stated in part that:
Pipe supports shall be standard catalog products approved by the contracting officer. * * *
*474 On or about August 18,1959, the plaintiff’s subcontractor began installing the refrigerant lines on the buildings. For :strapping, the subcontractor utilized %-inch galvanized metal straps, fastened with nails. The %-inch material was a standard product for strapping, and was a usual and customary type of material used for strapping the type of line involved in this case. However, the subcontractor did not obtain the approval of the contracting officer in advance with respect to the use of such pipe supports.
On September 9,1959, the plaintiff submitted for approval the support devices that were being used for the air-conditioning lines. By a letter dated September 15, 1959, the ■defendant’s resident engineer disapproved the use of %-inch straps, because of his opinion that this device cut into the Rubatex insulation and did not provide adequate support for the refrigerant lines. The resident engineer approved the use of 1-inch wide, shop-made, galvanized straps, secured with screws compatible with galvanized metal.
As of September 15, 1959, the subcontractor had already installed %-inch straps, fastened with nails, as supports for the refrigerant lines in 154 housing units. These previously installed straps were removed by the subcontractor, and they were replaced with 1-inch galvanized straps, secured with suitable screws.[22]
It will be seen from the summary of the evidence relating to claim 14 that the extra labor expense incurred in connection with the removal and replacement of pipe supports in 154 housing units was attributable to the failure of the plaintiff and its subcontractor to follow the plain requirement in the contract specifications that the approval of the contracting officer respecting material or equipment must be obtained prior to the commencement of installation.[23] This was cer *475 tainly a reasonable requirement, particularly in connection with items (such as supports for refrigerant lines) which the specifications prescribed in general language but did not describe in detail.
Therefore, the plaintiff is not entitled to recover on claim 14.
Claim 15 — Joints and Fittings in Refrigerant Lines
The plaintiff says in claim 15 that “The Eesident Engineer arbitrarily and without authority from the contract documents refused the Maplewood Sheet Metal Company [permission] to utilize joints and fittings in the copper refrigerant lines in the attic spaces,” and that the plaintiff thereby sustained damages.
Although the petition attributed the unauthorized prohibition against the use of joints in the refrigerant lines to the defendant’s resident engineer, the evidence shows that it was an inspector that imposed the prohibition on the plaintiff and its subcontractor. So far as the record shows, neither the plaintiff nor its subcontractor ever protested or appealed to the resident engineer or the contracting officer concerning this controversy that had arisen with an inspector. Consequently, the plaintiff, for the reasons stated in Part I supra, is not entitled to recover on this claim.
Claim 16 — Size of Heater Closets
Claim 16 is based upon the contention that “The plans simply did not allow sufficient room in the heating and air conditioning closets to accommodate the large-size equipment specified for the project,” and that the plaintiff sustained damages “as a direct result of the Eesident Engineer’s refusal to cooperate in light of an obvious defect in the plans and specifications.”
The plaintiff was required to install heating and air-conditioning units in closets provided for this purpose in the housing units constructed under the contract. The contract drawings indicated that the inside finished dimensions of the closets in which the heating and air-conditioning equipment was to be installed were 35% inches x 25% inches, or smaller.
*476 The heating and air-conditioning units that were currently being manufactured for housing units of the type involved here were too large to fit into closets of the dimensions previously mentioned, and still leave room for maintenance. This was called to the defendant’s attention, both orally and in writing, when the time came for the installation of the equipment. Exchanges of correspondence relative to the problem between the parties occurred in December 1958 and in January and February 1959.
Finally, in February 1959, the office of the District Engineer in Galveston requested the advice of the original architect of the buildings. On February 20, 1959, the architect forwarded to the district office a chart or table showing how the heating and air-conditioning equipment could be installed in the closets by turning the studs flat in the adjacent walls. This table was forwarded by the district office to the resident engineer at Fort Hood on February 27, 1959, with a statement to the effect that only the architectural changes indicated in the table would 'be permitted, and that they must be made at no additional cost to the Government. A copy of the table, together with the statement from the district office, was transmitted to the plaintiff by the resident engineer on March 12, 1959.
With the studs in the adjacent walls turned flat, there was enough clearance for the installation of the heating and air-conditioning equipment in the closets provided for that purpose.
The problem involved in this claim arose because the closets which the plaintiff built for the heating and air-conditioning units in accordance with the defendant’s architectural plans were too small to accommodate the equipment which the plaintiff was required to install. Hence, there was a defect in the plans prepared by the Government, and the Government is chargeable with the consequences of such defect.
Claim 17 — Removing and- Replacing EgvApment
In claim 17, the plaintiff says that it incurred additional labor expenses “to remove and then replace equipment previ *477 ously installed [in heater closets] with, the Resident Engineer’s approval.”
There was an ambiguity in the contract plans as to whether the surface of the concrete slab in the heater room of a housing unit for officer occupancy was to be 'at the same level as the surface of the concrete slab elsewhere in such a unit, or was to be raised to the same level with the surface of the oak flooring. The defendant’s resident engineer initially took the position that the first interpretation was correct, and his view was followed by the plaintiff in connection with the laying of the concrete slabs in 75 housing units for officer occupancy.
On August 4,1959, however, the resident engineer changed his position, and held that the surface of the concrete slab in the heater room must be on a level with the surface of the hardwood flooring. This made it necessary for the plaintiff to rework the portions of the concrete slabs in the heater rooms of the 75 units previously mentioned, by raising the surface 25/1G inches so that the surface of the slabs in those areas would be flush ¡with the surface of the hardwood flooring.
As the heating and air-conditioning equipment had already been installed in the 75 heater rooms previously mentioned, it was necessary to remove the equipment so that the concrete slabs could be reworked, and then to reinstall the equipment after the portions of the slabs in the heater rooms had been raised 2%6 inches.
Since the plaintiff was following the resident engineer’s interpretation of the plans and specifications in placing the surface of the concrete slabs in the heater rooms of the 75 units on the same level with the surface of the slabs elsewhere, the defendant obviously should bear the financial burden that ensued when the resident engineer subsequently changed his interpretation and required that the surface of the concrete slabs in the heater rooms of the 75 housing units be raised so as to be flush with the surface of the hardwood flooring. See Turnbull, Inc. v. United States, 180 Ct. Cl. 1010, 1018, 389 F. 2d 1007, 1011 (1967).
One of the extra costs was the additional labor expense that was involved in removing the heating and air-condition *478 ing equipment from, the heater rooms so that the reworking of the concrete slabs there might be accomplished, and in replacing the equipment after the slabs in the heater rooms were raised.
Claim 18 — Special Air Duct for Heater Closet
Claim 18 is based upon the contention that the plaintiff incurred additional expenses “in providing a special air duct and individually screening each of the furnace rooms throughout the 500 units.”
Under the contract, the plaintiff was required to install air ducts in all of the 500 housing units. However, there was not enough room for the installation of the air ducts in the heater closets, as shown on the plans and specifications. The-return air duct and the return air grille were located in the hallway ceiling, immediately in front of the furnace, and this left no room for the furnace vent pipe to run to the roof. The only way the vent pipe could be installed was through a sleeve in the return air duct. The resident engineer permitted this, provided that the duct was increased in size.
The plaintiff was forced to incur increased material and labor expenses in enlarging the return air duct and in adding acoustical lining. Since these extra expenses were made necessary because of defects in the Government’s plans and specifications, the Government is chargeable with them..
Claim 19 — Additional Insulation
Claim 19 is “for additional insulation of the return air-duct.”
Paragraph 25-17(a) of the specifications provided in part as follows:
(a) Ducts. — Unless otherwise indicated on the drawings, overhead supply and return ducts shall be insulated with not less than 1 inch thickness for return ducts and 2 inch thickness for supply ducts of impregnated mineral wool, thermally equivalent thickness of glass insulation, or other equally suitable material approved by the contracting officer. * * *
*479 It is the practice in the construction industry to insulate the outside portion of a return air duct, but not the inside portion. Consequently, the plaintiff and its subcontractor interpreted the quoted provision of paragraph 25-17(a) of the contract specifications as requiring that only the outside portions of the return air ducts in the housing units at Fort Hood be insulated with a 1-inch thickness of impregnated mineral wool or other equally suitable material.
However, the plaintiff and its subcontractor were required by the defendant to insulate the inside portions, as well as the outside portions, of the return air ducts.
Tn the absence of any clear indication in the pertinent contract specification that the inside portions of the return air ducts were to be insulated, the plaintiff and its subcontractor acted reasonably in relying on trade practice when they interpreted the specification as requiring that only the outside portions of return air ducts must be insulated. Since the plaintiff’s interpretation of an ambiguous specification drafted by the Government was reasonable, the plaintiff’s interpretation should be accepted by the court as fixing the rights and obligations of the parties. The plaintiff is entitled to recover on claim 19.
Claim SO — Registers
In claim 20, the plaintiff says that it sustained a loss “in replacement costs and freight charges incurred as a result of the Eesident Engineer’s refusal to allow Plaintiff to utilize the registers which had been approved, ordered and in the process of being installed.”
After high-wall registers that had been approved by the defendant were installed in 13 of the housing units at Fort Hood, the plaintiff was required by the defendant to remove the high-wall registers and replace them with low-wall registers. The reason for the change was that the defendant’s personnel did not like the looks of the high-wall registers after they were installed.
The plaintiff’s extra costs arising out of this incident amounted to $300.
*480 The defendant concedes that tlie plaintiff is entitled to recover $800 on claim 20.
Claim, 2% — Concrete
The Continuous Pour
One of the facets of claim 22 is whether the plaintiff and its concrete subcontractor were properly required by the defendant to pour in one continuous operation the concrete for the foundation grade beams and for the floor slab at each housing unit, or whether the defendant should have permitted the plaintiff to pour the concrete for the foundation beams separately from the concrete for the floor slab.
The concrete work in connection with each housing unit required the plaintiff to pour concrete for the perimeter and grade beams and for the floor slabs.
Also, the plans and specifications required certain mechanical and underground work for each housing unit to be installed within the perimeter and interior grade beams and beneath the floor slab. These items of work included the installation of drain fill, waterproof membrane, steel, heating ducts, and underground plumbing.
It is the customary method, in constructing housing of the type and quality involved in the contract, to pour the perimeter and the interior grade beams first, then perform work of the sort referred to in the preceding paragraph, and thereafter to pour the slab. In the performance of the contract at Fort Hood, the plaintiff wished to follow this customary method of procedure.
Prior to the commencement of any of the concrete work, the plaintiff’s principal officer visited the District Engineer (i.e., the contracting officer) in Galveston on December 17, 1958, and discussed with him the plaintiff’s desire to pour the foundation beams and the floor slab separately. At this conference, the plaintiff submitted a letter from a private engineering company, together with a drawing which showed a construction joint (i.e., a break in the concrete) between the beams and the slab.
*481 By a letter dated January 7, 1959, the contracting officer responded to the plaintiff’s proposal. He stated in part as follows:
* * * I regret to advise you that a construction joint will not be permitted. The Chief of Engineers has already called to our attention deficiencies in family housing caused by this type of construction. By permitting construction joints between the floor slab and the foundation wall there has resulted cracking of the asphalt tile floor where it extends across the joint.
Under the date of January 12, 1959, the plaintiff submitted another proposal for a construction joint between the floor slab and the foundation grade beams. The contracting officer responded to this request on January 29, 1959, and stated as follows:
Your proposal has been thoroughly reviewed with my staff and it is my determination that your proposed use of a construction joint will not be permitted. Existing construction criteria and foundation conditions in the Fort Hood area will not permit a deviation from the contract drawings on construction of the floor slabs and foundation walls.
The contracting officer having rejected the plaintiff’s proposals for a construction joint between the floor slab and the foundation grade beams (made in order that the plaintiff might pour the concrete for the floor slab separately from the concrete for the foundation grade beams), the plaintiff and its paving subcontractor necessarily used the single-pour system of pouring the concrete for the slab and for the foundation beams in one continuous operation. This was a more expensive method of procedure than the separate-pour method which the plaintiff wished to employ, since the single-pour method gave rise to a number of incidental problems, which are summarized in the findings of fact.
However, paragraph 8-13 of the contract specifications plainly stated that “No construction joints will be allowed in buildings, except with special permission of the contracting officer.” This is a very clear directive and the one bearing most specifically on the problem; furthermore, plate No. 4.06 *482 of the contract plans showed the details for the construction of the foundation beams and the slab, and these details showed a continuous, unbroken mass of concrete, without a construction joint, except that one detail on plate 406 showed an option for the separate pouring of the heater plenum and the slab.[24]
Therefore, when the plaintiff proposed to the contracting officer that a construction joint be permitted between the foundation beams and the slab, in order that the concrete for these items might be poured separately, the plaintiff was actually proposing a change in the contract so that the operations of the plaintiff and its subcontractors might be facilitated and rendered less expensive. It was discretionary with the contracting officer as to whether he would approve or reject the plaintiff’s proposal. And we cannot say that he breached the contract by deciding that the disadvantages of :a “double pour” dictated its disapproval despite the expense to the plaintiff. Cf., e.g., Mid-West Construction Ltd. v. United States, 181 Ct. Cl. 774, 788-89, 389 F. 2d 957, 966 (1967).
Moreover, the difficulties encountered by plaintiff do not prove that the specifications were so defective as to unreasonably hinder performance. Plaintiff’s witnesses conceded that a monolithic pour could produce a satisfactory slab. Furthermore, plaintiff should have known (and, in fact, the record supports the inference that it did know) the problems it could encounter, absent a waiver under 3-13, in making a *483 “single pour”. Instead of planning for that possibility, it took the risk of persuading the contracting officer to allow a construction joint.
Heater-Eoom Areas
There is included, as an aspect of claim 22, a request for reimbursement by the plaintiff with respect to the extra cost that was incurred in raising the surface of the portions of the concrete slabs within the heater rooms of the houses that were to receive hardwood floors.
The facts concerning this incident have already been summarized under claim 17. Claim 17 covered the additional cost of removing the equipment from the heater rooms when it became necessary to raise the concrete slabs in those areas so that the surface of the concrete there would be flush with the surface of the hardwood flooring, and of replacing the equipment after the raising of the concrete slabs had been ■accomplished.
As part of claim 22, the plaintiff requests reimbursement with respect to the extra cost that was involved in raising the portions of the concrete slabs in the heater rooms 2%6 inches.
On the basis of the reasoning set out under claim 17, the plaintiff is entitled to recover on the related aspect of claim 22.
The Waterproof Membrane
Under the plans and specifications, the entire concrete slab for each housing unit was to be waterproofed by means of •a tar membrane, consisting of felt or fabric saturated in coal-tar pitch, underneath the slab. The principal purpose of the membrane was to stop the percolation of water and thus prevent moisture from going through the concrete and -causing the floors of the houses to sweat.
It was also a purpose of the membrane to prevent moisture from getting into the underfloor heating and air-conditioning ducts. The specifications and the drawings required -that the waterproofing membrane be placed under the ducts.
*484 It was extremely difficult for the plaintiff to install the specified waterproof membrane underneath the ducts, because of the membrane’s stiffness.
On November 20, 1958, the plaintiff requested that the waterproof membrane be changed from a tar membrane to a polyethylene membrane, and offered a credit of $7,500 to the Government for this. The plaintiff’s request was disapproved by the defendant on November 26, 1958.
On December 2, 1958, the plaintiff requested reconsideration of its prior proposal. The plaintiff’s request was again denied.
On February 9,1959, the plaintiff proposed that the waterproofing membrane system be changed 'by placing the membrane over the heating and air-conditioning ducts instead of under the ducts, and the plaintiff- offered the defendant a credit for this proposed change. On the following day, the plaintiff’s request was denied.
The first house slab was poured by the plaintiff on February 18, 1959, and the pouring of house slabs continued from that date until approximately March 11,1959. During this period, the plaintiff constantly objected to placing the waterproof membrane underneath the heating and air-conditioning ducts, because the method was impracticable.
On March 11,1959, the plaintiff shut down the pouring of the house slabs and requested a conference to discuss problems in connection with the waterproofing. As indicated previously, the plaintiff had experienced great difficulty in placing the waterproofing membrane under the ducts because of the membrane’s stiffness. Also, when the membrane was placed down in the trenches that had been prepared for the ducts, the sides of the trenches tended to cave in. In addition, damage resulted when plumbers and other workmen working within the perimeters of the foundations walked across the membrane and punctured it. These difficulties were explained to personnel of the defendant at a conference.
On March 17,1959, the defendant’s resident engineer wrote a letter to the plaintiff, outlining a proposed change in the contract that would permit the plaintiff to place the waterproofing membrane over the heating and air-conditioning *485 ducts, instead of underneath, them. The resident engineer’s letter requested that the plaintiff furnish a proposed credit for the making of the change. By means of a letter dated March 21, 1959, the plaintiff proposed that the Government be given a credit in the amount of $10,006.32 for the change previously suggested by the resident engineer.
Within a reasonable time thereafter, a formal modification of the contract along the lines indicated in the preceding paragraph was prepared and signed by the parties. As a result of this change, the plaintiff was thereafter permitted to place the waterproofing membrane over the ducts for the heating and air-conditioning system, instead of being required to place the membrane underneath the ducts.
Since plaintiff proposed no finding of fact that its agreement to pay a credit is invalid, we limit ourselves to its claim for extra expense in attempting to waterproof the concrete slabs in the impracticable manner prescribed by the original contract.
The defendant had impliedly warranted that the waterproofing work could be performed satisfactorily if the plaintiff utilized the method prescribed in the contract. However, the problems — -particularly the damage to the membrane itself — resulting from plaintiff’s aborted attempt to follow the specifications amply demonstrate that it was highly unlikely that plaintiff’s efforts would result in a satisfactory, workmanlike waterproof covering so long as it adhered to the method originally outlined. Accordingly, the defendant is liable to the plaintiff for the latter’s damages arising from the breach of the implied warranty. See Centre Manufacturing Co. v. United States, ante, at 122.
The Water Pipes
On January 30,1959, the plaintiff submitted to the defendant a proposal to change the water piping system so that the water pipes would be run underneath the concrete slabs instead of above them. ' The submission set forth various alternative proposals for price increases in connection with the proposed change.
*486 On tbe same date, January 30,1959, the plaintiff submitted another alternative proposal to change the plumbing on the job at no increase or decrease in the contract price.
On February 5, 1959, the plaintiff submitted still another proposal to change the installation of the water piping, with cost factors different from those previously submitted on-January 30,1959.
On February 9,1959, the plaintiff informed the defendantthat it proposed to start placing concrete for the buildings on-February 11, and requested a decision concerning the proposals previously made relative to the water lines.
On February 10, 1959, the defendant’s resident engineer advised the plaintiff that the Government had not yet made a firm decision on the plaintiff’s proposals and, therefore, that the Government had not finally decided upon the exact location of the water lines. The resident engineer further stated' that, during the early stage of the construction program,, he would specify the exact location of the water piping on an individual building basis.
Subsequently, on or about March 20,1959, one of the plaintiff’s proposals respecting a change in the water lines was. adopted, and a formal change order was issued. The plaintiff accepted and signed the change order.
The building-by-building approach concerning the placement of the water lines, prior to the issuance of the change order mentioned in the preceding paragraph, hampered the-attempts by the plaintiff to 'build the houses at Fort Hood' on a production-line basis.
Even though the plaintiff’s suggested changes were ostensibly motivated by the desire to benefit the Government, the-defendant was entitled to a reasonable period of time within-which to consider and evaluate the problem raised by plaintiff and to assess the merits and costs of plaintiff’s various, proposals.
Under the circumstances, there does not appear to have-been any unreasonable delay on the part of the defendant in; finally acting upon the plaintiff’s alternative proposals and? selecting one of them on a basis that was, mutually satisfactory to the parties.
*487 For the reasons indicated above, we do not believe that the. plaintiff is entitled to recover on this phase of claim 22.
The Forms
Paragraph 1-3 (a) of the contract specifications stated impart as follows:
* * * When concrete is deposited against excavated surfaces, such surfaces shall be clean cut, plumb, and true to the form line. The earth shall be well compacted and shall not spall or deform during concrete pouring-operation. Undercutting will not be permitted. * * *
The quoted specification conformed to the custom in the construction industry of pouring concrete against excavated' surfaces in line with forms. However, when the plaintiff' attempted at the beginning of the job to set forms on top of' the trenches and to pour concrete against the soil, the plain-, tiff was instructed by the defendant to extend the forms to. the bottoms of the trenches.
In addition, although the forms for the concrete work were put in line with instruments and were adequately placed to hold the weight against them and preserve alignment and elevation, the plaintiff was required upon occasion by the . defendant to put in additional bracing before being allowed to pour concrete.
These requirements by the defendant with respect to the. forming for the concrete were not justified by the provisions, of the contract, were contrary to the customary practice in the construction industry, and interfered unreasonably with,, the plaintiff in the performance of the contract. Accord-, ingly, -the plaintiff is entitled to reimbursement for the ad-, ditional costs incurred as a result of such unwarranted, requirements.
Delay in Pouring Concrete
The plaintiff had the capacity for pouring concrete for 5, housing units per day in connection with the first 15 units,, and for 10 units per day thereafter.
However, during most of the job, the defendant had only-one concrete inspector on the job, and this inspector had the . *488 responsibility for inspecting snb-bases, waterproof membrane, reinforced steel, mesh, alignment, and forms, and he also had the responsibility of inspecting the concrete as it was being poured. This inspector would not allow more than one concrete slab to be poured at a time, and insisted upon personally observing all phases of the concrete pour. The plaintiff made numerous requests to the defendant for permission to pour more than one slab at a time, but these requests were refused by the inspector and his superiors.
Also, the plaintiff’s production schedule was hampered by the insistence of the concrete inspector that all patchwork be done on the concrete for a particular unit before the contractor was allowed to proceed with the pouring of the concrete for the next unit. This requirement was contrary to the customary practice in the construction industry of continuing the pouring operations from unit to unit, and doing patchwork as a separate project.
The plaintiff’s production was further hindered by the defendant’s insistence that the plaintiff, before pouring concrete, remove minute splinters of wood and pieces of drainage fill which had fallen into the trenches that had been prepared for the concrete. The amounts which the plaintiff was required to remove were insignificant, and the drainage fill itself was not foreign to the concrete mix. In order to do the job as the defendant required, the plaintiff’s laborers had to crawl on their hands and knees and remove handfuls of gravel.
As has been stated elsewhere in this opinion, the defendant was under an implied contractual obligation not to delay or hinder the plaintiff in the performance of the work under the contract. It appears that the defendant breached this obligation in connection with the matters discussed in this portion of the opinion. Therefore, the plaintiff is entitled to recover on this aspect of claim 22.
Unnecessary Eepairs
The plaintiff was required by the defendant to repair normal hairline cracks that had no structural significance.
The plaintiff was also required by the defendant to patch *489 honeycomb on unexposed surfaces of the concrete. Furthermore, whenever any patchwork was done, the defendant required that the plaintiff patch the entire section of the concrete, so that the patch would not be noticed.
Most of the requirements summarized in this portion of the opinion were not justified by the provisions of the contract and interfered unreasonably with the performance of the contract by the plaintiff. Accordingly, plaintiff is entitled to reimbursement for the extra costs incurred as a result of the unwarranted requirements.
Wasting Concrete
On one occasion, the plaintiff was required by the defendant to dump concrete which had been held in a truck for 45 minutes, although paragraph 8-17 of the contract specifications stated that a period of iy2 hours was allowed for concrete to be placed.
The plaintiff is entitled to recover for the breach of contract involved in this aspect of claim 22.
Unstable Sides of Trenches
The contract plans did not provide sufficient support for the dirt between the forms for the foundation grade beams and the trenches for the perimeter ducts, and the earth would fall away when an attempt was made to install the ducts in the manner called for in the specifications. The reason was that the plans required the perimeter ducts to be placed too close to the foundation grade beams, and the dirt between them would not hold up.
Because of the defect in the plans, as mentioned in the preceding paragraph, the plaintiff for a time dug wide trenches to take care of both the perimeter ducts and the beams, then poured concrete around the ducts in connection with the pouring of concrete for the beams. This resulted in additional concrete being used.
On December 4, 1958, the plaintiff requested that it be permitted to move the perimeter ducts inward 18 inches away from the foundation beams. On the same day, the *490 plaintiff’s request was granted by the defendant. This alleviated the problem of the collapsing dirt previously mentioned.
Another related problem was that the plans provided for many fingers of duct-work going into the plenum, and this resulted in little peninsulas of dirt that did not have enough support to stand by themselves. It was necessary for the plaintiff to remove the dirt and pour the entire area surrounding the plenum box with concrete in order to obtain a satisfactory result.
The difficulties mentioned in this portion of the opinion were caused by the defendant’s defective plans and specifications. Consequently, there was involved here a breach by the defendant of its implied contractual obligation to provide plans and specifications which, if followed by the plaintiff, would produce satisfactory results. The plaintiff is entitled to reimbursement for the damages flowing from the breach by the defendant of this implied obligation.
Sheet-Metal Thimbles
The defendant required the plaintiff to install sheet-metal thimbles at the intersections of the plenums and the ducts, although such thimbles were not called for in the contract plans and specifications.
The plaintiff is entitled to recover for the extra expense which it incurred in complying with this requirement that was outside the provisions of the contract.
Tolerance
Throughout most of the job, the defendant insisted on a “zero tolerance” in inspections for both floor level and floor alignment in the concrete and forming work.
A perfect concrete slab is virtually impossible to obtain. The tolerance as to levelness customarily used in the construction industry is % inch in 10 feet. The plaintiff requested throughout the job that it be allowed such a tolerance, but the plaintiff’s request was refused by the defendant.
*491 Toward the end of the job, on January 15,1960, the defendant’s resident engineer changed the defendant’s position and advised the plaintiff that “a tolerance of % inch in 10 feet will be allowed.”
The imposition by the defendant on the plaintiff of a “zero tolerance” requirement in connection with the concrete work during most of the job was outside the provisions of the contract and was contrary to the trade practice in the construction industry. This amounted to an unwarranted interference by the defendant with the plaintiff in the performance of the work under the contract, and it renders the defendant liable for the damages sustained by the plaintiff as a result of this breach by the defendant of an implied contractual obligation.
Claim, S3 — Cleaning Masonry
The plaintiff alleges in claim 23 that it was damaged “due to the arbitrary and excessive cleaning requirements exacted by the Eesident Engineer.”
Under the contract, the plaintiff was required to furnish masonry for the housing units. The plaintiff submitted,, and the Government approved, a buff brick as one of the types of brick to be used on the project.
Paragraph 4-8 of the specifications required the cleaning of the brick, after erection, with muriatic acid. It further stated that “Immediately after cleaning, the masonry surfaces shall be thoroughly rinsed down with clean water., leaving the masonry clean, free of mortar smears, and with tight mortar joints throughout.”
On several of the buildings, the Government inspectors-discovered green stains on the buff brick after the plaintiff had cleaned such brick with muriatic acid. The inspectors required that the stains be removed.
The plaintiff’s superintendent proposed to the defendant’s assistant resident engineer that sandblasting equipment be used to clean the buff brick of the green stains. The assistant resident engineer agreed to the use of the sandblasting equipment.
*492 The sandblasting work proceeded successfully for a portion of Mortgage Area 1. The sandblasting removed the stains from the buff brick. However, as the work reached the end of Mortgage Area 1, it was noted by the defendant’s personnel 'that some of the windows in the houses were being pitted by the sandblasting operation. The plaintiff was immediately notified, and the plaintiff was required to replace the pitted glass. Thereafter, from Mortgage Area 2 onward, the plaintiff took precautionary steps to protect the windows during the sandblasting operation.
Fundamentally, the plaintiff’s difficulty which forms the basis for claim 23 was occasioned by the use of buff brick, which showed green stains after being cleaned with muriatic acid in accordance with paragraph 4-8 of the specifications. As it was the plaintiff that originally suggested the use of buff brick, and the defendant merely approved the plaintiff’s proposal, there is no legal basis on which to make the defendant responsible for the difficulty that ensued from the use of this brick. Cf. Banks Construction Co. v. United States, 176 Ct. Cl. 1302, 1324-25, 364 F. 2d 357, 371 (1966) ; Roberts Construction Co. v. United States, 174 Ct. Cl. 940, 945, 357 F. 2d 938, 942 (1966).
Claim %]j. — Grinding Concrete Floors
The plaintiff says under claim 24 that it sustained damages “as a result of the requirement that concrete slabs be leveled by grinding machines to zero tolerance.”
In the early part of 1960, when the housing units at Fort Hood were being finished and the plaintiff was preparing portions of the concrete floors to receive vinyl tile, the defendant’s concrete inspector checked the finished concrete floors in a number of the kitchens. The inspector took the position that no tolerance as to the levelness of the concrete floors was permissible, and he marked places on the floors where the concrete slabs were not perfectly level.
The plaintiff commenced grinding the marked portions of the concrete floors with a grinding machine in an attempt to achieve the degree of levelness required by the defendant’s inspector.
*493 On January 27,1960, tthe plaintiff’s principal officer visited the job site and protested against the grinding of the concrete floors that were to receive vinyl tile. At that time, the floors were checked by supervisory personnel of the defendant in the presence of the plaintiff’s principal officer, and it was agreed that the grinding could be discontinued, since there were no excessive humps or depressions in the floors and the portions marked for grinding were in areas where furniture might normally be expected to be placed.
As indicated in the discussion of claim 22, sufra, the imposition of a “zero tolerance” requirement by personnel of the defendant was not justified by the provisions of the contract. For that reason, the requirement that the plaintiff grind certain portions of the concrete floors in an attempt to achieve a condition of perfect levelness amounted to an unreasonable interference with the plaintiff in the performance of the contract.
There is no indication in the evidence that the plaintiff delayed unduly the making of a protest to higher authority with respect to the concrete inspector’s unwarranted requirement.
The plaintiff is entitled to recover on claim 24.
Olaim %5 — Lumber
Grade Stamps and Certificates
Paragraph 8-6 (b) of the contract specifications provided as follows:
(b) Grade Marking. — Each piece of yard and structural lumber shall bear the official grade mark of the appropriate inspection bureau or association; or in lieu thereof, each shipment shall be accompanied by a certificate of inspection issued by the appropriate inspection bureau or association, or other agency approved as competent by the contracting officer.
In addition, section 8 of the specifications outlined numerous detailed requirements which the lumber that was to be used in the performance of the contract would have to meet.
*494 Early in the job, a number of shipments of pine lumber arrived at the job site without being grade-marked, and the certificates furnished in connection with such lumber were mill certificates, and not inspection bureau certificates. The mill certificates were not acceptable to the defendant, since they had not been “issued by the appropriate inspection bureau or association, or other agency approved as competent by the contracting officer.”
Shortly after the arrival at the job site of the pine lumber mentioned in the preceding paragraph, an inspector from the Southern Pine Inspection Bureau arrived at the job site, checked the pine lumber previously mentioned, and graded the lumber. The inspector rejected a portion of the lumber and passed other portions, which he graded and stamped. On subsequent shipments of pine lumber, the representative of the Southern Pine Inspection Bureau similarly inspected and graded the pine lumber that was brought to the job site. His examination of the lumber was accomplished with the aid of a ruler, a moisture meter, and a book of lumber grader’s rules.
A Government inspector on the job rejected a substantial amount of pine lumber that had been passed and graded by the representative of the Southern Pine Inspection Bureau. The plaintiff complains about this as one aspect of claim 25.
The plaintiff did not prove at the trial that the pine lumber rejected by the Government inspector actually met the detailed requirements for lumber set out in the contract specifications. Eather, it seems to be the plaintiff’s theory that the passing and grading of pine lumber by a representative of the Southern Pine Inspection Bureau conclusively established the acceptability of the lumber for the purposes of the contract.
The plaintiff’s position relative to this point seems to be untenable. The statement in paragraph 8-6 (b) of the contract specifications that each piece of lumber “shall bear the official grade mark of the appropriate inspection bureau or association; or in lieu thereof, each shipment shall be accompanied by a certificate of inspection issued by the appropriate inspection bureau or association,” was merely one of a number of requirements which the specifications prescribed for *495 the protection of the Government relative to the lumber that was to be used on the Fort Hood job. The lumber had to be properly grade-marked or accompanied by an appropriate certificate of inspection, and, in addition, it had to meet the other requirements set out in the specifications with respect to moisture content, etc.
Since the plaintiff has failed to prove that the pine lumber rejected by the Government inspector actually met all the requirements prescribed in the pertinent specifications, it has failed to establish a right to recover on this phase of claim 25.
Beams
At the commencement of the job, the plaintiff received from its supplier beams that contained an excessive amount of moisture. In order to remove the excessive moisture, the plaintiff air-dried the beams by stacking them in such a way that sticks separated the beams. After the beams were air-dried, the defendant would not permit the plaintiff to use many of the beams because they were discolored at the places where they had rested on sticks during the air-drying process, or because there were minor cracks in the beams.
After the rejection of the air-dried beams, as indicated in the previous paragraph, the plaintiff procured kiln-dried beams for the job.
Also, early in the job, personnel of the defendant requested that the beams in the plaintiff’s storage area be covered with tarpaulins in order to protect the beams from the rainy weather that was being experienced at the time. As a result of the beams being covered with tarpaulins during wet weather, some of the beams became moldy and discolored. The defendant would not permit the plaintiff to use such beams subsequently without cleaning off the discoloration.
The usefulness of the beams for structural purposes was not affected by the discoloration or by the minor cracks previously mentioned.
The requirements which the defendant imposed on the plaintiff with respect to beams, as outlined in this part of the opinion, seemingly were based on aesthetic considerations that were not incorporated in the provisions of the contract. Since such requirements were not justified by the provisions *496 of the contract, the plaintiff is entitled to recover on the basis of the extra expenses that it incurred in complying with such requirements.
Plywood
Paragraph 8-4 (m) (3) of the contract specifications provided in part that the plywood sheathing to be used on the buildings at Fort Hood “Shall be interior type conforming to CS 45, Grade C-D, Int.” Paragraph 4.4.4.4 of Commercial Standard CS 45-55, the applicable provision relating to Douglas fir plywood, stated in part that “Grade D Veneer (may be used only in Interior type panels) shall contain no knotholes greater than 2*4 in. in maximum dimension * *
The plaintiff complains that a great deal of plywood which bore an association grade stamp was rejected by the defendant’s inspectors on the ground that the plywood contained knotholes which, when measured with a ruler, exceeded the maximum dimension of 2y2 inches referred to in the preceding paragraph.
As stated earlier, the fact that lumber or plywood was grade-stamped or certificated by an appropriate inspection bureau did not conclusively establish that the material complied in all respects with the contract specifications. In connection with this particular aspect of claim 25, the plaintiff did not prove at the trial that the defendant’s personnel rejected any plywood which actually complied with the pertinent specifications as to the size of knotholes.
Eafters and Joists
Paragraph 8-3 (a) of the contract specifications, dealing with the subject of “Framing and Structural Lumber”, listed the following and required that they be 1500-F (or No. 1) lumber:
Beams
Girders
Eafters
4-inch wide
joists or rafters
*497 Whether the words “4-inch wide joists or rafters” establish a separate category or define the term “Bafters”, this portion of the specifications clearly mandates that the item — “4-inch wide joists or rafters” — be No. 1 grade.
On the other hand, the second subparagraph of 8-3 (a) allows 1200-F (or No. 2) lumber to be used for “Joists.” Furthermore, in the construction industry, it is generally considered that the difference between a rafter and a joist is that a rafter is on a pitch in excess of 3-and-12, while a joist is a flatter member and lias a pitch of 3-and-12 or less.
One type of building involved in the Fort Hood project was the deck and beam building. With respect to the deck and beam building, the plans prepared by the defendant referred to the roofing members as “roof joists.” These “roof joists” were to be 4 inches by either 6 or 8 inches wide. The “roof joists” in the deck and beam houses did not have a pitch in excess of 3-and-12. Despite the plaintiff’s objections, the defendant required the use of 1500-F lumber for the “roof joists.”
The plaintiff asserts that it reasonably interpreted an ambiguous specification and, therefore, should recover the excess cost of using No. 1 lumber. We cannot agree that the specification was murky in an aspect relevant to the present issue. The drawings required 4-inch “roof joists”, and paragraph 8-3 (a) (1) dictates that “4-inch wide joists or rafters” be No. 1 grade. The prevailing industry definition does not bear on that specific requirement which mentions both “Joists” and “Bafters”. Nor does the reference to “Joists” in the same paragraph create the ambiguity the plaintiff desires, for the scope of that general term is clearly limited by the particular phrase “4-inch wide joists.” That is a very precise instruction. See Hol-Gar Manufacturing Corp. v. United States, 169 Ct. Cl. 384, 395-96, 351 F. 2d 972, 979-80 (1965).
It should also be mentioned that, for the first group of conventional-type buildings to be framed on the Fort Hood job, No. 1 lumber and No. 2 lumber of the same size were delivered to the job site, one for use as rafters and the other for use as ceiling joists. The workmen on the job failed to distinguish between the two grades of lumber, and installed *498 them indiscriminately. When tbe Government inspectors noted that some No. 2 material had been installed as roofing members, the inspectors required the plaintiff to remove such No. 2 material and replace it with No. 1 material.
Since the error that was made 'by the workmen in using No. 2 lumber for roofing members was not attributable to anything that the defendant had done, there is no legal basis on which to hold the defendant responsible for the extra cost that was involved in correcting the error.
Kidge Boards
The contract plans and drawings showed that the ridge on the housing units at the intersection of the roof framing members was supported by a ridge member designated as a “Bidge Beam.”
Although paragraph 8-3 (a) of the contract specifications indicated that boards of “Standard” grade might be used for “Bidge Board,” the defendant required the plaintiff to furnish 1500-F (or No. 1) lumber for the “Bidge Beams” in the houses at Fort Hood. While the paragraph specified No. 1 lumber for “Beams”, it contained no reference to “Bidge Beams”, and there is nothing to indicate that the “Bidge Beams” noted in the drawings fell into the catagory of “Beams” rather than “Bidge Boards.”
Certainly, the plaintiff’s view that the “Bidge Beam” shown on the contract plans and drawings was the same as the “Bidge Boards” mentioned in paragraph 8-3 (a) of the specifications, and, accordingly, that lumber of “Standard” grade might be used for such purposes, was a reasonable one in the light of the ambiguity. Hence, the plaintiff’s interpretation should be adopted by the court. On that basis, the defendant’s requirement that No. 1 lumber be used for the ridge beams or boards was not warranted by the provisions of the contract.
Carport Posts
Neither the plans nor the specifications expressly named the type of material that was to be used for the posts supporting the beams on the carports at the Fort Hood housing units.
*499 The plaintiff interpreted tbe specifications as permitting No. 2 pine to be used for carport posts, because tbe specifications dealing with vertical framing members allowed such material to be used. Also, it is the normal practice in the construction industry to use No. 2 material as vertical support members, such as posts for carports.
On tbe other hand, tbe defendant took tbe position that since the specifications stated that exterior posts for buildings should be clear all-heart redwood, this particular requirement should be applicable to the posts supporting the carport beams.
The plaintiff was required by the defendant to use clear all-heart redwood for the carport posts, instead of using 4x4 structural framing lumber, as the plaintiff had planned to do.
Once more, we are dealing here with an ambiguity in the specifications, which had been drafted by the defendant. Since the plaintiff’s interpretation of the specifications as permitting No. 2 lumber to be used as posts for the support of the carport beams was a reasonable one, such interpretation should be accepted by the court as fixing the rights and obligations of the parties in this respect.

Claim —Carpentry

Studs
The contract specifications permitted the use of Douglas fir or Southern pine studs. The plaintiff used Douglas fir for studs throughout the units that were built under the contract.
The studs were the supporting members for the gypsum-board walls of the housing units. Gypsum wallboard, sometimes called sheetrock, is a rigid material and has very little flexibility. The specification with respect to the installation of the wallboard (paragraph 9-8) provided that “Dependence on nails to draw the wallboard against the framing will not be acceptable.”
The Government inspectors used a straightedge in inspecting the studs that were installed in the buildings. The inspectors required that the studs be perfectly straight, and *500 any stud that did not comply with the requirement of “zero tolerance” had to be “scabbed” or removed. The scabbing operation consisted of cutting and straightening a stud, and then installing a 4-foot piece of 1 x 4 lumber on each side of the stud.
The plaintiff was not permitted to “scab” more than three studs in a row; and if, after scabbing three consecutive studs in order to meet the defendant’s requirement as to straightness, the plaintiff was required to take corrective action as to the next stud in the row because it was not perfectly straight, the plaintiff had to remove such stud completely and replace it. In order to remove and replace a stud, the plaintiff had to loosen or take out fire blocking, take out the old stud, install a new stud and toenail it back in place, and then reinstall the fire blocking. This sometimes involved the removal and reinstallation of plumbing or electrical wiring as well.
In addition, because of the inspector’s requirement of “zero tolerance,” the plaintiff was required on occasion to tear out walls which had been completed and painted.
The imposition of a “zero tolerance” with respect to the straightness of studs was not warranted by the provisions of the contract, and was inconsistent with trade custom. The Standard Grading and Dressing Buies for Douglas Fir Lumber of the West Coast Lumber Inspection Bureau defined “Crook” as “a deviation edgewise from a straight line drawn from end to end of a piece,” and specified different tolerances as to straightness that were allowable for various grades of lumber. For example, in the case of an 8-foot 2x4 No. 1 or No. 2 stud, a crook (or deviation from straightness) of approximately % inch was allowable, while in the case of a 16-foot 2 x 4 No. 1 or No. 2 stud, a crook of approximately inch was allowable.
Accordingly, the defendant is liable to the plaintiff for the damages which the plaintiff sustained.
Strongbacks
Paragraph 8-12 (b) of the specifications stated in part with respect to “Ceiling Framing” that “Size and location *501 of ‘strongbacks’ ska'll be as noted on tke floor plans.” However, the floor plans for the Fort Hood project did not contain any indication for the use of strongbacks.
A strongback is a special kind of framing which supports ceiling joists. A strongback is customarily used in areas where the span of the ceiling joists is so long that the ceiling may sag.
Despite the plaintiff’s objections, the defendant required the plaintiff to put in strongbacks over the ceiling joists in every house which had ceiling joists.
As the defendant’s requirement respecting the installation of strongbacks went beyond the requirements of the contract, as reasonably interpreted by the plaintiff, the plaintiff is entitled to recover for the extra expense which it was[1] forced to incur as a result of the unwarranted requirement by the defendant.
Fascia Material
Exterior lumber does not come in uniform lengths. It is common practice for a mill to ship fascia material in lengths varying from 4 feet to 20 feet. In the installation of fascia material, it is the usual practice to have staggered and random lengths, i.e., to use a long piece and then a short one.
No specific minimum length for fascia material was prescribed in the contract specifications. However, paragraph 8-20 of the specifications stated in part that “Exterior trim and millwork shall be in long lengths, with joints staggered and concealed or in unobjectionable locations.”
The shortest fascia material that the plaintiff was permitted by the defendant to use at Fort Hood was 7% feet on deck and beam houses and 6 feet on conventional-roofed houses (except for isolated instances). On occasion, the plaintiff was required by the defendant to remove fascia boards approximately 4 feet long that had already been installed, and replace them with longer material. The fascia material which the plaintiff was required to remove had been installed in a workmanlike manner.
There was an ambiguity involved in paragraph 8-20 of the contract specifications as to whether the requirement that *502 “Exterior trim and millwork shall be in long lengths” prohibited the use on deck and beam houses of fascia material that was shorter than 7*4 feet, and prohibited the use on conventional-roofed houses of fascia material that was shorter than 6 feet. In such a situation, the plaintiff’s reliance on the trade practice of using some fascia boards 4 feet long in conjunction with longer pieces amounted to a reasonable interpretation of an unclear specification.
Closet Doors
Paragraph 15-17 of the specifications required the plaintiff to furnish for the closets in the housing units at Fort Hood folding doors which were “Slimdor” or “Amweld” folding doors, or equal.
Under the date of January 3,1959, the plaintiff submitted descriptive data and a sample of a metal folding door manufactured by the Poberts Manufacturing Company. Shortly thereafter, the defendant approved the door for use on the project and stamped its approval on the plaintiff’s submission. The stamp contained the following statement:
Approved as to general layout; dimensions and quantities not checked. Approval does not relieve contractor of responsibility for errors which may exist as contractor shall be responsible for dimensions & design of adequate connections, details & satisfactory construction of work.
One of the last items of work in the houses, as they were being completed, was the installation of the closet doors. Upon the installation of the doors, it was ascertained that in many instances the doors did not fit the previously framed-in openings.
The closet doors were made of steel and could not be reworked. Consequently, the plaintiff reworked the closet door openings in order to make the closet doors fit.
The plaintiff’s difficulty in connection with the closet doors was apparently due to the fact that it procured a metal door that would not fit the framed-in openings that had been prepared for the doors. It is true that the plaintiff informed the defendant of its plan to use the particular closet doors, *503 and that the defendant approved the plaintiff’s submission. However, in expressing its approval, the defendant specifically stated that it had not checked the dimensions, and the contractor was put on notice that it was still responsible with respect to the matter of dimensions.
Since it appears that the plaintiff’s problem in connection with closet doors was not attributable to any wrongdoing on the part of the defendant, the plaintiff is not entitled to recover on this aspect of claim 26.
Closet Shelves
Plate 414 of the contract drawings showed a section and an elevation for closets containing a closet shelf, a wooden strip for clothes hooks, and a clothes pole. Below these details there appeared the following statement: “Typical closet, storage & coats.” Next to the details mentioned in the preceding sentence were two more details labeled “Walk-in closets.”
Under the date of July 10, 1959, the plaintiff’s superintendent wrote the defendant’s resident engineer and stated in part as follows:
It is our understanding that on the floor plans where the word “Closet storage and coats” appear that we are to install shelving as indicated in details A414 and B414. On floor plans where “walk-in closets” are indicated, we will follow details C414 and D414. If this interpretation is correct, we would appreciate your verification.
By a letter dated July 15, 1959, the resident engineer replied to the plaintiff’s letter of July 10, and stated in part as follows :
This office concurs with your above referenced letter in that shelving for closet, storage and coats, shall be as indicated on Detail A/414 and B/414. Shelving detail for walk-in closets shall be as indicated on details C/414 and D/414.
Thereafter, the work went forward on the closets. The plaintiff installed shelves, hook strips, and poles in all of the closets shown on the floor plans as storage and coat closets or walk-in closets.
*504 Storage closets customarily do not contain hook strips, shelves, and poles. However, since the installation of these devices in the closets at Fort Hood was based upon an interpretation of the contract drawings that was mutually agreeable to the plaintiff and the defendant at the time, the plaintiff is not now in a position to complain about the installation of hook strips, shelves, and poles in storage closets.
In connection with the installation of closet shelving, the plaintiff was instructed by the defendant at the outset to install the shelving by the normal nailing process. Later, however, the plaintiff was instructed by the defendant to stop •nailing the shelves, and the plaintiff was required to go back and knock out the shelves that had already been nailed and reinstall them without nails. During the knocking-out process, a great deal of shelving was damaged and had to be replaced.
Since the problem referred to in the preceding paragraph was due to a change in the defendant’s view concerning the proper manner of installing the shelving in closets, the defendant is liable for the extra expense which it caused the plaintiff to incur.
Interior Trim
Paragraph 8-28 of the contract specifications provided in part that “Interior trim to be set against gypsum board or wood in the building shall be run with hollow backs.” On the other hand, plate 414 of the contract drawings contained details for the interior trim, and it showed that the two largest pieces of interior trim were hollow-back pieces but that four other pieces of smaller trim were to be flat-back material.
On March 22, 1959, the plaintiff submitted shop drawings of the interior trim which it intended to supply. These shop drawings followed the details shown on the contract drawings, i.e., they showed that the plaintiff intended to use both hollow-back pieces and flat-back pieces in accordance with plate 414. The shop drawings were approved by the defendant on April 9, 1959. Thereafter, the plaintiff had the redwood trim manufactured and delivered to the job site.
*505 On December 30, 1959, the plaintiff wrote a letter to the defendant’s resident engineer, stating that its attention had been called to the inconsistency between the provision in paragraph 8-28 of the specifications which required the use of hollow-back pieces and the indication on plate 414 that some hollow-back pieces and some fiat-back pieces were to be used. The plaintiff requested “an early reply indicating which of the two contract documents govern.” The reply of the resident engineer was dated January 14, 1960 and stated that plate 414 would govern.
The plaintiff proceeded to install the interior trim in a good and workmanlike manner. However, the use of some flat-back pieces of interior trim caused cracks to appear around the trim. The defendant’s inspectors would take a a business card, and if they could slip it into the crack behind a piece of trim, they would demand that the crack be caulked. In a number of instances, the plaintiff was required to color the filler material in order to match the finish of the redwood.
Since the difficulty with respect' to cracks behind the interior trim was not attributable to any fault on the part of the plaintiff, but arose out of the circumstance that the plaintiff used flat-back trim in accordance with the provisions of the contract as prepared by the defendant and interpreted by the parties, the defendant should be required to reimburse the plaintiff for the latter’s unexpected expense incurred in caulking the cracks.
Initially, the plaintiff set the nails in the redwood trim. This procedure involved taking a little punch and setting the nails slightly below the surface of the wood so that the places might be puttied and not seen. Later, however, the defendant instructed the plaintiff not to set the nails as the plaintiff had been doing, and the plaintiff immediately discontinued the practice.
However, at still a later stage in the construction process, the plaintiff was ordered by the defendant to set the nails in the trim. In addition, the plaintiff was instructed to go back and reset the nails in the units that had been com *506 pleted since the plaintiff discontinued the practice of setting nails pursuant to instructions from the defendant.
As the plaintiff’s difficulty in connection with the setting of the nails in the interior trim was attributable to the contradictory instructions issued by the defendant, the plaintiff should be permitted to recover on this aspect of claim 26.
Bird Blocking
Bird blocking is put in deck and beam housing. A bird blocking is a piece of wood that goes in between two rafter beams at the intersection of the interior wall and the roof beams. '
The usual and customary manner of installing bird blocking in deck and beam houses is to install it with the rafters, before the roof decking goes on. It is easier to put on at this time, and it acts as a spacer and holds the beams, keeping them from twisting at the plate line and at the ridge line.
However, the defendant’s inspectors at Fort Hood required that the bird blocking be put in after the dry wall was installed in the buildings. This occasioned unusual difficulty and extra expenses to the plaintiff, as outlined in the findings of fact. The plaintiff was certainly entitled (in the absence of any express provision in the contract to the contrary) to follow the usual and customary trade practice of installing the bird blocking along with the rafters.
Since in Part I, we rejected the Government’s affirmative defense to this claim, the plaintiff is entitled to recover on the bird blocking aspect of claim 26.
Fire Blocking
A fire block is a horizontal member in a wall section. It is placed between the studs.
Paragraph 8-12 (a) of the specifications stated in part that “Partitions in each story of exterior walls shall be provided with one row of horizontal blocking the full width of the studding, cut-in and securely nailed.” Detail B-407 on plate 407 of the contract drawings showed the fife blocking on the exterior wall, together with a notation stating “2 x 4 blocking at midpoint.”
*507 The usual and customary method of fire blocking is to use precut blocks 14% inches long. They are set at approximately midheight, and are nailed offset from each other over the width of the block, so that the nailing will be easy. They are usually installed before the wall is raised and while it is lying on the floor, nailed together.
The plaintiff desired to follow the customary method of placing the fire blocking in an alternative fashion, with the blocks nailed offset from each other between studs. However, the defendant required that the fireblocks be nailed at exactly 4 feet and % inch from the bottom of the plate up to the center of the block. It was necessary for the plaintiff to make measurements and then nail the blocks exactly in line, with a toenail process. Because of this requirement, the installation of the fire blocking took a longer period of time than the customary procedure would have taken.
However, the express requirement in paragraph 8-12 (a) of the specifications that the exterior walls “shall be provided with one row of horizontal blocking the full width of the studding,” and the specific indication on the contract drawings that the exterior walls should have “2 x 4 blocking at midpoint,” governed the matter of the installation of the fire blocking on this particular job. These specific provisions of the contract could not be overcome by the usual trade practice of nailing pieces of fire blocking offset from each other.
Other Blocking
Additional blocking was required by the defendant in instances where it was not called for in the plans and specifications.
Since this requirement was outside the provisions of the contract, the plaintiff is entitled to be reimbursed for the extra expenses to which it was subjected by virtue of such requirement.
Siding
The contract plans and specifications provided for various kinds of exterior finishes for the houses at Fort Hood. Some of the houses were finished with brick exteriors, while others *508 bad wood siding applied to tbem. Among the wood sidings provided for were various binds of redwood ‘and cedar.
The siding was installed 'by tbe plaintiff in accordance wi’tbtbe plans and specifications.
End-splitting and shrinkage are inevitable and normal in redwood, the material of which much of the siding was made. However, some siding was ordered by the defendant to be removed after installation because of the occurrence of the inevitable and normal end-splitting and shrinkage, and not because of poor workmanship on the part of the plaintiff.
In view of the defendant’s implied warranty that results satisfactory to the defendant would be accomplished if the plaintiff followed the contract plans and specifications, the difficulty with respect to the end-splitting and shrinkage of redwood siding installed in accordance with the plans and specifications was attributable to a breach of this implied warranty. Accordingly, the plaintiff is entitled to be reimbursed for the extra expenses that it incurred in removing and replacing such redwood siding.
Caulking
Although the contract specifications did not require caulking at the intersection of the 2x2 redwood or cedar member and the beam underneath the wood siding, the plaintiff was required by the defendant to perform such a caulking operation.
As this requirement was outside the provisions of the contract, the plaintiff is entitled to recover for the extra expense to which it was put in complying with such requirement.
Fences
There was an inconsistency in the number of fences shown on the landscape plans and the number of fences shown on the plot plans, with the landscape plans showing the greater number of fences.
The plaintiff was required by the defendant to follow the landscape plans, rather than the plot plans, in building fences on the project.
*509 The ambiguity in the plans with respect to the number of fences which the plaintiff was required to build should be resolved against the defendant as the drafter of the contract plans and specifications. Accordingly, the plaintiff is entitled to recover for the cost of building fences in excess of the number provided for on the plot plans.
Multiple Inspections
The plaintiff was subjected to multiple inspections of the same framing work by different inspectors. Sometimes, items approved on a previous inspection would be disapproved on a subsequent inspection.
These inconsistent inspections amounted to an unreasonable interference with the plaintiff in its attempt to perform the contract. Cf. Roberts v. United States, supra, 174 Ct. Cl. 940, 857 F. 2d 938; Adams v. United States, 175 Ct. Cl. 288, 358 F. 2d 986 (1966). Accordingly, the plaintiff is entitled to recover on this phase of claim 26.
Absence of Grade Stamps
The lumber that was delivered to the building sites had been graded as conforming to the specifications and had been properly grade-marked.
The plaintiff was required by the defendant on occasion to remove from buildings lumber that had been installed but which did not bear a grade stamp after installation. The inference is warranted that the grade stamp had been cut off the end of the lumber during the carpentry work.
The lumber which the defendant ordered the plaintiff to remove from buildings, as indicated in the preceding paragraph, did not show any signs of being defective.
The defendant’s actions with respect to the incidents mentioned in this part of the opinion amounted to an unreasonable interference by the defendant with the plaintiff in the performance of the contract. For that reason, the defendant is liable to the plaintiff for the extra expense which resulted from such unreasonable interference.
*510 Claim 07 — Painting Roof Overhang
Under the terms of the contract, the plaintiff was required to paint certain portions of the exteriors of the housing units built under the contract. Paragraph 18-9 of the specifications covered the subject of exterior painting and provided in part as follows:
(a) General. — Exterior painting shall include the finishing of all millwork, wood siding, ferrous metal, galvanized metal, uncolored asbestos board noted to be painted. Items completely finished át the factory shall not be painted.
Hi H* Hs H«
(g) Finishes. — Exterior finishes shall be as noted on the “EXTERIOR FINISH SCHEDULE” on the drawings, and as described in paragraph 18-11 “Paint Finishes.”
Plate No. 428 of the contract drawings, under the EXTERIOR FINISH SCHEDULE, described the finish for the exposed insulated roof decking and contained this notation: “(No Paint Required for Portland-cement-binder type deck).”
The roof decking required under the original specifications was the “Portland-cement-binder type” referred to on plate 428 of the drawings. However, no roof decking that fully complied with the requirements set out in the original specifications was available on the market at the time, so the parties entered into a contract change which gave the plaintiff greater flexibility in the selection of roof decking.
The material furnished by the plaintiff, approved by the defendant, and installed as the roof decking on the deck and beam houses at Fort Hood was 3-inch Johns-Manville insulated roof decking. This material was primarily composed of pressed wood fibers, bound together with an asphalt binder and a cellulose binder. The underside of the roof decking material, in looks, appeared to be the same as acoustical ceiling panels, and came from the factory with a coat of white paint.
The edge and surface of the roof decking were not treated in such a way as to withstand weather, and the material did *511 not give the appearance of being able to withstand the weather. Furthermore, the published literature on the roof-decking indicated that it was not completely finished at the factory for exterior use.
The defendant’s personnel at Fort Hood required that the exposed exterior underside of the roof decking be painted. The painting subcontractor protested to the plaintiff with respect to this requirement. On January 27, 1960, the plaintiff forwarded this protest to the contracting officer, who, in turn, forwarded the matter to the Federal Housing Commissioner. Under the date of February 16, 1960, the Federal Housing Commissioner rendered a decision stating that the painting work on the exposed exterior underside of the roof decking was required by the contract, and giving the reasons for his decision. This determination was adopted by the contracting officer, and the plaintiff was duly notified.
The original specifications, on which the plaintiff based its bid, provided for the use of roof decking of the Portland-cement-binder type and provided that no paint would be required for such decking. The problem relative to the painting arose because it was impossible to procure on the market the type of roof decking prescribed by the specifications, and the plaintiff utilized, with the approval of the defendant, a type of roof decking that was not able to withstand the weather without protection from painting. From this the plaintiff concludes that its extra expenses are ultimately attributable to the impossibility of carrying out the original contract provisions, which turned out to be defective in light of the then current market conditions.
We cannot accept the plaintiff’s allocation of responsibility.[25] Since it contracted to supply the material, the burden of determining the availability of “Portland cement binder” decking belonged to it, not to the Government. Vogt Bros. Manufacturing Co. v. United States, supra, 160 Ct. Cl. at page 701; cf. Chalender v. United States, 127 Ct. Cl. 557, 563, *512 119 F. Supp. 186, 190 (1954). The requirement that “Portland cement binder” type of decking be used was certainly not a representation that such material was then available on the market. Moreover, there is no significant difference between a situation (claim 3, supra, for example) in which the contractor must pay more than he expected to have a commercially unavailable product specially manufactured and circumstances, as here, where the contractor had to perform unexpected work in order to prepare an adequate substitute for an item he could not acquire. In neither case, absent a special agreement or wrongful conduct, should the Government sustain the additional cost. The risk was plaintiff’s, and the defendant, by approving the use of Johns-Manville decking, did not agree to shift that burden. The result is that the defendant was within its contractual rights when it demanded that plaintiff paint the roof decking in order to provide a finished product that conformed, insofar as possible, to the decking required by the contract.
III.
The subject of damages is covered by findings 435-452 and is discussed, in general, in Part I, supra. As indicated in the findings, the plaintiff is entitled to recover $310,277.48, of which amount $30,337.18 is for the use and benefit of its subcontractors.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastín G. White, and the briefs and argument of counsel, makes findings of fact as follows:

General

1. At all times material herein, the Robertson Construction Company (hereinafter referred to as “the plaintiff”) was— and it now is — a joint venture composed of the following California corporations: WEB Corp., WEME, Inc., WMI, Inc., WMEK, Inc., WEH Corp., Samex Investment Corp., WMIK, Inc., WEJ Corp., Sayell Investment Corp., Sayirv Investment Corp., WRM Corp., Sayman Investment Corp., *513 Boliarl Investment Co., Anna Investment Co., Inc., Paul Investment Co., Inc., Helen Investment Co., Inc., and Nelson Gardens, Inc.
2. Pursuant to an invitation for bids (Invitation No. NG-41-443-58-65) dated May 14,1958, as amended, the plaintiff on June 17, 1958, submitted its bid to furnish all the necessary labor, equipment, and material and to perform all the work, services, and arrangements for an Armed Services housing project consisting of 500 housing units to be constructed at Fort Hood, Texas, in accordance with the terms of the specimen copies of the letter of acceptability and the housing contract attached to the invitation for bids, and for the price set forth in the price schedule attached to the plaintiff’s bid.
3. Prior to submitting its bid for the construction of the 500 units at Fort Hood, the plaintiff was the eligible builder and constructed 2,042 housing units at Fort Knox, Kentucky, under the Capehart Act housing program.
4. (a) By a letter dated June 30,1958, the Department of the Army (hereinafter referred to as “the Department”) issued its letter of acceptability whereby it determined that the plaintiff’s bid in the amount of $8,204,229 (consisting of a basic bid and additive alternates “a” through “t”) was the lowest acceptable bid. Bids were opened on June 17, 1958, and the plaintiff’s bid was determined to be the lowest of six bids received, with a total bid of $8,204,229 on all items.
(b) By a letter dated July 2, 1958, the plaintiff asserted that it had made a mistake in its bid. The plaintiff’s claim was thereafter considered by the contracting officer and by the Comptroller General of the United States. By a decision dated September 22,1958 (B-137334), the Comptroller General allowed the plaintiff’s claim with respect to the mistaken bid. Thereafter, the defendant’s contracting officer permitted an increase of $54,000 in the base bid. As a result of this adjustment, five additive alternates were deleted.
(c) The plaintiff’s final bid of $8,218,036 was only $259,596, or 3 percent, less than the Government’s estimate of the cost of the 500-unit housing project at Fort Hood.
5. On or about October 30,1958, the initial closing for the 500-unit project was completed and the plaintiff entered *514 into Housing Contract No. DA-41-243-eng-3808 (hereinafter referred to as “the contract”) for the construction of the 500 family units at Fort Hood, Texas, for the contract price of $8,218,036. The total mortgage amount limitation under the Capehart Act was determined by the FHA to 'be $8,236,700 for the 500 units, since the estimate of usable on-site utilities amounted to $13,266 and the odd dollars were “rounded off” to hundreds.
6. In form, the contract contained the standard provisions applicable to housing contracts utilized for the construction of housing under the Capehart Housing Act. It provided in part as follows:
ARTICLE XVIII — INSPECTION.
(32) The Department will make all inspections necessary to determine compliance with the terms of this Housing Contract.
$ ‡ ‡ ‡ $
GENERAL PROVISIONS
iji % # if: %
1. Definitions.

tfc ifc Hi ifc

(b) “Contracting Officer” means the person who executes this Housing Contract on behalf of the Department, and includes his duly appointed successor or his authorized representative.
*5* Hí i' Ht
2. Contract Documents.
(a) The contract documents are complementary and what is called for by one shall be deemed to be called for by all. The intent of this Housing Contract is to include all labor, materials, supplies, equipment, transportation, services and items necessary for the financing and construction of the project.
H* »[» íH
(c) In any case of discrepancy, either in the figures, in the Drawings, or in the Specifications, the matter shall promptly be submitted to the Contracting Officer, who shall promptly obtain a determination in writing from the Commissioner. Any adjustment by the Eligible Builder without such determination shall be at his own *515 risk and expense. Omissions from the Drawings or Specifications, or misdescription of details of work which 'are manifestly necessary to carry out the intent of the Drawings and Specifications, or which are customarily performed, shall not relieve the Eligible Builder from performing such omitted or misdescribed details or work, but they shall be performed as if fully and correctly set forth and described in the Drawings and Specifications. The Eligible Builder shall check all Drawings and Specifications furnished him immediately upon their receipt and shall promptly notify the Contracting Officer of any discrepancies. The Eligible Builder shall compare all Drawings and verify the figures before laying out the work and shall be responsible for any errors which might have been avoided thereby. When measurements are affected by conditions already established, the Eligible Builder shall take measurements notwithstanding the giving of scale or figure dimensions in the Drawings. Deviations from the Drawings and ■the dimensions therein given, whether or not error is believed to exist, shall be made only after written authority is obtained from the Contracting Officer and the Commissioner.
*****
8. Materials and WorhmansMp.
Unless otherwise specifically provided for in the Specifications, all equipment, materials and articles incorporated in the work covered by this Housing Contract are to be new and of the most suitable grade of their respective kinds for the purpose, and all workmanship shall be first class. Where equipment materials or articles are referred to in the Specifications as “equal to” any particular standard, the Contracting Officer shall decide the question of equality. The Eligible Builder shall furnish to the Contracting Officer for his approval the name of the manufacturer of machinery or mechanical or other equipment which he contemplates incorporating in the work, together with their performance capacities and other pertinent information When required by the Specifications, or when called for by the Contracting Officer, the Eligible Builder shall furnish the Contracting Officer for approval full information concerning the materials or articles which he contemplates incorporating in the work. Samples of materials shall be submitted for approval when so directed, and materials used shall conform to approved samples. Machinery, equipment, materials, and articles installed or *516 used without such approval shall be at the risk of subsequent rejection. * * *
5. Permits, Responsibility for Work, Etc.
(a) * * * tie [the Eligible Builder] shall also be responsible for all materials delivered and work performed until completion and final acceptance, except for any completed unit thereof which theretofore may have been finally accepted.
(b) The Eligible Builder shall protect the materials and work from deterioration and damage during construction and shall store and secure flammable material from fire, remove oily rags, waste and refuse from buildings each night, and during cold weather furnish all heat necessary for the proper conduct of the work. * * *
6. Inspection.
(a) Except as otherwise provided herein, all material and workmanship, if not otherwise designated by the Specifications, shall be subject to inspection, examination, and test by the Contracting Officer at 'any and all times during manufacture and/or construction and at any and all places where such manufacture and/or construction are carried on. The Department and the Mortgagor-Builder, or either of them, shall have the right to reject defective material and workmanship or require its correction. Eejeoted workmanship shall be satisfactorily corrected, and rejected material shall be satisfactorily replaced with proper material, without charge therefor, and the Eligible Builder shall promptly segregate and remove the rejected material from the premises. If the Eligible Builder fails to proceed at once with the replacement of rejected material and/or the correction or defective workmanship, such failure may be treated as a default.
*
8. Disputes.
Except as otherwise provided in this Housing Contract, any dispute concerning a question of fact arising under this Housing Contract which is not finally decided by the Commissioner, which may be adjusted between the Eligible Builder and the Contracting Officer and which is not in fact disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Eligible Builder. Within 30 days from the date *517 of receipt of such copy, the Eligible Builder may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the Department, and the dicision [sic] of the head of the Department or his duly authorized representative for the •hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive; and provided further, that in no event shall the Contracting Officer, the head of the Department or his duly authorized representative have authority under this clause to make any decision which shall cause the total amount payable to the Eligible Builder under this Housing Contract to exceed the maximum amount payable from mortgage proceeds. In connection with any appeal proceeding under this clause, the Eligible Builder shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Eligible Builder shall proceed diligently with the performance of this Housing Contract and in accordance with the decision of the Contracting Officer.
9. Changes and Changed Conditions.
(a) The Contracting Officer may, at any time, by a Construction Change Request, FHA Form No. 2437C, and without notice to sureties, propose changes in the Drawings and/or Specifications of this Housing Contract and within the general scope thereof. Each such proposed construction change will be submitted to the Eligible Builder for his estimate of the increase or decrease in cost and time of performance, if any. After such action by the Eligible Builder, the proposed construction change will be returned to the Contracting Officer. Likewise, the Eligible Builder may, without notice to sureties, propose changes within the same scope, all such proposed changes to be in writing and to contain the Eligible Builder’s estimate of the increase or decrease in cost and time of performance, if any, and to be submitted to the Contracting Officer. In all cases, the Eligible Builder will sign proposed construction changes for himself and as agent for the Mortgagor-Builder concerned.
(b) All proposed construction changes, including those resulting m no increase or decrease of cost will be submitted by the Contracting Officer to the Commis *518 sioner, with copy to the Mortgagee concerned. The determination of the Commissioner as to the increase or decrease in cost and time of performance shall be final with respect to all such changes to be paid or deducted from mortgage proceeds. If any such change is approved by the Mortgagee concerned and the Commissioner to be paid or deducted from mortgage proceeds, the amount of the corresponding maximum insurable mortgage, as herein defined, and this Housing Contract will be considered as modified by such approved construction changes, and the Eligible Builder shall proceed diligently to execute such approved construction change.
(c) No change of any character shall be made unless in pursuance of a written order approved as required in the preceding paragraphs, and no claim for adjustment of the contract sum shall be recognized unless the Eligible Builder, prior to the making of such claim for adjustment, is in receipt of an approved written order.
* * * • * #
10. Deductions for Unoorrected Worle.
If the Contracting Officer and the Commissioner deem it inexpedient to correct work not performed in accordance with this Housing Contract, an equitable deduction of the contract price shall be made therefor pursuant to the construction change procedure herein provided.
^ iji #
12. Correction of Defects and Faulty Workmanship and Warranties.
(a) The Eligible Builder shall, at the request of, and in a manner acceptable to the Contracting Officer and the Commissioner correct any defects due to faulty materials or workmanship which appear within a period of one year following final endorsement of the mortgage note concerned for mortgage insurance by the Commissioner.
f]í ^
34. No Waiver by Department.
The failure of the Department or any Mortgagor-Builder in any one or more instances to insist upon strict performance of any of the terms of this Housing Contract, or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment to any extent of the right to assert or rely upon any such terms or option on any future occasion.
*519 36. Oral Modification.
No oral statement of any person whomsoever shall in any manner or degree modify or otherwise affect the terms of this Housing Contract.
$ ‡ ‡ $
44. Shop Drawings.
The Eligible Builder shall submit to the Contracting Officer for approval, four (4) copies of all shop drawings as called for under the various headings of these specifications. These drawings shall be complete and shall contain all required detailed information. If approved by the Contracting Officer, each copy of the drawings will be identified as having received such approval by being so stamped and dated. The Eligible Builder shall make any corrections required by the Contracting Officer. Three (3) sets of all shop drawings will be retained by the Contracting Officer and one (1) set will be returned to the Eligible Builder. The approval of the drawings by the Contracting Officer shall not be construed as a complete check, but will indicate only that the general method of construction and detailing is satisfactory. Approval of such drawings will not relieve the Eligible Builder of the responsibility of any error which may exist as the Eligible Builder shall be responsible for the dimensions and design of adequate connections, details, and satisfactory construction of all work.
7. The plaintiff has fully performed the contract, has completed the construction of the 500 units, and the 500 units have been accepted by the Department. The date of final closing for each mortgage area under the contract was as follows:
Mortgage Area 1 — February 23,1960;
Mortgage Area 2 — March 22,1960;
Mortgage Area 3 — April 15,1960;
Mortgage Area 4 — May 6,1960;
Mortgage Area 5 — June 3,1960.
8. At all times material herein:
(a) E. A. Hansen was Colonel, C.E., Contracting Officer, and District Engineer, Corps of Engineers, Galveston District.
(b) Stacy McKnight was Eesident Engineer, Corps of Engineers, Galveston District, Fort Hood, Texas. The Con *520 tracting Officer appointed him “Contracting Officer Bepre-sentative for assuring compliance with the terms of all contracts within your assigned area.” Among the specific functions delegated were: “Inspection, examination and testing of workmanship”; “Bejection of defective material and/or workmanship”; and “Kequire replacement of defective material and/or workmanship.” This delegation, first made in mid-1958 and periodically reaffirmed, was applicable to this Fort Hood project.
(c) Oran White was Assistant Besident Engineer, Corps of Engineers, Galveston District, Fort Hood, Texas.
(d) Mr. Cloudt was Inspector, Corps of Engineers, Galveston District, F ort Hood, Texas.
(e) Mr. McQuain was Assistant Chief of Construction, Corps of Engineers, Galveston District.
(f) Mr. Harrison was Inspector, Corps of Engineers, Galveston District.
(g) Mr. Mebane was Inspector, Corps of Engineers, Galveston District.
(h) Mr. Laird was Chief of Construction, Corps of Engineers, Galveston District.
(i) Mr. Casey was Inspector, Corps of Engineers, Galveston District.
(j) Mr. Wilson was Inspector, Corps of Engineers, Galveston District.
(k) Mr. Boswell was Inspector, Corps of Engineers, Galveston District.
(l) Elliott Maltzman was General Manager of the plaintiff and a partner in W. E. Eobertson Co.
(m) LeBoy Staton was General Superintendent of the plaintiff.
>9. At all times material herein:
(a) General Floor Covering Company of Los Angeles was the plaintiff’s subcontractor that furnished the labor and material in connection with the flooring work, and J. H. Neece was the general partner in General Floor Covering Company.
(b) Trinity Flooring Company of Dallas, Texas, furnished the labor and material in connection with the flooring *521 subcontract, and George Berry Herdon was thaJt company’s general superintendent.
(c) Anderson Cabinet Corp. was the plaintiff’s subcontractor that furnished the labor and material in connection with the cabinet work.
(d) Texon Wood Manufacturing Co. was the plaintiff’s subcontractor that furnished the labor and material in connection with furnishing, fabricating, and installing fully formed kitchen counter-tops, vanity tops, and certain other cabinets.
(e) Kitzman’s Plumbing of Texas, Inc., was the plaintiff’s subcontractor that furnished the labor and material in connection with the plumbing work and bath wall heaters, and Eoy A. Bordeaux was Kitzman’s general superintendent.
(f) J. E. Eiley & Sons, Inc., was the plaintiff’s original subcontractor that furnished labor and material in connection with the dirt-hauling work.
(g) Odell Geer Construction Co. was originally the subcontractor for J. E. Eiley & Sons, Inc., and subsequently furnished the labor and material in connection with the dirt-hauling work. Odell Geer was the owner of Odell Geer Construction Co.
(h) B. H. C. Paving Co. was the plaintiff’s subcontractor that furnished the labor and material in connection with the street-paving work. Bert Camp was the owner of B. H. C. Paving Co.
(i) C. H. Euebeck Co. was the subcontractor that furnished the labor and material in connection with the roofing, waterproofing, and sheet-metal work. Jack Weathers was an employee of C. H. Euebeck Co.
(j) Mitchell Darby Co. was the subcontractor that furnished the labor and material in connection with the installation of the utility systems, waterlines, gas distribution system, and sewer systems. Mitchell Darby was the president of Mitchell Darby Co.
(k) Maplewood Sheet Metal Co. was the subcontractor that furnished the labor and material in connection with the heating and air-conditioning work. Billy Middleton was the general superintendent and Jack Neise (also known as Neece) was the co-owner of Maplewood Sheet Metal Co.
*522 (l) Southern Concrete Construction, Inc., was the subcontractor that furnished the labor and material in connection with the concrete work. Richard E. Job was the principal stockholder of Southern Concrete Construction, Inc. Sometime between April and June of 1959, Southern Concrete Construction, Inc., became a supplier only of ready-mix concrete.
(m) E. Scoggins Masonry Contractors, Inc., was the subcontractor that furnished the labor and material in connection with the masonry work.
(n) F. H. Donovan Paint Co., Inc., was the subcontractor that furnished the labor and material in connection with the painting work. Before completing the work, the F. H. Donovan Paint Co., Inc., became a bankrupt and' was unable to complete its painting subcontract on the Fort Hood project. The painting work was completed by the Home Indemnity Company as surety for F. H. Donovan Paint Co., Inc.
(o) Na Mar Builders, Inc., and Marna Builders, Inc.,, were the subcontractors that furnished the labor and material in connection with the carpentry work. Jack Nation was the president and Cleve Johnson was the general superintendent of Na Mar Builders, Inc., and Marna Builders, Inc. The plaintiff’s subcontracts for carpentry work were-with Na Mar Builders, Inc., only. The plaintiff had no apparent subcontract with Mama Builders, Inc., on the Fort Hood Capehart housing project.
10. (a) Under the contract, the construction of the 500 family units was divided into five separate projects, as follows:
(1) Mortgage Area 1 (FHA Project #112-81005-Army-6) consisted of 88 units ;
(2) Mortgage Area 2 (FHA Project #112-81006— Army-7) consisted of 66 units;
(3) Mortgage Area 3 (FHA Project #112-81007— Army-8) consisted of 120 units ;
(4) Mortgage Area 4 (FHA Project #112-81008-Army-9) consisted of 99 units; and
(5) Mortgage Area 5 (FHA Project #112-81003— Army-5) consisted of 127 units.
*523 (b) The several projects were constructed by the plaintiff as separate ventures under the following corporate names:
Mortgage Area 1 — Allied Builders;
Mortgage Area 2 — Bonded Building Co.;
Mortgage Area 3 — Cal-Tes Co.;
Mortgage Area 4 — Don Construction Co.;
Mortgage Area 5 — E. J. Contractors.
11. (a) During the course of performance of Hie contract, the plaintiff presented two claims to the contracting officer for decision under the “Disputes” clause procedures. One of these was claim 11, for service stops and boxes, which was decided by the contracting officer on May 11,1959.
(b) The second claim presented to the contracting officer was claim 27, relative to the painting of the roof overhang, which was decided by the contracting officer on February 17. 1960.
12. During the course of the performance of the contract, the parties agreed upon and executed 10 construction changes, altering the work and the contract price. Each of the construction change requests (FHA Form 2437-c) was agreed upon by the mortgagee-bank and the Federal Housing Administration, and was executed by the contracting officer and the plaintiff’s principal officer. As a result of the 10 construction change orders agreed upon, the final contract price at the completion of the job was increased upward to $8,236,427.79, leaving a balance of $272.21 below the statutory limitation on mortgage proceeds.
13. On February 23, 1960, the final closing for Mortgage Area 1 occurred in Dallas, Texas. At that time, the parties executed Supplemental Agreement No. 1 to the contract, which incorporated into the contract, by reference, the 10 construction changes that had been agreed, upon by the parties during the course of performance, together with appropriate changes in the contract price. In addition, the parties also executed all other necessary documents to effect a closing of Mortgage Area 1.
14. (a) At the time of the final closing for Mortgage Area, 1 on February 23,1960, the plaintiff handed to the contracting officer 28 claims in writing. The plaintiff requested reimbursement for all the claim items, and also requested *524 a ruling by the contracting officer on all tbe items except number 27 (see finding 11 (b)).
(b) Thereafter, the contracting officer prepared and issued to the plaintiff his decision and findings of fact dated March 11, 1960, on the claims referred to in paragraph (a) of this finding.
(c) Among other things, the contracting officer found that items 10, 11, and 28 among the plaintiff’s claims had been previously adjudicated.
(d) With respect to the plaintiff’s other claims, the contracting officer’s decision and findings of fact contained the following statements (among others) :
The initial contract price of $8,218,036 left a balance of $18,664 'below the statutory limitation. Change Requests approved on all mortgage areas in the contract up to final closing on Mortgage Area No. 1 on 23 February 1960 left a balance of $272.21 below the limitation.
s& # * * *
* * * [T]he contracting officer finds and determines that:
# * * Jf: *
work under Mortgage Area No. 1 was determined complete, except for items of delayed completion, by the Contracting Officer and the FELA;
the Contracting Officer assured the FELA that there would be no further change requests processed on the project;
the Mortgagee Bank declared no more advances would be made;
Fort Hood Housing Corporation No. 1, maker of the note, was released from any and all claims by the Eligible Builder;
the Heed of Trust note on Mortgage Area No. 1 received final endorsement by FELA on 23 February 1960, thereby establishing as final the amount payable from mortgage proceeds for FELA Project 112-81005-Army-6, and constituting the full amount obligated to be paid to the Eligible Builder by the Mortgagor Builder under the terms of the contract;
the Contracting Officer’s authority to render decisions arises under, and is governed by, the provisions of the contract, which contract restricts the Contracting Officer to decisions on questions of fact and prohibits any deci *525 sion which, shall cause the amount payable to the Eligible Builder under the contract to exceed the maximum amount payable from mortgage proceeds;
Therefore, the Contracting Officer is without authority to grant or deny your requests for additional compensation, and such requests are hereby dismissed.
15. Under the date of April 4,1960, the plaintiff appealed from the contracting officer’s decision to the Armed Services Board of Contract Appeals.
16. During the course of the final closing for Mortgage Area 1, the plaintiff executed a general release, to which was attached a list of 28 claims. The text of the release was as follows:

RELEASE

The work under Contract No. DA-41-243-eng-3808 dated October 30, 1958; between the United States of America; FOET HOOD HOUSING COEPOEATION NO. 1, a Delaware corporation; and the undersigned, EOBEETSON CONSTEUCTION COMPANY, a joint venture; having been satisfactorily completed and accepted as set forth in the “Determination of Completion and Notice of Final Acceptance” of even date herewith, the undersigned does hereby remise, release and forever discharge the United States of America and FOET HOOD HOUSING COEPOEATION NO. 1, their officers, agents, successors and assigns, jointly and severally, of and from any and all claims and demands whatsoever arising out of or by virtue of said Contract, except as follows:
see attached list
The attached reservations of claims are specifically waived in respect to Fort Hood Housing Corporation No. 1.
17. (a) The final closing for Mortgage Area 2 occurred at Dallas, Texas, on March 22,1960. At that time, the plaintiff handed to the contracting officer a list of 24 claims that were numbered 1-12,14-19, 21, 22, and 25-28. The plaintiff requested a ruling by the contracting officer on all the claim items except number 27.
(b) The contracting officer’s decision and findings of fact relative to the claims mentioned in paragraph (a) of this *526 finding were dated May 4, 1960, and were similar to tile decision and findings of fact which the contracting officer had previously issued with respect to Mortgage Area 1 (see finding 14).
18. In connection with the closing of Mortgage Area 2, the plaintiff executed a general release which was similar in all significant respects to the release previously executed with respect to Mortgage Area 1, including the list of reserved claims attached to the release (see finding 16).
19. Early in April 1960, as the parties were preparing to effect the final closing of Mortgage Area 3, the contracting officer wrote to the plaintiff, noting that its proposed release submitted for review prior to the final closing disclosed an intent to submit another list of claims. The contracting officer’s letter stated in part as follows:
Since the release indicates that claims are being reserved under the contract as pertains to this Mortgage Area, you are requested to submit those claims for the obtaining of an FHA determination thereon and the issuance of the Contracting Officer’s decision prior to closing. It is realized that the closing date in such event would have to be postponed indefinitely to permit the gathering of factual information and study for submission of the matter to the FHA. However, such procedure will insure full consideration of any claims you feel you may have in accordance with the terms of the contract.
20. (a) The final closing for Mortgage Area 3 occurred at Dallas, Texas, on April 15,1960. At that time, the plaintiff handed to the contracting officer a list of 23 claims that were numbered 1-12, 14-16, 18, 19, 21, 22, and 25-28. The plaintiff requested a ruling by the contracting officer on all the claim items except number 27.
(b) The contracting officer’s decision and findings of fact relative to the claims mentioned in paragraph (a) of this finding were issued on May 25,1960. Such decision and findings of fact were similar to those previously issued in connection with Mortgage Area 1 (see finding 14).
21. On April 25, I960, as the parties were preparing to close Mortgage Areas 4 and 5, the contracting officer again requested the plaintiff to submit its claims in advance of the *527 closing, “so that an FHA determination may be obtained thereon, and a Contracting Officer’s decision may be rendered prior to closing,” and indicating that “such procedure will insure full consideration of any claims you feel you may have in accordance with the terms of the contract.”
22. (a) The final closing for Mortgage Area 4 occurred at Dallas, Tesas, on May 6,1960. At that time, the plaintiff handed to the contracting officer’s representative a list of 22 claims that were numbered 1-12, 15, 16, 18, 19, 21, 22, and 25-28. The plaintiff requested a ruling by the contracting officer on all the claim items except number 27.
(b) The contracting officer’s decision and findings of fact relative to the claims mentioned in paragraph (a) of this finding were issued under the date of June 13, 1960. The decision and findings of fact were similar to those previously issued in connection with Mortgage Area 1 (see finding 14).
23. (a) The final closing for Mortgage Area 5 occurred at Dallas, Texas, on June 3,1960. Some four days later, by means of a letter dated June 7, 1960, the plaintiff submitted to the contracting officer a list of 22 claims that were numbered 1-12,15,16,18,19, 21,22, and 25-28. The plaintiff requested a ruling on all the claim items except number 27.
(b) The contracting officer’s decision and findings of fact relative to the claims referred to in paragraph (a) of this finding were issued under the date of June 22,1960. The decision and findings of fact were similar to those previously issued in connection with Mortgage Area 1 (see finding 14).
24. For each of the mortgage areas, the plaintiff executed a general release which, in all significant respects, was similar to the general release quoted in finding 16.
25. (a) In each instance, the plaintiff appealed from the contracting officer’s decision and findings of fact to the Armed Services Board of Contract Appeals. The appeals were docketed as ASBCA Nos. 6393, 6425, 6521, 6587, 6588, and 6597. Subsequently, the appeals were consolidated by the Board for decision.
(b) Thereafter, the Government moved to dismiss the claims.
*528 (c) Under tbe date of September 6,1961, tbe Armed Services Board of Contract Appeals dismissed all tbe claims on tbe ground that tbe statutory mortgage limitation had been exhausted and that there were no available proceeds for payment of the claims because tbe limitation of an average of $16,500 per unit bad been reached. Tbe Board’s decision in these consolidated proceedings was based upon the decision of tbe Comptroller General dated May 3, 1961 (B-145318) in Anthony P. Miller, Inc., and the Board’s own decision of June 29, 1961, in Anthony P. Miller, Inc. (ASBCA No. 6677).
Claim 1 — Hardwood Flooring
26. Under the contract, tbe plaintiff was required to furnish and install hardwood flooring in 154 housing units that were commonly referred to as tbe “officers’ quarters.”
27. (a) Paragraph 8-17 of the contract specifications provided that the hardwood flooring was to be laid on wood sleepers, and that the wood sleepers were to be secured to the concrete slab with bituminous adhesive made especially for that purpose and applied in strict accordance with the manufacturer’s directions.
(b) Paragraph 8-28 of the contract specifications provided in part as follows:
Interior Finish. — Interior finish shall be manufactured of the woods specified. Interior finish, including doors and flooring, shall not be brought into building until building is closed to the weather. * * *
(c) Paragraph 8-30 of the contract specifications was entitled “Finish Floors” and provided in part as follows:
(a) Preparation.— * * * Finish flooring shall not be brought into the building until the building is otherwise ready. * * *
(b) Installation. — 'Flooring shall have a finish face of 2% inches and shall not be less than [2]%2" in thickness, shall be tongue and grooved sides and ends and hollow backed, bundled in lengths of two feet and up with the average length of all flooring not less than four feet, laid with close joints, tightly drawn up, and blind nailed *529 with eight penny cut steel or spiral or screw type flooring nails into each floor bearing. Joints shall be alternated, so that there will be at least two boards between them. A one-inch space for expansion shall be provided at walls or partitions. * * *
28. There are three basic methods of laying hardwood flooring over a concrete slab:
(a) The first involves the rigid anchoring of screeds to the slab base, followed by a sub-floor which receives the finished hardwood flooring.
(b) The second method utilizes a sub-floor nailed diagonally on the screeds, which have been imbedded only in mastic.
(c) The third method provides for wood sleepers to be secured to the concrete slab with bituminous adhesive.
29. Of the three basic methods of laying hardwood flooring over a concrete slab, the method providing for wood sleepers to be secured to the concrete slab with bituminous adhesive is a method developed and recommended for its efficiency and economy. This was the method prescribed by the contract.
30. Hardwood flooring expands and contracts to some extent because of weather conditions. In periods of damp weather, such flooring will expand to some extent; and when the weather is dry, the boards will shrink to some extent. As a consequence, boards that are properly installed will be close together in damp weather, but there will be at least some space between the boards during periods of dry weather. If hardwood flooring which is not yet finished becomes rain-soaked, it has a tendency to warp and to buckle.
31. In laying hardwood floors, it is customary and good practice to sand, fill, seal, and wax the hardwood floors as soon as possible after they are laid, in order to protect the floors from the effects of weather. The protective coats of finish and wax, after the sanding process is completed, keep the cracking and splintering of hardwood floors down to a
32. The oak lumber used by the plaintiff’s subcontractor in constructing the hardwood flooring under the contract was inspected and approved for the project by the Corps of Engineers.
*530 33). The plaintiff’s subcontractor installed the dry wall, the doors, and the windows in the units of the officers’ quarters before the sleepers and the hardwood flooring were laid.
34. Installation of the dry wall, doors, and windows before laying the sleepers and hardwood floors was a means of giving greater protection to the sleepers and hardwood floors against changes due to temperature and moisture.
35. The flooring installation in the first building (building 120) was commenced on July 22,1959, with the laying of the wood sleepers. On July 31, 1959, the plaintiff (through its subcontractor) commenced laying the oak flooring itself in the first building. The laying of the oak flooring continued through the month of August in Mortgage Area 1.
36. The oak flooring was installed in an acceptable manner, with good workmanship. When initially installed, the oak flooring was satisfactory from the standpoint of tightness, levelness, and otherwise.
37. It rained at the job site on several occasions during August 1959. There was an especially severe rain, accompanied by high wind, at Fort Hood on Á ugust 31,1959. As windows or doors in some of the buildings where hardwood floors had been installed were open on the occasions of the August rains, including the severe rain and wind storm on August 31, water entered a number of the buildings and wet the hardwood floors. In some instances, the floors were saturated in areas near doors and windows. The oak floors in 28 of the buddings were damaged as a result of the wetting referred to in this finding.
38. (a) On the day after the severe rain and wind storm which occurred at the end of August 1959, and which is referred to in finding 37, the plaintiff notified its insurance company regarding a claim for water damage. On the same day, an insurance adjuster visited the job site to check the damage. The insurance adjuster and the plaintiff’s superintendent examined the damage in the houses and prepared a joint estimate concerning the amount of repair work that was required. This joint estimate showed water damage to the floors in 28 buddings, totaling an estimated amount of *531 $3,099.56. Buildings 1-3, 5, 7, 8, 10, 12-17, 21-24, 27, and 119-128 were involved in the water damage.
(b) In due course, the insurance company paid the plaintiff the sum of $2,999.56 (the estimated amount of the loss, less the sum of $100 that was deductible under the terms of the insurance policy).
39. Beginning in October 1959, the plaintiff’s flooring subcontractor replaced some of the oak flooring that had been damaged by water. However, repair work was not accomplished during 1959 in all of the 28 buildings that had water-damaged floors.
40. By the early part of November 1959, the initial process of laying the hardwood floors in the 154 units of the officers’ quarters had been completed, and the floors were ready for sanding, filling, and finishing.
41. Paragraph 18-8 of the contract specifications provided that the floor sealer, wood filler, and floor wax were to be applied immediately after wood-finished floors had been sanded.
42. The finishing of the oak: flooring in Mortgage Area 1, and especially in the theater area, which had been laid in late July and August of 1959, was commenced on November 9 and 10, 1959, and continued during the months of November and December.
43. In the course of the sanding, filling, and finishing operation, the plaintiff’s subcontractor filled the cracks which had developed in the hardwood floors with filler that had been approved by the defendant.
44. In November 1959, a controversy arose between the plaintiff and the defendant’s resident engineer on the Fort Hood job as to whether certain of the hardwood floors within Mortgage Area 1 were in an acceptable condition. The plaintiff took the position that all the floors complied with the pertinent specifications. The defendant’s resident engineer, on the other hand, contended that some of the hardwood floors were unacceptable. In this connection, the resident engineer and the defendant’s inspectors took the position that no tolerances with respect to visible cracks between boards, *532 or with respect to levelness of the floors, were permissible under the contract.
45. On December 10, 1959, the defendant’s resident engineer wrote a letter to the plaintiff, stating as follows:
In view of the fact that you are .striving, to close Mortgage Area Number 1 at the earliest possible date, it is considered advisable to again point out to you that many of the hardwood floors are unacceptable. The floors are unlevel in many areas. Some boards are not sufficiently nailed, and cracks are excessive in size. Filling of wide cracks will not 'be accepted.
It is requested that you take the action necessary to correct these floors at the earliest possible date in order that closing will not be delayed.
46. On December 12 and 13,1960, a group of buildings in the theater area were inspected, and punch lists covering the alleged deficiencies in the floors were made up and given to the plaintiff.
47. On December 16, 1959, the defendant’s resident engineer wrote a further letter to the plaintiff, stating in part as follows:
In view of the fact that effort is being made to set an early closing date on Mortgage Area Number 1, it is considered necessary to advise you of certain items which are not acceptable and which will require corrective action pi’ior to final acceptance.
«*» •{» K»
s. Some * * * oak floors are not level — in particular, building 120, east unit.
48. On December 31,1959, an inspection of building 13 was made, and the contractor was given the list of alleged deficiencies with respect to that building, one of which was that the oak flooring was wet due to one of the doors being left open.
49. On January 19,1960, the defendant’s resident engineer wrote a letter to the plaintiff, as follows:
On 14 January 1960 you were given a list of deficiencies on the hardwood flooring in the 13 units on “V” Street. Almost without exception each unit had excessive face nailing of boards, cracks too large between *533 boards, improper filling of cracks and sand marks or filler marks left in surface finish.
On 15 January your flooring subcontractor began finishing in another area, namely Building 15. This floor was inspected immediately after sanding operations, and it too contained excessive width cracks and face nailing. Your subcontractor was immediately notified; however, he continued to finish the floor without making corrections. Since then he has worked in Buildings 16 and 17, with each building containing one or more of the above deficiencies, without attempting to correct prior to finishing operations.
Based on the above, it is requested that steps be taken immediately to correct all obvious deficiencies in the flooring prior to finishing operations. In the event there is any doubt as to what will be an acceptable floor, I will again meet with you and your representatives to point out these items, as continued finishing of faulty materials and/or workmanship must cease since these items will not be accepted.
50. On January 24, 1960, the plaintiff’s principal officer visited the job site and discussed the acceptability of the hardwood flooring in Mortgage Area 1 with the defendant’s resident engineer. The plaintiff’s principal officer and the resident engineer did not reach an agreement as to whether all the floors were acceptable.
51. On January 25, 1960, at the request of the plaintiff’s principal officer, a member of the District Engineer’s staff from Galveston visited the job site in connection with the flooring problems. After the staff member arrived at Fort Hood, he and the defendant’s resident engineer and the plaintiff’s principal officer made an inspection of the floors in a number of houses. The general condition of the floors was rather good. However, there were some places in living rooms and bedrooms where the boards were not tight. In several instances, cracks between boards as wide as % inch were noted. Also, there were places where face-nailing of floor boards was apparent.[1] In a few instances, there were water marks on floors near the doors.
52. On January 26,1960, the member of the District Engineer’s staff mentioned in finding 51 and the plaintiff’s princi *534 pal officer met together and reached an agreement on the standards that should be applicable in determining the acceptability of the hardwood floors. This agreement was embodied in a memorandum of understanding, which they both signed, and which stated in part as follows:
Flooring laid tight will have an initial width of 18" per 8 boards. It is recognized that there will be expansion of the boards because of temperature and humidity changes and that the boards will expand to something greater than this initial width. It was also agreed that the maximum width of 8 consecutive boards would not exceed 18%6" and that no individual crack would be greater than %2". Any flooring not meeting these tolerances will be repaired as required to come within the above limits. (Although it will be the exception, the Eesident Engineer, or his authorized representative, may in individual cases authorize flooring in excess of the above tolerances in obscure areas or at other locations where they feel that repair of floor beyond these tolerances will serve no useful purpose.) The individual floor cracks which exceed %2" tolerance will be repaired in one of two ways. In the event the board can be shifted to leave a crack of less than %2" on either side, the repair may be accomplished in this manner. In the event repair in this manner will not result in a crack of less than %2", individual boards or portions of the floor will be replaced to such an extent as is required to come ■within these tolerances. It was agreed that the contractor may in certain instances obtain special milled flooring of greater width than the nominal 214".
The question of floor level was discussed and tentative agreement reached that acceptable floor level would be that not exceeding y^" in 10' deformation in areas where furniture might reasonably be expected. However, before confirmation of this tolerance, a representative of the contractor and the Fort Hood Resident Office will make specific checks of all of the buildings containing hardwood floors to determine how many, if any, of the floors would need to be repaired to meet this criteria. In the event the contractor feels that an unreasonable number of floors would have to be partially torn up and replaced, the matter will be further discussed.
It was also agreed that face nailing would be held to a minimum in conformation with the practices in tongue and groove floor construction.
*535 53. (a) A few weeks after the memorandum of understanding was signed (see finding 52), a further controversy arose between the plaintiff and the defendant’s resident engineer concerning the acceptability of hardwood floors. The plaintiff’s principal officer went to Fort Hood again in connection with this matter, and conferred with the resident engineer. The plaintiff’s principal officer took the position that all the hardwood floors on the project complied with the standards set out in the memorandum of understanding and were acceptable under the memorandum of understanding. The defendant’s resident engineer, on the other hand, contended that many of the floors were not acceptable because they were not level or because there were too many cracks between the boards.
(b) After talking with the defendant’s resident engineer, the plaintiff’s principal officer telephoned to the District Engineer in Galveston, who was also the contracting officer, and stated to him that the resident engineer was not abiding by the memorandum of understanding, and that if the District Engineer did not come to the job site immediately, the plaintiff would withdraw from the job. The District Engineer informed the plaintiff’s principal officer that he could not come to Fort Hood immediately, but that he would be there two days later.
54. Two days after the telephone conversation mentioned in finding 53 (b), the District Engineer went from Galveston to Fort Hood. He was accompanied by the chief of the construction division of the District. At Fort Hood, the District Engineer and the chief of the construction division met the plaintiff’s principal officer and other representatives of the plaintiff. The group made an inspection of several houses that were involved in the controversy between the plaintiff and the defendant’s resident engineer concerning the acceptability of the hardwood floors. The District Engineer determined that the floors in some of the houses had variations in the surface which were in excess of the criterion as to levelness prescribed in the memorandum of understanding. In other instances, the District Engineer determined that floors contained cracks in excess of the tolerances prescribed *536 in the memorandum of understanding. The District Engineer, as contracting officer, ruled that the plaintiff must correct some of the deficiencies found by the resident engineer, but in places where the District Engineer believed that the deficiencies would no't adversely affect the utilization of the floors, he decided that the floors would be accepted without any corrective action. Some supposed deficiencies in the hardwood floors previously listed by the resident engineer were determined by the District Engineer to be within the tolerances prescribed in the memorandum of understanding, so that no corrective action by the plaintiff was required concerning such matters.
55. After the events referred to in finding 54, the District Engineer and the plaintiff’s principal officer discussed and set a tentative closing date for Mortgage Area 1.
56. On February 23, 1960, the parties effected the closing of Mortgage Area 1. At that time, the parties entered into an escrow deposit agreement, under which moneys were withheld for uncompleted work. Included in the items escrowed was an amount of $2,000 representing twice the estimated cost for the completion of the finishing of the hardwood floors.
57. In support of its claim 1 relative to the hardwood floors, the plaintiff submitted an invoice from its flooring subcontractor in the amount of $2,257.62. The evidence in the record fails to establish that the work billed under this invoice was attributable to actions by the defendant or its personnel.
58. The evidence in the record does not establish that the plaintiff or its flooring subcontractor was required by the defendant to take any corrective action with respect to hardwood floors that met the standards prescribed in the memorandum of understanding mentioned in finding 52.
Claim, 2 — Kitchen and Bathroom, GoMnets
59. Under the contract, the plaintiff was required to furnish kitchen and bathroom cabinets in all of the 500 housing units.
60. The plaintiff’s subcontractor for the manufacture and assembly of the kitchen and bathroom cabinets was the And *537 erson Cabinet Corporation. A separate subcontractor, tbe Texon Wood Manufacturing Company, was engaged to install the cabinets and also to manufacture the plastic tops for the kitchen base cabinets.
,61. (a) Section 10 of the contract specifications related to the furnishing and installation of the kitchen and bathroom cabinets. It provided in pertinent part as follows:
10-3. Materials; Lumber and Woodwork. — Lumber shall conform to Federal Specifications MM-L-736 and MM-L-751. At the contractor’s option, lumber for the various uses shall be one of the species listed for the purpose and of the grade indicated.
Type Grade Species
Solid Stock Choice Pine, Idaho.
Painted. O. Select Pine, Northern white, Norway, Sugar, Ponderosa
Natural. A. Birch, Red Maple, white
Plywood: Painted 34" thk Sound One Side Pine, Idaho, Northern, white Norway, Sugar Ponderosa.
Natural 34" Thk Good One Side %" Thk Good One Side Sound One Side Birch, Red Maple, white
10-4. General. — Cabinets shall be of the type and approximate size indicated on the drawings. * * * Differences from the construction hereinafter specified will be permissible (doors and drawers may be flush or lip-type construction) provided that the cabinets afford equal space and utility and appearance, but these differences must be listed for approval by the contracting officer at the same time that shop drawings are approved. * * *
10-5. Odbmets. — Wall and base cabinets shall be of essentially the same construction and shall be built as detailed on the drawings, mortised and tenoned, glued, and nailed together, or doweled and glued together. All exposed edges of natural finished plywood shall be T-banded with matching wood “T”. Exposed edges of painted grade plywood need not be banded provided they are free of voids and are well filled except that *538 shelves made of plywood shall have front edge T banded with matching material. Where cabinet end and bottoms are exposed they shall be rabbeted to receive the 14-inch plywood back. Drawers shall have %" solid stock fronts of material as noted, 7/16" solid stock paint grade hardwood sides let into the front, 7/16" solid stock paint grade soft or hardwood backs let into sides, and %" paint grade plywood 'bottoms let into front and sides. All drawers shall be provided with paraffin treated paint grade hardwood center guides and shall be nailed and glued into a substantial unit.
*****
10-9. Installation. — Cabinets shall be fitted and scribed to the walls and to each other and be nailed or screwed securely in position. Counters shall be attached to cabinets by use of screws or other anchors from the under side.
10-10. Shop Drawings. — Before execution of any work, shop drawings clearly indicating all material, construction, and fastenings will 'be submitted for approval by the contracting officer.
(b) Federal Specification MM-L-751 related to the principal species of softwood grown in the United States. It gave instructions to Government procurement officials concerning the formulation of bids for softwood lumber, the inspection of such lumber, the packing and marking of such lumber for shipment, and the various lumber associations whose grading rules were applicable to the different species of softwood lumber. Douglas fir was one of the numerous species of lumber referred to in MM-L-751.
62. Under the specifications, the exposed surfaces of the cabinets in certain of the 500 housing units were required to be of a natural-finish material. These cabinet units were to receive a natural finish. The remainder of the cabinets were 'to be painted and were required to be made from a paint-grade material.
63. (a) In January 1959, the plaintiff submitted shop drawings and samples of kitchen cabinets prepared by its subcontractor. Under the date of February 4, 1959, the defendant’s resident engineer disapproved the shop drawings and samples, listing obvious conflicts between them and the specifications.
*539 (b) On or about March 9, 1959, the plaintiff submitted a second group of shop drawings and cabinet samples for acceptance.
64. The specifications required the submission of shop drawings for the kitchen cabinets, but did not require the submission of samples.
65. (a) The sample of the paint-grade cabinet submitted by the plaintiff for acceptance had a hollow-core masonite door, No. 2 pine shelving, and fir plywood ends and backs.
(b) Masonite is a manufactured material that is made out of wood fibers. It is neither a hardwood nor a softwood. Masonite is the usual and customary material for doors on paint-grade cabinets, and a masonite cabinet door has equal utility to a wooden cabinet door.
66. (a) Under the date of March 27, 1959, the resident engineer advised the plaintiff as follows:
Reference your letter 5 March 1959 submitting samples of cabinets and your letter of 9 March 1959 submitting shop drawings by the Anderson Cabinet Corporation.
The samples and drawings are approved, with exceptions as noted on the shop drawings, subject to all contractual requirements.
Samples will be retained in the construction area during the construction period.
(b) One of the exceptions shown on the drawings in red pencil was as follows: with respect to the doors of the cabinets, as to which it was stated on the drawings that the doors were hollow-core lip doors, there was added thereto the exception, “As spec. par. 10-3.”
67. (a) As submitted in the shop drawings that were approved, the cabinet details did not show the sides of the cabinets extending beyond the backs of the cabinets to form a scribe strip.
(b) With respect to the proposed materials to be used, the shop drawings showed the cabinet back as 14-inch plywood, but did not indicate the type of plywood to be used.
(c) The shop drawings did not indicate the material for use as cabinet shelves.
*540 (d) The shop drawings did not indicate the material to be used on the face of the doors.
68. Under the date of April 14,1959, the assistant resident engineer wrote the plaintiff, stating that a note had inadvertently been omitted from the returned drawings to the effect that no details had been submitted for cabinets shown in 10 places as called for by the plans.
69. (a) On May 4,1959, the plaintiff’s cabinet subcontractor advised the plaintiff that it had corrected the first two sheets of its shop drawings and had added on the third sheet items requested by the Corps of Engineers. The subcontractor further stated:
It is our belief that it would be better for you bo return to us an approved new and completed set of plans rather than pass upon the last page of the set with items added; this would avoid any confusion and misunderstanding. We will appreciate the return of new drawings (plans) together with approval as soon as possible.
(b) On May 5, 1959, the plaintiff submitted further shop drawings on the cabinet details. On June 1, 1959, the defendant approved the drawings submitted on May 5, with exceptions as noted thereon and “subject to all contractual requirements.” These drawings were returned to the plaintiff on June 2,1959.
70. (a) On June 25,1959, one of the defendant’s inspectors noted that the contractor was utilizing masonite fronts on the hollow-core doors. On July 1,1959, the plaintiff’s cabinet subcontractor advised the plaintiff in a letter that masonite doors had been furnished in the sample cabinet, and the corrected plans had not been received in time to change the construction. The plaintiff’s cabinet subcontractor further noted advantages for the use of masonite on the cabinet doors, and requested permission to use such material.
(b) The defendant’s resident engineer refused to approve the use of masonite for the cabinet doors on the paint-grade cabinets.
(c) On July 8, 1959, the plaintiff advised its cabinet subcontractor that masonite doors were not approved, and requested the subcontractor to manufacture and ship wooden doors to comply with the specifications.
*541 71. On July 6,1959, the plaintiff submitted a sample for a paint-grade cabinet door, but failed to state the type of material or grade for use on the door. This information was furnished on July 13, 1959, when it was indicated that the sample of the paint-grade door was manufactured of sound grade or No. 2 grade birch plywood. The sample was approved on July 15, 1959, “subject to all contractual requirements.”
72. On August 17, 1959, the plaintiff advised the defendant’s resident engineer that its cabinet subcontractor proposed to use Douglas fir lumber in lieu of “C” select pine shelving material for the cabinet shelves. The plaintiff also advised that the subcontractor proposed to use Douglas fir lumber, in lieu of the species listed in section 10 of the specifications, for the base standards and upper wall standards of the cabinets. On August 18,1959, the resident engineer disapproved the use of Douglas fir material in the cabinets, and stated that the cabinets should be constructed with materials listed in section 10 of the specifications.
73. Sometime during August 1959, the plaintiff delivered to the job site cabinets for 35 units.
74. (a) After the delivery of the cabinets for the 35 units in August 1959, the defendant’s resident engineer rejected the cabinets on the grounds that the backs of the cabinets were constructed of Douglas fir and not of pine plywood, and that the shelving was made of No. 2 pine and not of grade “C” select pine.
(b) On August 28, 1959, the plaintiff wrote the resident engineer, requesting that he state in writing his reasons for the disapproval of the cabinets.
(c) Under the date of September 11, 1959, the resident engineer advised the plaintiff in part as follows:
The cabinets as delivered did not meet the contract requirements in that the material was not of the species and grade specified in Paragraph 10-3 of the contract specifications and joints were not constructed in accordance with paragraph 10-5 of the specifications.
75. After the rejection by the resident engineer of the cabinets which had been fabricated for the first 35 units, the *542 plaintiff offered to substitute a better grade of Douglas fir than that used in the sample which had been previously approved by the resident engineer; The resident engineer refused to approve the better grade of Douglas fir and required the plaintiff to furnish pine plywood for the backs of the cabinets and grade “0” select pine for the shelving.
76. Thereafter, the plaintiff furnished cabinets, using pine plywood for the backs and grade “C” select pine for the shelving.
77. The cabinet parts were manufactured at the plant of the plaintiff’s cabinet subcontractor, and then were assembled on the job site at a quonset hut. In a number of instances, the cabinet materials were piled outside under plastic. Also, in some instances, assembled cabinets were also stored outdoors without proper protection from the weather.
78. Following an inspection of the cabinet work on September 21, 1959, the defendant’s resident engineer wrote a letter to the plaintiff on September 80,1959, calling attention to 11 types of alleged deficiencies that had been noted, and stating generally:
The workmanship of these cabinets as a whole is unsatisfactory. It is requested that immediate action be taken to correct these deficiencies which exist.
,79. A further inspection of the cabinet work was made on October 12,1959, and the defendant’s resident engineer wrote a letter to the plaintiff on October 13,1959, calling attention to 11 types of alleged deficiencies that had been noted. The resident engineer’s letter concluded with the following paragraph:
Your attention is invited to the fact that several conferences have 'been held and several letters written in regard to the unsatisfactory workmanship of the cabinets. You are hereby requested to take the action necessary to correct the unsatisfactory workmanship in the cabinet construction and to see that no cabinets are installed in the buildings until such time as the cabinet work is up to the standards required by the contract. At such time as a cabinet has been constructed to comply *543 with.'the contract, this office should be notified in order that it can be inspected. If it is determined that the cabinet meets the requirements of the contract, then it may be installed in one of the houses for a pattern to follow.
80. On October 14, 1959, counsel for the plaintiff wrote a letter to the bonding company for the cabinet subcontractor, stating in part as follows:
Your insured, Anderson Cabinet Corporation, have for a considerable length of time been in default on the delivery of acceptable cabinets in connection with the cabinet work at Ft. Hood, Texas.
Eepeated telephone conferences, as well as personal conferences, have been held with the principals of Anderson Cabinet Corporation, and notwithstanding such conferences and their promises to deliver promptly acceptable cabinets, they have failed to do so.
Eobertson Construction Company does hereby declare Anderson Cabinet Corporation to be in default under its sub-contract with them and does hereby demand that you, as the bonding company for said sub-contractor, take over the completion of said job under your bond, which was executed in connection with said sub-contract.
81. Another inspection of the cabinet work was made on October 21,1959. Upon the basis of that inspection, the defendant’s resident engineer wrote to the plaintiff on October 23,1959, listing 11 types of alleged deficiencies that had been noted in connection with the natural finish cabinets and 7 types of alleged deficiencies that had been noted in connection with the paint-grade cabinets. The resident engineer’s letter concluded with the following paragraph:
It is noted that finished cabinets are being stacked outside without proper protection from the elements. Some of these cabinets are warping. Warped cabinets will not be accepted and therefore, should not be installed in the buildings.
82. In connection with the installation of the cabinets under the contract, the defendant’s personnel took the position that no tolerances whatever were permissible as to squareness of frames and levelness of doors.
*544 83. According to the usual and customary trade practice in the building industry, cabinets are considered to be of good workmanship if they appear to be square and level to the naked eye.
84. (a) The defendant’s resident engineer and inspectors rejected cabinets which appeared to be square and level to the naked eye but which, when subjected to inspection through the use of a 2-foot framing square, were found to be less than perfect as to squareness of frames and levelness of doors.
(b) The personnel of the plaintiff’s cabinet subcontractor endeavored throughout the job to comply with the “zero tolerances” standard imposed by the defendant’s resident engineer and inspectors.
85. On December 16, 1959, the defendant’s resident engineer wrote a letter to the plaintiff, stating in part as follows:
In view of the fact that effort is being made to set an early closing date on Mortgage Area Number 1, it is considered necessary to advise you of certain items which are not acceptable and which will require corrective action prior to final acceptance.
# # #
n. The natural finish cabinets have doors of a different species of wood than the main cabinets. Only red birch has been approved.
86. On December 31, 1959, the defendant’s resident engineer wrote another letter to the plaintiff, stating as follows:
Your attention is invited to paragraph “n” of letter this office dated 16 December 1959 wherein it was pointed out that the natural finish cabinets are being installed with doors of a different species of wood than the main cabinets and that only red birch has been approved.
It has been observed that another truck load of cabinet material, including white birch cabinet doors for natural finish, arrived at the jobsite this date. You are again advised that white birch doors will not be accepted on natural finish cabinets.
87. The plaintiff was required by the resident engineer to remove 434 natural-finish cabinet doors made of white birch *545 that had already been installed, and to replace them with doors made of red birch.
88. (a) The doors which were rejected were not made from red birch, but were of the same type of material as that used on the paint-grade cabinets, i.e., a paint-grade white birch material. Bed birch can be distinguished from white birch by the difference in its color. Bed birch is from the heartwood, and white birch is from the sap-wood, of birch timber. Bed birch can be ordered in the trade.
(b) The doors which were rejected were similar to the door that was on the sample natural-finish cabinet that the plaintiff submitted to the defendant on or about March 9, 1959 for acceptance.
89. In the early part of January 1960, the defendant’s resident engineer notified the plaintiff that the plaintiff was to install blocking at the ends of the compartments in the the upper kitchen cabinets which contained the exhaust fan and recessed light. In accordance with the requirements of the resident engineer, the plaintiff (through its cabinet subcontractor) proceeded to install the blocking in approximately 150 units. However, the plaintiff’s cabinet subcontractor took the position that the plans did not require such blocking, and that its installation would involve an additional cost of $3.50 per house. A letter along this line dated January 15, 1960, from the subcontractor to the plaintiff was forwarded to the resident engineer. On January 22, 1960, the resident engineer advised the plaintiff that a restudy had been made of the plans, that the blocking was not called for on the plans, and, therefore, that the blocking would not be required.
90s. The installation of cabinets may be accomplished by one of two methods: they can either be installed 'by the use of moldings, or they can be scribed to the walls. Both methods are generally regarded as acceptable. Notwithstanding the provision in paragraph 10-9 of the contract specifications which prescribed the scribing method, the plaintiff was required by the defendant to use molding in the installation of the cabinets, instead of scribing them to the walls.
*546 Claim 3 — Bathroom Wall Heaters
91. Paragraph 23-11 of the contract specifications related to “Wall Heaters” and provided in part as follows:
The gas-fired wall heaters shall he of the circulating radiant type with vertical flue, porcelain enameled, on cast-iron heat exchanger. * * *
92. A heat exchanger is the portion of the heater where the gas fire produces heat and which then becomes warm. The outside air comes into contact with the heat exchanger and circulates through the room. The term “heat exchanger” does not apply to the grille or frame of the heater itself.
93. The plaintiff’s plumbing subcontractor’s first submission of a bathroom wall heater contained a baked enamel finish, not a porcelain enamel finish. This wall heater was disapproved by the defendant because of the baked enamel finish.
94. The plumbing subcontractor advised the defendant that the manufacturer from which it had intended to obtain the wall heaters had discontinued making heaters with a porcelain enamel face, but that such heaters could be specially manufactured.
,95. Ultimately, the plaintiff’s plumbing subcontractor submitted a wall heater with a porcelain enamel face, which the defendant approved. The approved type of heater was thereafter used on the jdb.
Claim Jf. — Dishwasher Bough-In
96. Paragraph 24-20 of the contract specifications provided in part as follows:
24-20. Electric Dishwasher. — This item of equipment is not included in the basic bid. The plumbing rough-in will be bid under the Base Bid as noted on the drawings and bidding schedule. Furnishing and installing the equipment and connections shall be bid under the additive alternates.
* * * $ *
(f) Drain. — The machine shall be either gravity-drain type or pump type. * * *
*547 (i) Standard ProdMct. — Each dishwasher furnished shall be the latest standard catalog model of the manufacturer as sold commercially for residential use.
97. Additive alternates m and n provided for the addition of dishwashers, and contained the following statement (among others) :
* * * Bough-in of necessary drainage lines, vents, and water lines is included in the BASIC BID. * * *
98. Neither the plaintiff nor its plumbing subcontractor included the rough-in plumbing for the dishwasher in their basic bids, but instead figured it into their bids for the additive alternates. The dishwasher additive alternate was not included in the plaintiff’s contract.
99. The plaintiff was not required to furnish dishwashers under the contract, and was notified that no dishwashers would be required before the rough-in work was commenced.
100. The plaintiff decided to provide a rough-in for a pump-type dishwasher. All the standard types of dishwashers that were available on the market at the time for residential use provided for a pump-type drain as opposed to a gravity drain. A pump-type dishwasher required hot water but not cold water. A drain and hot-water outlet were readily available at the kitchen sink, which was located right nest to the place for the dishwasher.
101. After completing the rough-in for the plumbing in building 120, the plaintiff and the plaintiff’s subcontractor asked for an inspection by the resident engineer. A number of deficiencies were noted upon such inspection, and the plumbing subcontractor was required to correct the deficiencies and re-do the rough-in several times before the inspectors approved the rough-in installation.
102. After receiving approval of the rough-in installation on building 120, the plumbing subcontractor proceeded to complete the rough-in installation for 13 units in the theater area, and again requested a complete inspection. Upon receiving approval of the 13 units, the plumbing subcontractor proceeded with the plumbing rough-in in accordance with the procedures and standards established by the resident en *548 gineer on the first 18 units, and completed the rough-in plumbing in a total of 154 units.
103, Of the 154 units, 86 units had been inspected and approved and the concrete had been poured.
KM. On April 30, 1959, the Government inspectors, upon a further inspection, took the position that the plumbing rough-in must be suitable for a gravity-drain type dishwasher as well as for a pump type dishwasher. The plaintiff’s principal officer informally appealed to the District Engineer (i.e., the contracting officer) in Galveston. The District Engineer upheld the then-current position of the defendant’s personnel on the job.
105. Upon the basis of the District Engineer’s determination, the parties began negotiations over alternative types of plumbing rough-ins.
106. On May 6 the plaintiff’s subcontractor offered to install rough-in plumbing suitable for pump type dishwashers and to give the defendant a credit of $7,040 if the resident engineer would agree not to require cold water lines and gravity drains. This proposal was rejected by the resident engineer as to the units for which a slab had not been poured. He left open the possibility of a change for the other 86 units, provided an equitable credit was offered to the Government.
107. On May 20 and 25 the plaintiff’s subcontractor offered equitable credits of $20.58 and $30.00 per unit if the resident engineer would agree to an alternative type of rough-in for the 86 units. On June 16 the resident engineer indicated acceptance of the latter offer.
108. A construction change was executed pursuant to the “Changes and Changed Condition” article. The change included the alternative rough-in proposed by plaintiff’s subcontractor for the 86 units and an equitable credit to the Government of $30 per unit (totaling $2,580). On February 23, 1960, the parties entered into a supplemental agreement by which the contract was “changed and amended to conform with and embody” all approved construction changes, including the plumbing rough-in change.
109. As to the other units, the plaintiff, at the direction of the resident engineer, reworked the 68 units for which plumb *549 ing rough-in had been completed and provided cold water taps and gravity drains. On the remaining 346 units constructed under the contract, the plaintiff, also at the direction of the resident engineer, roughed-in gravity drains and both cold and hot water outlets.
Claim 5 — Pi<p& Insulation
HO. Paragraph 24-18 of the contract specifications provided as follows:
2-N18. Insulation. — All hot- and cold-water lines in outside walls or in attic space shall be insulated with 34-inch thick non-conducting wool felt or mineral wool conforming to Federal Specification HH-I-567 or HH-1-564. Strap covering not over 18 inches apart on each side of fittings. Insulation shall be specially designed for tubing.
111. (a) The plaintiff’s plumbing subcontractor made a number of proposals for changes in the placing of water lines during the early part of the job. In February 1959, oral approval of one of the proposals was given so that concrete work could proceed. Subsequently, a formal change order was issued and executed by both parties.
(b) In pertinent part, the change order provided as follows:
A._ In accordance with instructions from higher authority, it is necessary to revise the hot and cold water lines as follows to prevent possible freezing of lines during cold weather: 1. Water service lines are to be installed under outside grade beams and up through inside partitions to attic space. * * *
B. Provide access to furred attic spaces through panels * * *.
(c) The change order involved all five mortgage areas and an increase in the contract price.
112. Sometime in June 1959, there arose a question about placing insulation on the water pipes in the deck and beam type houses. Nearly all deck and beam houses had furred-down ceilings, and water lines were run into those spaces. Such spaces were considered by the defendant’s personnel to be attic spaces, and the plaintiff’s plumbing subcontractor *550 was required to furnish insulation for water pipes in the furred areas. On June 15, 1959, the plaintiff’s plumbing subcontractor requested additional compensation for insulating the water lines in the spaces between the roof and ceiling of the deck and beam houses. The request was sent to the defendant’s resident engineer.
113- In reply to the request mentioned in finding 112, the resident engineer on June 18,1959, wrote as follows:
Eeference is made to your letter dated 16 June 1959, transmitting a letter from Kitzman’s Plumbing of Texas dated 15 June 1959, in regard to the insulation of hot and cold water lines in the attic of the deck and beam type buildings.
Paragraph 24 — 18 of the contract specifications states that all hot and cold water lines in outside walls or attic space shall be insulated.
The definition of an attic space is that space just below the roof. The fact that this space is ventilated or not ventilated has nothing to do with whether it is an attic space or not.
The space in question is an attic space and has been all along. Therefore, the hot and cold water piping installed in this space requires insulating ana required insulating prior to the installation of access panels and eave venting.
In view of the above, your request for an increase in contract price is denied.
114. On July 8,1959, the plaintiff forwarded to the resident engineer its subcontractor’s protest, which read as follows:
This is to inform you that we will only install pipe insulation in furred spaces on deck and beam units under protest for the following reasons:
1. All furred pipe chases, detail Z-411 are within the insulated area or the units. The piping in these chases are not in a [sic] outside wall, or attic space.
2. All furred ceilings, detail C-410 are within the insulated area of Units.
?>. We do not consider the space just below the insulated roof as attic space unless it is accessablo [sic]. In this case access panels have been added in furred ceilings, and in pipe chases in kitchens and laundry areas. The piping in the furred pipe chases are not in outside walls or attic.
*551 This item involves considerable material and labor. Our request for increase in contract price of $9,499.46 has been denied on the basis that the area below the roof is attic space. We do not agree with this decision and hereby file our protest.
115. On July 10, 1959, the resident engineer wrote to the plaintiff, as follows:
Eeference is made to your letter dated 8 July 1959, submitting a copy of Kitzmaa’s Plumbing letter dated 7 July 1959, in regard to insulating hot and cold water lines in outside walls and attic spaces.
As outlined in letter of this office dated 18 June 1959, hot and cold water piping shall be insulated when installed in outside walls and in attic space.
Water pipe installed in Detail Z/411 is the same as being installed in a 4 inch or 6 inch outside wall. The outside wall has been widened sufficiently to provide for running the water pipe and therefore the water lines shall be insulated as specified for outside walls.
Water pipe installed above the ceiling is installed in the attic, therefore pipe installed in space shown on Detail C/410 is installed in the attic and must receive insulation as specified for attic piping.
In view of the above, your request for an increase in contract price is denied. Any further discussion concerning this matter should be handled in accordance with Article 8, “Disputes”, of the housing contract.
116. (a) No protest against the resident engineer’s letter of July 10, 1959, was made by the plaintiff to the contracting officer, except for the claim filed at the final closing of each mortgage area in 1960.
(b) The piping insulation was thereafter installed in the houses by the plaintiff’s plumbing subcontractor.
117. According to trade custom, the furred area above a furred-down ceiling is not considered to be attic space.
Claim 6 — Compression Stops
118. Paragraph 24-2 of the contract specifications incorporated by reference Federal Specification WW-P-541b for plumbing fixtures. The contract specifications did not refer to any amendments of Federal Specification WW-P-541b.
*552 119. Paragraph 17.1.3.1 of Federal Specification, WW-P-541b, as originally promulgated for plumbing fixtures, allowed three types of supply connections to be used: type PY (pipe, threaded), type TY (tube, soldered joint), and type EY (pipe with tube riser). Under an amendment to that Federal Specification which became effective after the letter of acceptability was issued to the plaintiff in this case, the requirement with respect to plumbing fittings and connections was changed to type PY only. This amendment was not referred to in the contract specifications.
120. The plaintiff’s plumbing subcontractor, relying on the original provisions of paragraph 17.1.3.1 of Federal Specification WW-P-541b, intended to use type EY plumbing fittings and connections. However, the defendant required that type PY fittings and connections be used on the job.
Claim 7 — Earth Fill Under Conor ate Slabs
121. The contract specifications relating to earth fill under concrete slabs provided (among other things) as follows:
1-3. Exemption.
(a) General.— * * * Suitable excavated material required for fill under slabs shall be separately stockpiled as directed by the contracting officer.
* * * * *
1-4. Fill. — Where concrete slabs are placed on grade; all humus, grass, weeds, loam, and organic or other undesirable material as determined by the contracting officer, shall be removed before fill or drainage fill is placed. Fill (in addition to the drainage fill required in paragraph 1-6 necessary to raise the subgrade for concrete slabs shown on the foundation plan to the elevations indicated, shall comply with the requirements and shall be tested in the same manner as required for fill in Section 35, “EXCAVATION, FILLING, SITE GEADING, SUB-GEADE PEEPAEATION & TOPSOILING” of these specifications. This fill shall be compacted to at least 85% but not more than 90% Modified AASHO density and shall have the maximum moisture content for the degree of compaction.
In addition to the drainage fill required in paragraph 1-6, at least six inches of the above specified fill material shall be placed under all slabs shown on the foundation *553 plan, even though this requirement may necessitate cut of existing undisturbed earth. (Minimum fill under any slab shall be 10 inches: 4 inches drainage fill over 6 inches fill.)
* * * * *
1-6. Drainage Fill. — The top 4 inches of fill under slabs for the Eesidence Proper and the Exterior Storage shall be porous, free-draining material such as broken stone, gravel, or cinders, with not more than 10 percent passing the No. 10 sieve and having a maximum permissible size of 2 inches. This material shall be leveled and thoroughly tamped.
❖ iff % * #
35-5. Excavation.—
* * * * *
(b) * * * All suitable excavated material shall be transported to and placed in the fill areas within the limits of the grading areas as specified and as shown on the drawings or as otherwise directed. * * *
35-6. Utilisation of Excavated Materials. — All suitable material removed from the excavations shall be used, insofar as practicable, for grading, subgrades, shoulders, slopes, bedding, backfill as required, and for other purposes as directed by the contracting officer. No excavated material shall be wasted without the authorization of the contracting officer. * * *
❖ * * * #
35-9. Fill Material. — Embankments and backfill shall ■be constructed of suitable material, free from muck, trees, tree boles, stumps, standing or matted brush, matted roots, rubbish, and frozen materials. The plasticity index of fill to be used under pavements or slabs shall not exceed 9.
35-10. Formation of Fills. — Fills shall 'be formed of approved material, placed in horizontal layers. * * * *****
35-15. Borrow. — Additional fill material and top soil, required to make up any deficiencies in the quantities of such materials available from the excavations, shall be obtained from borrow areas located on the base, as designated by the contracting officer. * * *
122. “PI” means plasticity index. The plasticity index of soils measures the difference between the behavior of soils *554 in the presence of moisture or liquids and in a solid state. The plasticity index has a bearing on the load-bearing qualities of soil, the water-retention qualities of soil, and the amount of soil movement to be expected under load conditions or under water conditions. The higher the plasticity index, the more detrimental are the characteristics of the soil with respect to its weight-bearing quality; and the lower the plasticity index, the better the soil is for weight-bearing.
123. The bulk of the soil material at Fort Hood, and in the vicinity of the area where the houses were built, is a soil material called caliche. The plasticity index of the soil at Fort Hood runs to an average of PI-16. In certain areas at Fort Hood, most of which were a considerable distance from the housing site, soil material with a plasticity index of 9 or less was available. This material was found near hills and along creek beds. Shortly after the plaintiff’s excavation subcontractor commenced the excavation work, the plaintiff’s superintendent and some personnel of the excavation subcontractor discussed the specifications with the Government’s resident engineer, assistant resident engineer, and several inspectors. The Government’s assistant resident engineer advised that the Government interpreted the specifications to mean that all fill under the house slabs was required to have a plasticity index o.f 9 or less.
124. On December 17, 1958, the plaintiff’s principal officer visited the office of the District Engineer, who was also the contracting officer, and conferred with him and the resident engineer. At that time, the District Engineer was advised that the plaintiff interpreted the specifications to require only 6 inches of PI-9 material to be placed under the house slabs; and that if any additional fill was required below the 6 inches of PI-9 material, the contractor could use other fill material with a plasticity index higher than 9. During this conference, the parties also discussed a possible change in the contract so as expressly to permit the contractor, whenever more than 6 inches of fill material beneath the concrete slabs was required, to use PI-9 material for the first 6 inches immediately beneath the drainage fill, and then to use soil' material with a plasticity index higher than 9 for the remainder of the fill.
*555 125. By a letter dated January 7, 1959, and addressed to the plaintiff, the contracting officer made the following determination (among others):
a. Of primary concern to you was a proposal to permit fill material under buildings of other than the specified selected material now called for by the contract. I have agreed to such a change and have so advised my Resident Engineer, provided an equitable credit is offered to the Government. It will be permissible to place suitable material from the excavated areas as fill material and to place the PI-9 selected material specified on only the top six inches of the fill.
126. The plaintiff did not offer an equitable credit to the Government.
127f. Thereafter, the defendant required that all fill necessary to raise the subgrade for concrete slabs up to the elevations indicated in the plans should consist of fill with a plasticity index of 9 or less.
128. The plaintiff was not permitted to use material higher than PI-9 from cut areas as fill material where building sites were more than 6 inches below grade. The plaintiff was required to use the designated PI-9 fill material, which had to be hauled in from the designated borrow areas, to raise the grade of the building sites in excess of the 6-inch minimum of designated fill material.
129. The usual and customary practice in the construction industry is to balance the cut and fill areas so far as this is practicable, and to use the excavated material as fill so as to avoid the hauling of dirt to and from the site.
130. Under the terms of the contract, the plaintiff was required to lay out stakes and markers for the excavation work. The plaintiff employed a private engineering firm to do this work. This firm laid out the stakes, which were used to mark out the sites of the house pads and were used as guides for the placement of the PI-9 fill. The stakes set by the plaintiff’s private engineering firm were set on a 5-foot offset. In other words, the stakes were set 5 feet outside the actual lines of the buildings. Thereafter, the PI-9 fill was placed and rolled, using the stakes as reference points. The pads of PI-9 material were thus built to approximately 5= feet beyond the building lines.
*556 131. The-evidence in the record does not establish that the extension of the PI-9 material outside the building lines was attributable to any requirement imposed by the defendant or its personnel.
Claim 8 — Hmlmg of PI-9 Material
,132. Paragraph 1-7 of' the contract specifications provided in part as follows:
1-7. Borrow. — Borrow material for filling beneath the concrete slabs shall be obtained from borrow areas on the military reservation selected by the contractor subject to the approval of the contracting officer. No borrow shall be obtained within the limits of the project site without prior written approval of the contracting officer. Borrow material shah conform to the requirements for fill as specified in paragraph 1-4 above. * * *
133. On October 3,1958, which was prior to the execution of the formal contract but after the issuance by the Government of the letter of acceptability accepting the plaintiff’s bid, the plaintiff wrote to the contracting officer regarding the designation of borrow areas. The plaintiff’s letter stated in part as follows :
We request that you designate borrow areas within the limits of the military reservation of approved material for fill beneath the concrete slabs. We feel that this is only reasonable and is standard procedure. These borrow areas should be within a reasonable distance from the project site on the reservation. * * *
134. (a) Under the date of October 23,1958, the contracting officer responded to the plaintiff’s letter of October 3, 1958. The contracting officer enclosed a marked-up drawing showing two locations where borrow could be obtained. The contracting officer’s letter further stated that borrow material from the designated areas must conform to the requirements of the specifications.
(b) The borrow area sites referred to by the contracting officer were both on the military reservation. Borrow Area No. 1 was approximately 6 or 7 miles from the job site. Borrow Area No. 2 was along the same road and was approximately 8 to 10 miles from the job site.
*557 135. During the initial period of construction, the plaintiff obtained borrow from the area marked as Borrow Area No. 1 on the map mentioned in finding 134. However, after the plaintiff had constructed approximately 13 house pads, the material in this borrow area turned spotty.
136. Shortly thereafter, the Government’s assistant resident engineer, several inspectors, and the plaintiff’s and the subcontractor’s superintendents made a survey of the military reservation. The first area visited was Borrow Area No. 2, as designated on the map mentioned in finding 134. This area ran along the bank of Cowhouse Creek. The subcontractor’s superintendent did not want to obtain borrow from this area because the stripping of unsuitable material to an average depth of two feet would have been necessary to reach the PI-9 material. The survey party thereafter went to a third site on the military reservation. This third borrow area was 16 miles from the job site. However, the material at this third area was easier and cheaper to excavate than that in Borrow Area No. 2, because the material was uniform and no top stripping was necessary.
137. The material from the third borrow area, as described in finding 136, was used for fill under the concrete slabs by the plaintiff for the remainder of the construction.
138. The evidence of record shows that the plaintiff did not pay its subcontractor anything additional for the added distance of hauling the PI-9 material from any of the various borrow areas.
Claim 9 — Paving of Streets
139. Under the provisions of the contract, the plaintiff was required to construct the streets on which the housing units constructed by plaintiff were located.
140. Under the specifications of the contract, the plaintiff was required to do the following in connection with the construction of the streets:
(a) the preparation of the subgrade, which included the shaping to line, grade, and cross-section, reshaping, and wetting as required, and rolling of the subgrade to obtain proper compaction;
*558 (b) the laying of a rock base (a flexible base course);
(c) the application of a bituminous prime coat on the base course (priming the street); and
(d) paying the streets with a hot-mix pavement consisting of 1%-inch hot-mix surface course on the previously primed coat.
141. (a) Paving the streets immediately after completion of the priming steps is the customary practice in the construction industry, and is recognized as the sound manner in which to construct streets. Nothing in the specifications limited the plaintiff’s right to pave the streets immediately after they had been primed.
(b) Some patching of streets after construction is inevitable.
142. (a) Paragraph 87-9 of the specifications under the contract provided, among other things, as follows:
37-9. Preparation of Surface. — Immediately before applying the prime coat, all loose material, dirt, clay, or other objectionable material, shall be removed from the surface to be primed with a power broom or blower supplemented with hand brooms, as directed by the contracting officer. After the cleaning operation and prior to the application of the prime coat, an inspection of the area to be coated will be made by the contracting officer to determine its fitness to receive the bituminous priming material. That portion of the subgrade or base course prepared for immediate treatment, if considered excessively dry, shall be lightly sprinkled with water immediately in advance of the application, as directed by the contracting officer, to assure a uniform spread of the bituminous material.
(b) Paragraph 87-10 of the specifications under the contract provided that:
37-10. Application of Bituminous Material. — Immediately following the preparation of the base course, the bituminous material shall be applied * * *. Following the application of prime material, the surface shall be allowed to dry for a period of not less than 48 hours without being disturbed, or for such additional period of time as may be necessary to attain penetration into the foundation course and drying out or evaporation *559 of tbe volatiles from prime material, which period shall be determined by the contracting officer. * * * The primed surface shall be maintained by the contractor until the succeeding layer of pavement has been placed. During this interval, the contractor shall protect the primed surface against damage and shall repair all broken spots.
(c) Paragraphs 38-4 and 38-5 of the contract specifications provided that all samples of materials used in the paving process should be supplied by the contractor at its* expense, that all tests necessary to determine conformance with the requirements would be performed by the Government without cost to the contractor, and that all materials must be approved prior to use in the work.
(d) Paragraph 38-7 of the specifications under the contract provided that no bituminous mixture should be manufactured until a job-mixture formula had been approved by the contracting officer.
(e) Paragraph 38-11 of the specifications under the contract provided that:
38-11. Reconditionmg of Base Course. — The previously constructed base course shall be conditioned as specified below; and in all cases, prior to laying a bituminous course, the underlying surface shall be cleaned of loose and foreign matter by sweeping with power sweepers, power brooms and hand brooms as directed by the contracting officer. The surface of the base course will be inspected and tested for adequate compaction and surface tolerances. Any ruts or soft, yielding spots that may appear in the base course, any areas having inadequate compaction, and any deviations of the surface from the requirements specified for the underlying course shall be corrected by loosening the affected areas, removing unsatisfactory material and adding approved material where required, reshaping, recompacting to line and grade to the specified density requirements.
(f) Paragraph 38-14 of the specifications under the contract provided that prior to the laying of the surface course, the prime coat or tack coat should be completely cured and should be cleaned of all foreign or objectionable matter with power blowers, power brooms, or hand brooms, as directed.
*560 (g) Paragraph 38-18 of the specifications under the contract provided that:
38-18. Protection of Pavement.— * * *
At the completion of the entire project, the contractor shall repair any damages to pavements or pavement failures, and deliver all pavements to the Government free of damage or pavement failures, and with clean surface, free of accumulations of eroded topsoil or debris accumulating during construction.
143. The plaintiff entered into a subcontract for the priming and hot-mix paving of the streets under the contract with Bert Camp, doing business as BHC Materials Company.
144 Bert Camp had performed work for the Corps of Engineers in and around the Fort Hood area prior to his entering into a subcontract for the hot-mix paving of the streets under the contract.
145. In March 1959, the plaintiff was readying its first street in the theater area of Mortgage Area 1 for placing of the prime material. Under the date of March 26, 1959, the resident engineer wrote to plaintiff, noting that samples of the material for use in the hot-mix paving were required to be submitted not less than 30 days before use, and that it would take a minimum of 30 days to approve the materials. On April 3,1959, the plaintiff wrote to its paving subcontractor,. Bert Camp, d/b/a BHC Materials Company, requesting him to submit the materials for approval.
146. Sometime shortly thereafter, the assistant resident engineer had a discussion with the plaintiff’s superintendent with respect to the commencing of the asphalt paving. The assistant resident engineer advised that if the contractor did. the paving on the streets during the early portion of the job and allowed the local soil to get on the streets as mud and remain during construction, the mud would attack the asphalt surface and, when it dried, it would peel off the top surface of the asphalt. The 'assistant resident engineer took the plaintiff’s superintendent to a street adjoining the first street in Mortgage Area 1 and pointed out a street paved by a prior contractor. He explained that the prior contractor had expended a considerable amount of money re-doing streets because of damage done by mud drying on the asphalt surface.
*561 147. On April 8, 1959, the plaintiff’s principal officer conferred with the resident engineer. The resident engineer advised the plaintiff’s principal officer that the type of topsoil in the area, if allowed to remain on top of the pavement, would eat away the asphalt pavement. The parties discussed whether it would be more economical to place the asphalt promptly and later repair it, or leave off the top-surface asphalt for placement later near the end of the job. The resident engineer explained to the plaintiff’s officer the difficulty encountered on other jobs in connection with streets paved during the early stages of construction and later damaged, and invited him to look at the previous projects. The resident engineer advised the plaintiff’s principal officer that lie felt it would be more economical for the plaintiff to delay the laying of the asphalt until just prior to the closing of the mortgage area.
148. During the conversations mentioned in findings 146 and 147, there was discussion of the probable repairs to the streets that would have to be made by the plaintiff (or its paving subcontractor) if the paving were completed early in the job and the streets were then used during the construction program by trucks and other vehicles, causing mud to accumulate on the streets and damage to be done to the surface of the asphalt as the mud dried. The representatives of the plaintiff were advised by the representatives of the defendant that the Government would not accept skin-patching of the streets as a means of correcting such damage, but that it would be necessary for the plaintiff (or its paving subcontractor) to cut into the asphalt with a power saw in order to remove damaged areas and effect proper repairs.
149. During the conversations referred to in findings 146 and 147, there was also discussion of the work on the streets that would be required of the plaintiff (or its paving subcontractor) if the laying of the hot-mix asphalt were delayed until near the end of the construction of the project and the unpaved streets were used in the meantime by trucks and other vehicles involved in the construction program. The representatives of the defendant informed the representatives of the plaintiff that, upon completion of the buildings, it *562 would then only be necessary for the plaintiff (or its paving subcontractor) to clean from the streets any foreign material that might have accumulated on them, repair any spots of erosion or any ruts that might have occurred in the base, re-prime the repaired 'areas, and then place the hot-mis asphalt.
150. Although the defendant’s assistant resident engineer and resident engineer, in the conversations referred to in findings 146 and 147, indicated a belief that it would be more economical for the plaintiff to delay the paving of the streets until near the end of the construction program, in order to avoid the necessity of making repairs to the pavement, neither of these officials instructed the plaintiff to delay the placing of the hot-mis asphalt. On the contrary, the defendant’s representatives made it plain that the plaintiff had the authority to proceed 'at once with the paving of the streets if the plaintiff wished to do so, subject to the necessity of properly repairing any damage that might be done to the pavement during the construction of the project. It was also made plain by the defendant’s representatives, in this connection, that skin-patching would not be an acceptable means of repairing such damage.
151. After the conversations and discussion referred to in findings 146-150, the plaintiff’s principal officer concluded that it would be in the plaintiff’s interest to proceed with the paving of the streets without delay, and he instructed the paving subcontractor to go ahead with the laying of the hot-mix asphalt. The paving subcontractor, however, declined to do so, in view of the warning by representatives of the defendant that the Government would not accept streets that contained skin-patching.
152. Because of the unwillingness of the plaintiff’s paving subcontractor to proceed promptly with the paving of the streets, at the risk of subsequently having to repair damaged areas of the pavement by means other than skin-patching, the laying of the hot-mix asphalt was delayed until near the end of the construction program, and the unpaved streets were used by trucks and other vehicles during the course of the construction program.
153. In the fall of 1959, the plaintiff submitted its hot-mix asphalt formula for approval, and shortly thereafter received *563 approval of the hot-mix formula. In December 1959, the plaintiff commenced the finishing operations on the streets in Mortgage Areas 1 and 2. The streets were swept, ruts and pockets of erosion were repaired by adding additional material, and the repaired areas were reprimed. The defendant’s assistant resident engineer then inspected the streets prior to the laying of the hot mix. Upon this inspection, he found in several places, from the gutter line to the quarter-point of the street, that there was a mud film within the pores of the prime and base, varying in thickness from a small amount to % mch. The assistant resident engineer advised that the mud was foreign material which would have to be removed before the hot-mix was overlaid. The reason for this requirement was that, although the mud was dry at the time, it would, if permitted to remain and be covered with the hot-mix asphalt, subsequently absorb moisture through capillary action and create a soft spot in the base, which would result in failure of the pavement.
154. On the next morning, the plaintiff scarified and removed approximately 1% inches of the prime and base material, using suitable equipment for this job, replaced the base, and reprimed it. Thereafter, the plaintiff proceeded to lay the hot-mix asphalt and completed the paving for Mortgage Areas 1 and 2.
155. In the latter part of February and early part of March 1960, the plaintiff was preparing the streets for final hot-mix paving in Mortgage Areas 3,4, and 5. On February 26,1960, the plaintiff requested an inspection of the streets prior to the placement of the hot-mix, and such inspection was made. The inspection revealed that, as in Mortgage Areas 1 and 2, mud had penetrated into the pores or voids of the base, to a depth of % inch in some places. The defendant’s assistant resident engineer stated that the mud would have to be removed from the base course prior to the completion of the paving.
156. The plaintiff’s principal officer did not agree with the decision that the mud should be removed from the base course, and requested another inspection of the streets. The inspection party met at the same location, and the plaintiff’s principal officer requested the defendant’s assistant resi *564 dent engineer to point out the deficiency. The defendant’s assistant resident engineer thereupon demonstrated the depth of the mud existing in the base by digging in the base, using a knife for the purpose. The assistant resident engineer reiterated that the mud would have to be removed prior to the placing of the hot mix.
157. Thereafter, the contractor removed approximately iy2 inches of the base material, replaced it, primed it, and completed the hot-mix asphalt paving in Mortgage Areas 3, 4, and 5.
Olaim 10 — Boofmg
158. Under the contract, the plaintiff was required to install built-up roofing, which included the laying of several courses of felt, mopped into hot bitumen. The details for the method of installation were covered by paragraph 6-6 (c) of the contract specifications and plate No. 407 of the drawings (the gravel guard and tar stop plan detail).
159. C. H. Buebeck Company, of Waco, Texas, was the subcontractor engaged by the plaintiff to perform the roofing installation.
160. The plaintiff’s roofing subcontractor concluded that there was an inconsistency between paragraph 6-6 (c) of the contract specifications and plate No. 407 of the drawings with respect to the installation of the roofing, and that the contract did not prescribe a workable method of installing the roofing. The roofing subcontractor prepared an analysis of the problem, and proposed an alternative method for the installation of the roofing. The analysis and proposal were forwarded to the defendant by the plaintiff. The roofing subcontractor’s suggestion of a different method for the installation of the roofing was approved by the defendant.
161. Commencing on April 26,1959, and continuing thereafter, the roofing subcontractor proceeded to install the roofing in accordance with the modification suggested by the subcontractor and approved by the defendant.
162. When the installation of the roofing was almost complete, a conference occurred between the contracting officer and the plaintiff’s principal officer. During the course of the conference, the contracting officer referred to the modi *565 fied method for the installation of the roofing that had been suggested by the plaintiff’s roofing subcontractor and approved by the defendant, and the contracting officer demanded that the contract price be reduced by $2,560 because of this change; otherwise the existing roofing would have to be removed. The plaintiff’s principal officer protested to the contracting officer, but felt that the plaintiff was in a disadvantageous position for bargaining because most of the roofing job had been completed. The plaintiff’s principal officer ultimately agreed to the contracting officer’s demand; and under the date of February 17, 1960, the plaintiff and the defendant jointly signed a change order which involved a reduction of $2,560 in the contract price because of the change that had been made in the method of installing the roofing.
163. At the final closing for Mortgage Areas 1 and 5, the plaintiff and the defendant executed supplemental agreements embodying in the contract all of the changes previously agreed to by the parties (including the change mentioned in finding 162).
Claim 11 — Service Stops and Boxes
164. Under the contract, the plaintiff was required to furnish service stops and boxes for all of the 500 housing units.
165. (a) A service stop is generally installed as near to the back of the curb as possible, and is used to cut off the water supply for the housing unit. A service stop is placed in a service box. A closing of the water line serving the housing unit is effected by opening the box and inserting a handle to operate the stop.
(b) A service stop is to be distinguished from a corporation stop. The latter is a stop which is installed on the water main and which is completely covered by the backfill of earth over the main. The corporation stop cannot be used to shut off the water without removing the earth that covers the corporation stop.
166. The primary purpose of the service stop is to make it. possible to disconnect the individual housing unit from the main water-service line, without the necessity of discontinuing water service in additional units.
*566 167. (a) The water mains in the Fort Hood project were not located in the paved streets. The mains were located behind the curbs in front of the buildings, and at some places behind the buildings, but not in the streets.
(b) Service boxes could have been installed directly behind the curbs for only half the houses in the project.
168. Paragraph 31-8 of the specifications under the contract provided in part as follows:
* * * All service stops and gate valves shall be provided with extension service boxes of the lengths required by the depths of service-lines stops or valves. Service lines shall be constructed in accordance with the following requirements:
(a) Service Lines. — Service lines shall be connected to the main by a corporation-type stop and a lead or copper gooseneck, with a service stop below the [frost] line.
(b) Miscellaneous Items.
* * * * *
(2) Corporation Stops. — Corporation stops shall have water-works standard thread on the inlet end, with flanged joint couplings for connection to goosenecks.
(3) Goosenecks. — Copper tubing for gooseneck connections shall conform to the applicable requirements of Federal Specification WW-T-799, Type K, annealed. Length of connections shall be in accordance with standard practice.
(4) Service Sto2>s. — Service stops shall be waterworks ground-key type, oval flow way, tee handle, without drain. * * *
(5) Service Boxes. — Service boxes shall be of cast iron or concrete. Extension service boxes of the required length and having either screw- or slide-type adjustment shall be installed at all service-box locations. The 'boxes shall have housings of sufficient size to completely cover the service stop and shall be complete with identifying covers. Where water mains are located in paved street having curbs, the boxes shall be located directly back of curbs.
169. (a) General provision 2(a) of the contract states in part as follows:
The contract documents are complementary and what is called for by one shall be deemed to be called for by all. * * *
*567 (b) General provision 2(c) of the contract states in part as follows:
* * * Omissions from tbe Drawings or Specifications, or misdescription of details of work which are manifestly necessaiy to carry out the intent of the Drawings and Specifications, or which are customarily performed, shall not relieve the Eligible Builder from performing such omitted or misdescribed details or work, but they shall be performed as if fully and correctly set forth and described in the Drawings and Specifications. * * *
170. Under the date of February 16, 1959, the resident engineer advised the plaintiff that the water service lines were being installed without service stops and boxes, and pointed out relevant portions of the specifications covering the installation of such items. (Valves on the water lines had been installed by the plaintiff’s plumbing subcontractor 12 inches from the building walls, but the resident engineer took the position that this did not meet the requirement of the contract for service stops and boxes.) This information was conveyed to the plaintiff’s utility subcontractor, the Mitchell Darby Construction Company. That company on March 5,1959, protested the requirement for installing service stops and boxes, maintaining that such facilities were not required by the contract. The subcontractor’s protest was forwarded to the resident engineer on March 5, 1959, and, in turn, was forwarded from the contracting officer to the Federal Housing Administration.
171. Under the date of March 20,1959, the Federal Housing Administration issued a determination that the service stops and boxes were required under tbe contract, and the plaintiff was so advised by the resident engineer on March 27, 1959. On April 9, 1959, the plaintiff’s subcontractor protested the FHA determination; and by a letter dated April 16, 1959, the plaintiff invoked general provision 8 of the contract, entitled “Disputes.”
172. By a letter dated May 11,1959, and sent by registered mail, return receipt requested, the contracting officer wrote the plaintiff, issuing his decision and findings of fact denying the plaintiff’s request for additional compensation for the installation of service stops and boxes. The contracting *568 officer made findings tbat a dispute bad arisen over tbe requirements of tbe drawings and specifications; tbat tbe Director of tbe Federal Housing Administration had made a determination tbat tbe stops and boxes were required under tbe contract; that such determination of necessity established tbat tbe installation of such facilities was not a change under the contract which would warrant additional payments from the mortgage proceeds; that tbe determination of the Federal Housing Administration was final; and tbat tbe contracting officer did not have authority to make a decision which would cause tbe total amount payable to exceed the maximum amount payable from tbe mortgage proceeds.
173. On May 13, 1959, the plaintiff’s subcontractor forwarded to tbe plaintiff its claim tbat tbe installation of tbe stops and boxes was additional, together with supporting data showing the cost of tbe additional installation. On May 29, 1959, the plaintiff’s subcontractor forwarded to tbe plaintiff a corrected invoice for submission in connection with its prior claim letter. This invoice was an invoice from tbe Bowles & Edens Supply Company of Dallas, Texas, which purported to show tbe purchase of various stops and boxes and other connections for tbe work. In fact, this invoice did not reflect any actual purchase of the material.
174. (a) Under the date of June 18, 1959, the plaintiff wrote the resident engineer, enclosing its subcontractor’s correspondence regarding the claim and requesting forms and instructions for filing an appeal from the contracting officer’s decision.
(b) Under the date of July 8,1959, the contracting officer responded to the plantiff’s request, stated that the “Disputes” clause provided for an appeal from the contracting officer’s decision within 30 days from receipt thereof, and further stated as follows:
* * * The Contracting Officer’s decision dated 11 May 1959 dealing with stops and boxes was received by you on 13 May 1959. An appeal was not taken within 30 days from its receipt.
You are therefore advised that the Contracting Officer’s decision dated 11 May 1959 is final and conclusive and an appeal therefrom does not lie, pursuant to Clause 8.
*569 175. (a) At the final closing of Mortgage Area Ion February 23, 1960, the plaintiff handed the contracting officer its list of 28 itemized claims. Included therein was claim 11 with respect to service stops and boxes. The contracting officer on March 11, 1960, issued findings of fact and a decision, and transmitted a copy thereof to the plaintiff by registered mail, return receipt requested. The contracting officer found with respect to claim 11 that the plaintiff had not appealed from the contracting officer’s decision of May 11, 1959, within 30 days, and that a belated appeal therefrom did not lie under the “Disputes” clause.
(b) Similar findings were made by the contracting officer with respect to claim 11 at the final closings for Mortgage Areas 2,3,4, and 5.
176. (a) During the months of July and September 1960, the plaintiff’s subcontractor, the Mitchell Darby Construction Company, executed general releases without reservation, which by their express terms released the United States of America, the Federal Housing Administration, the bonding company, the mortgagor-builder corporation, and the plaintiff from “all contracts, demands, actions, and causes of actions, damages, suits, debts, sums of money, covenants, promises, extras and claims arising out of” the various housing projects. One such release covering each of the mortgage areas was excuted by the plaintiff’s subcontractor.
(b) Under the date of September 20, 1960, the plaintiff’s subcontractor executed a general release covering the five mortgage areas, which released the United States in the same terms as set forth hereinbefore. This release further stated as follows:
It is understood that there is a claim before the Contract Board of Appeals, Claim No. 11, in the amount of $16,141.00 and that one-half interest shall be assigned from any proceeds arising from this claim, to Robertson Construction Company.
Claim 13 — Insulation for Refrigerant lines
177. Paragraph 25-l7(b) of the contract specifications stated as follows:
(b) Pifes. — The refrigerant suction lines between the cooling coils and the compressors shall be insulated with *570 impregnated mineral-wool pipe covering of light-duty thickness, the equivalent thickness of cellular glass, or other equally suitable material approved by the contracting officer.
178. Paragraph 27-4 (c) of the specifications provided that the mineral wool insulation should conform to Federal Specification HH-I-562, Type II, the class suitable for temperature application for pipes. Paragraph 3.5 of that specification required that the thermal conductivity or “k” factor should not exceed certain values at stated temperatures. Paragraph 3.7.2 of that specification called for the minimum thickness of mineral wool insulation to be 1% inches for the refrigerant pipes used on the Fort Hood job, which would have required an outside diameter of from 3% to 4 inches.
179. The “k” factor and the “u” factor measure the insulating properties of insulation. The “u” factor is a measure of the overall coefficient of heat transfer between the interior .and exterior surface of insulating materials, regardless of thickness. The “k” factor, which is used to compare insulation of the same thickness, is the coefficient of heat transfer for a 1-inch thickness of insulating material.
180. Because of the confined nature of the space that was available for the refrigerant lines in the Fort Hood houses at the vertical drop from the attic down to the connection of the evaporator coil, it was not possible to install l^-inch insulation on the refrigerant lines there in a satisfactory and workmanlike manner.
181. (a) On December 2, 1958, the plaintiff submitted for approval as insulation for the refrigerant pipes a foam rubber material called “Rubatex,” proposing to use a '14finch thickness of such material for insulation.
(b) By a letter dated January 8, 1959, the defendant’s resident engineer disapproved the 14-inch Rubatex, stating that it was not of sufficient thickness to give the insulating properties of the material specified in the specifications.
(c) On March 6, 1959, the plaintiff resubmitted the same material in the same thickness, together with descriptive data .showing its insulating properties and qualities. The “k” value given therein was .27.
*571 (d) By a letter dated May 22, 1959, the resident engineer disapproved the insulation again, stating that it was not of sufficient thickness to give the equivalent in insulating properties to the mineral wool specified in the specifications. His letter further stated in part as follows:
Federal Specification HHI-562 specifies that Type II light duty pipe insulation shall have a maximum k value of 0.315 at 50° F mean temperature and shall have a minimum wall thickness of 1.5 inches for pipe sizes 1 inch to 3% inches. Using the above values, the required u value of refrigerant piping insulation for pipe sizes 1 inch to 3y2 inches must be not more than 0.21. Based on a k value of 0.27, Eubatex insulation would be required to have a minimum wall thickness of 1.29 inches to produce a u value not to exceed 0.21.
(e) Eubatex % inch in thickness is commonly used in the trade as insulation for refrigerant lines, and is suitable for such purpose.
182. (a) On June 15,1959, the plaintiff submitted for approval Eubatex insulation having a thickness of % inch.
(b) The %-inch Eubatex was disapproved by the resident engineer on June 17,1959.
183. (a) The plaintiff next submitted Eubatex that was -% inch thick.
(b) This submission was rejected by the resident engineer on the ground that %-inch Eubatex was not the equivalent of mineral wool insulation 1% inches thick.
184. (a) On July 31, 1959, the plaintiff again submitted Eubatex having a %-inch thickness for approval.
(b) On the same day, the plaintiff’s submission was approved by the resident engineer.
185. The %-inch thick Eubatex did not provide the equivalent insulating properties of the 1%-inch mineral wool insulation specified by the contract, but the defendant approved the material in order to permit the contractor to move the job along.
186. There was a delay of more than 7 months from the original submission by the plaintiff of %-inch Eubatex insulation for approval and the subsequent approval of %-inch Eubatex insulation by the resident engineer for use on the units to be constructed under the contract.
*572 187. During the period of time that elapsed between the original submission of Bubatex insulation for refrigerant lines and the subsequent approval of Bubatex insulation, work was progressing on the buildings that were being constructed under the contract, and sheetrock had been installed on the ceilings of 88 units in Mortgage Area 1.
188. Because of the delay in the approval of the Bubatex insulation, it was necessary for the workmen who installed the insulation to crawl through small scuttle holes and work on their hands and knees in order to install the refrigerant insulation in 88 units. Normally, such insulation is installed prior to the construction of dry walls.
Claim lJj, — Straffing of Refrigerant Lines
189. The plaintiff was required to strap the refrigerant lines that were installed in the units which were being built under the contract.
190. The specifications under the contract did not describe the type of strap, or the location or type of anchor, to be used in connection with the refrigerant lines.
191. Paragraph 25-3 (b) of the contract specifications stated as follows:
(b) Material and Eguifment Schedule. — As soon as practicable and within 30 days after the date of award of contract and before commencement of installation of any material or equipment, a complete schedule of the material and equipment proposed for installation shall be submitted for the approval of the contracting officer. The schedule shall include catalogs, cuts, diagrams, drawings, and such other descriptive data as may be required by the contracting officer. In the event any items of material or equipment contained in the schedule fail to comply with the specifications requirements, such items may be rejected.
192. Paragraph 25-16 (c) of the specifications stated as follows:
(c) Pife Sufforts. — Pipe supports shall be standard catalog products approved by the contracting officer. Supports for horizontal lines shall be spaced not more than 10 feet on centers.
*573 193. On or about August 18, 1959, the plaintiff’s subcontractor began installing the refrigerant lines on the buildings without having obtained an approval of the pipe supports for the refrigerant lines.
194. On August 21, 1959, a sample installation for the refrigerant line installation was set up. This installation utilized %-inch galvanized metal straps, fastened with nails.
195. On September 9,1959, the plaintiff submitted for approval the support devices for the air-conditioning lines. On September 14, 1959, the plaintiff supplemented its sub-mittal by stating that “It is further proposed to use perforated hangar iron in areas where we may not be able to satisfactorily anchor with the 1" galvanized strap as submitted in our previous letter.”
196. By a letter dated September 15, 1959, the resident engineer approved the use of 1-inch wide, shop-made, galvanized straps secured with screws compatible with galvanized metal. The use of %-inch straps was expressly disapproved, because it cut into the Kubatex insulation and did not provide adequate support for the refrigerant lines.
197. Thereafter, the %-inch straps which had previously been installed in 154 housing units were removed, and the job was completed by using the 1-inch approved straps.
198. The strapping of refrigerant lines in 154 units with %-inch straps was done under daily Government inspection.
199. The %-inch material used by the plaintiff in the 154 units was a standard product for strapping, and was a usual and customary type of material used for strapping the type of line involved in this case.
200. After the installation of strapping in 154 units, the plaintiff was required to change the %-inch straps to 1-inch straps, and was required to use brass screws.
Olaim IS — Jomts and Fittings in Refrigerant Lines
201. Paragraph 25-16 (b) of the specifications under the contract provided as follows:
(b) Fittings for copper refrigerant lines shall be of wrought copper or brass, shall be suitable for use with high-temperature solder, and shall be designed for a working pressure of 300 psi gage.
*574 202. Paragraph 27-16 of the specifications under the contract provided in part as follows:
27-16. Refrigerant. — Employed in the central air-conditioning system shall be Freon 12 or Freon 22. Each system shall be completely charged with refrigerant, after which it shall be tested and proved tight at all joints. * * *
203. Fittings are devices used to make joints or connections' in refrigerant lines. A “swage” joint is made with a special swaging tool which is inserted into the end of one copper pipe, enlarging it so that another pipe will enter it and be joined to it. A “swage” joint is a field joint and differs from a manufactured joint in that it uses no fittings; it is made from the pipe material itself. The “swage” joint is weaker than a manufactured joint using fittings, because the enlarged circumference of the pipe decreases the pipe’s wall thickness.
204. The plaintiff’s subcontractor planned to use “swage” joints in the refrigerant lines. However, the defendant’s inspector refused to permit the use of “swage” joints in the refrigerant lines.
205. The defendant’s inspector also refused to permit the plaintiff’s subcontractor to use manufactured sweat-type fittings in the refrigerant lines within the attic spaces of the housing units, where the copper refrigerant line running, from outside the unit turned down in the attic to continue to the heater room. Instead, the inspector required the use of continuous copper tubing within the attic spaces.
206. The evidence in the record does not show that the-inspector’s action was protested by the plaintiff or its subcontractor to the defendant’s resident engineer or the contracting officer.
207s. The plaintiff’s subcontractor was permitted to use joints and fittings in the heater rooms and on the outside of the buildings.
Claim 16 — Size of Heating and Air-Conditioning Closets
208. The plaintiff was required to install heating and air-conditioning units in the heating and air-conditioning *575 closets of the housing units that were being built under the contract.
209. Paragraph 25-6 (a) of the specifications under the-contract provided, among other things, as follows:
(a) General. — The furnace shall have a capacity not' less than that shown on the drawings. Gas-fired furnaces shall be a type approved and listed by the American Gas Association Directory of Approved Gas Appliances and Listed Accessories, and the capacity shall be determined on the basis of the “output ratings” shown herein. All materials necessary for proper assembly shall be furnished with each furnace. When furnace, casings, blowers, motors, and other parts of equipment are shipped unassembled, all parts shall have been made so as to permit field assembly without grinding, drilling, or similar work. * * *
210. Paragraph 25-3 of the contract specifications stated as follows:
25-3 General. — The contract drawings indicate the-extent and general arrangement of the heating system.. If any departures from the contract drawings are deemed necessary by the contractor, details of such departures and the reasons therefor shall be submitted as soon as practicable to the contracting officer for approval. No such departures shall be made without the-prior written approval of the contracting officer. The warm-air heating installation shall conform to Pamphlet No. 90B of the National Board of Fire Underwriters.
_ (a) Standard Products. — The equipment to be furnished under this Specification shall be essentially the standard product of the manufacturer. Where two or more units of the same class of equipment are required,, these units shall be products of a single manufacturer; however, the component parts of the system need not be-the products of the same manufacturer.
(b) Material and Equipment Schedule. — As soon as practicable and within 30 days after the date of award of contract and before commencement of installation of any material or equipment, a complete schedule of the material and equipment proposed for installation shall be submitted for the approval of the contracting officer. The schedule shall include catalogs, cuts, diagrams,, drawings, and such other descriptive data as may be required by the contracting officer. In the event any items- *576 of material or equipment contained in the schedule fail to comply with the specifications requirements, such items may be rejected.
211. The drawings under the contract indicated that the inside finished dimensions of most furnace rooms were 35% inches x 25% inches. Some were smaller.
212. The defendant was informed orally and in writing that no equipment currently being manufactured would fit into the furnace rooms.
213. On December 2, 1958, the plaintiff submitted to the •defendant’s resident engineer shop drawings and data on the heating and air-conditioning system which he proposed to install in the houses. This was supplemented by further submissions of heating and air-conditioning equipment ■drawings and data on December 30,1958 and January 6,1959.
214. On January 8, 1959, the resident engineer returned the plaintiff’s submittals with the notation that the heating furnaces could not be approved because they did not fit the spaces in which they were to be installed, so as to allow room for maintenance.
215. (a) On January 19 and 20, 1959, the plaintiff submitted shop drawings and data on the heating and air-conditioning units.
(b) On January 29, 1959, the resident engineer approved the heating and air-conditioning units and the shop drawings, as noted. In his letter, the resident engineer further stated that:
In order to provide additional space in some heater rooms as noted on the sheet metal drawings, this office has no objection of turning the studs sideways as indicated, provided the wall-board as specified for these areas will not be affected.
216. On February 3, 1959, the plaintiff submitted to the resident engineer a list of proposed building changes to obtain space for the heaters, which involved moving walls and doors and other structural changes to the houses. The resident engineer forwarded this proposal to the office of the District Engineer in Galveston for advice. On February 9, 1959, the District office responded, and on the following day *577 tbe resident engineer transmitted that advice to the plaintiffs In substance, the plaintiff was advised that the units had been approved as to capacity and construction, but that no approval was given to alter the buildings; that the plaintiff had the responsibility to select units which would fit; and that heaters which would fit the spaces should be resubmitted for approval.
217. On February 10,1959, the plaintiff submitted a request for reconsideration of the decision denying its proposed' changes, and stated that it had been unable to find a heating unit which would fit the space provided. This request was transmitted to the office of the District Engineer in Galveston, That office shortly thereafter requested the original architect of the buildings for advice. On February 20, 1959, the architect forwarded to the District office a chart or table showing where the proposed equipment could be installed by turning the studs flat in the adjacent walls.
218. On February 27,1959, the Galveston office forwarded the table to the resident engineer, with advice that only the architectural changes indicated in the table would be permitted, at no additional cost to the Government. A copy of the table, together with the foregoing advice, was transmitted to the plaintiff by the resident engineer on Marclí 12, 1959.
219. With the studs turned flat, there was enough clearance to install the heaters in the spaces provided. The installation of the heaters and the making of the necessary connections to the system were difficult and required more time and effort on the part of the plaintiff’s heating subcontractor than the subcontractor had anticipated.
220. The evidence shows that, when submitting its bid to the plaintiff, the plaintiff’s heating subcontractor did not check the dimensions of the heater-room spaces against the dimensions of the heater which it proposed to furnish. The plaintiff’s subcontractor merely examined the contract drawings, assumed that its proposed heater would fit, and intended to treat any discrepancy between the size of its proposed heater and the spaces as a “field” problem.
*578 Olaim If — Removing and Replacing Equipment
221. Detail S on plate 406 and sheet 430-C under the contract showed the concrete furnace room slab at the same level :as the other portion of the concrete slab. Details M-414 and 0-414 under the contract indicated that the concrete furnace room slab was to be raised to the same level with the oak .flooring in the officers’ quarters. These details were .inconsistent.
222. Upon instructions from the defendant’s resident engineer, the portions of the slabs in the furnace rooms of the officers’ quarters were placed at the same elevation as the portions of the slabs which were to receive the hardwood floors.
223. On August 4,1959, after a conference was held with the plaintiff’s general superintendent and principal officer, together with inspectors Harrison and Cloudt, the resident •engineer required that the portions of the slabs in the furnace rooms of the houses containing hardwood flooring in Mortgage Areas 1 and 2 be reworked, raising the heater closet finished floor area 2%0 inches.
224. The order mentioned in finding 223 meant that slabs in 75 units had to be raised so as to be flush with the hardwood flooring, rather than with the top of the slab under the hardwood flooring.
225. The plaintiff’s heating subcontractor was required to remove the equipment already installed in the 75 units, and reinstall it after the slabs had been raised.
226. The understanding between the heating subcontractor and the plaintiff is that the plaintiff is to prosecute the subcontractor’s claim, which includes monies withheld from the subcontractor by the plaintiff.
Olaim 18 — Special Air Duct for Heater Oloset
227. Under the contract, the plaintiff was required to install air ducts in all of the 500 housing units.
228. Paragraph 25-12 of the specifications under the contract provided (among other things) as follows:
25-12 Ductwork. — Sheet-metal work indicated on the drawings, specified, or required for the heating of the *579 building shall be erected in a first-class workmanlike manner, and shall be approved by the contracting officer. Ducts, unless otherwise approved, shall be true to the dimensions indicated on the drawings and straight and smooth on the inside, with neatly finished joints. The ducts shall be securely anchored to the building in a manner approved by the contracting officer, and shaE be so installed as to be completely free from vibration under aE conditions of operation. The ducts shall be properly braced and reinforced with steel angles or other structural members spaced not more than 60 inches on centers. * * *
229. Paragraph 25-17(a) of the specifications under the -contract provided as follows:
(a) Duots. — Unless otherwise indicated on the drawings, overhead supply and return ducts shaE be insulated with not. less than 1 inch thickness for return ducts and 2 inch thickness for supply ducts of impregnated mineral wool, thermally equivalent thickness of glass insulation, or other equally suitable material approved by the contracting officer. The insulating material shall be set in a waterproof adhesive and coated with suitable water-repeEant cementing substance that wiE provide an effective vapor barrier.. An approved vapor-barrier envelope may be furnished, if standard with the manufacturer of the insulation and suitable for the finish coating. Insulation exposed within equipment rooms shall be protected by means of a finished coating of suitable plaster not less than % inch in thickness applied in a manner recommended by the manufacturer of the insulation and approved by the contracting officer. The insulation shall be mechanically secured to the ducts by means of galvanized steel and corner angles, cemented surface anchors, or other approved devices or methods. If the wiring method is used, corners of the insulation shall be adequately protected.
230. There was not enough room for the installation of the air ducts for the heater closets, as shown on the plans and specifications.
231. The return air duct and the return air griEe were located in the haEway ceiling, immediately in front of the furnace, and this left no room for the furnace vent pipe to run to the roof. The only way it could be installed was through a sleeve in the return air duct to accommodate the *580 passage of the vent through the return air duct itself and pass on through to the roof. The resident engineer permitted this, provided that the duct was increased in size.
232. The new sleeve that was installed in the heater closet in the units that were being constructed under the contract reduced the size of the return duct through which the sleeve passed, and the return air duct had to be enlarged from 14 inches x 18 inches to 18 inches x 18 inches.
233. The plaintiff was forced to incur increased costs to' enlarge the return air duct, additional acoustical lining expense, and additional labor cost.
Claim, 19 — Additional Insulation on Portion of Return Air Duct
234. Paragraph 25-15 of the contract specifications provided in part as follows:
25-15 Acoustical Lining for Duct Work. — Acoustical lining for duct work for preventing the transmission of noise, shall be installed in all return air plenums. The material shall be securely fastened to the inside of the ducts in an approved manner * * *. Material shall be designed for this application, and shall be approved by the contracting officer.
235. Paragraph 25-17(a) of the specifications provided in part as follows:
(a) Ducts. — Unless otherwise indicated on the drawings, overhead supply and return ducts shall be insulated with not less than 1 inch thickness for return ducts and 2 inch thickness for supply ducts of impregnated mineral wool, thermally equivalent thickness of glass insulation, or other equally suitable material approved by the contracting officer. * * *
236. Plate 430-C of the drawings under the contract indicated by an arrow that one portion of the heating system is a plenum and another portion is an air duct.
237. The plaintiff was required to insulate the inside portion of what plate 430-C of the drawings under the contract indicated was a return air duct.
*581 238. The expression in the plans and specifications as to the insulation of return air ducts referred to outside air ducts. This is the invariable practice in the construction industry.
239. The plaintiff’s subcontractor attempted to point out to the inspectors that the plans differentiated between the plenum and a return air duct and required inside insulation only on the plenum, but was told that the inside portion of the return air duct would have to be insulated.
Olaim 20 — Registers
240. The plaintiff’s claim 20 for $300 was admitted to be ■equitable by the defendant.
241. Approved high wall registers were installed in 13 units that were being built under the contract.
242. The plaintiff, through its subcontractor, was required ■by the defendant’s resident engineer to remove the previously approved high wall registers which had been installed in 13 units, and replace them with low wall registers which had opposed blade dampers.
243. The approved registers were taken out because inspectors did not like their looks after they were installed.
Olaim 22 — Concrete
The Monolithic Pour
244. Under the terms of the contract, the plaintiff was required to do all of the concrete work in connection with the housing units contemplated under the contract.
245. The concrete work in connection with the housing units required the plaintiff to pour concrete for the perimeter and interior grade beams and footings and for the floor slabs and flat work.
246. The plans and specifications required certain mechanical and underground work for each housing unit to be installed within the perimeter and interior grade beams and beneath the floor slab, including heating ducts, drain fill, steel, waterproof membrane, and underground plumbing.
247. Section 3 of the specifications concerned the emplacement of concrete and required the plaintiff to pour concrete *582 slabs for the family housing units. Paragraph 3-13 of the specifications stated:
3-13. Construction Joints. — No construction joints will be allowed in buildings, except with special per* mission of the contracting officer.
248. Plate No. 406 of the contract plans showed the details-for the construction of the foundation beams and the slab for the houses. Each of the details for the slab and the foundation beams showed a continuous unbroken mass of concrete,, without construction joints. Only one detail drawing om Plate 406 showed an option for separate pouring. This detail, by means of a line on the drawing, indicated a construction-, joint between the heater plenum and the slab. This was the only construction joint shown on Plate 406.
249. (a) Paragraph 1-5 of. the specifications stated as follows:
_ 1-5. Bach-filling. — After completion of beams, foundation footings, and other construction below the elevation of the final grades, and prior to backfilling, all forms shall be removed and the excavation shall be' cleaned of all trash and debris. * * * Backfill shall be-brought up evenly on each side of the wall as far as-practicable.
(b) It was impracticable to comply with -the last sentence of the specification quoted in paragraph (a) of this-finding, i.e., to backfill on each side of the wall if the footings and beams were poured at the same time as the slab.
250. The plaintiff planned to pour the concrete for the-beams and footings separately from the floor slab. It is the-customary and workmanlike method, in constructing housing of the type and quality involved in the contract, to first' pour the footings and then complete other work inside the-building area prior to pouring the slab.
251. (a) Prior to the commencement of any-of the concrete - work, the plaintiff’s principal officer visited the contracting-officer in Galveston and discussed with him the providing: of a construction joint between the grade beam and’the 4-inch. floor slab of the houses. This was because the plaintiff desired to pour the foundation grade beams and the floor slabs, separately. At this conference, which was held’ on Decern- *583 ber 17, 1958, tbe plaintiff submitted a letter from a private engineering company, together with, a drawing showing the plaintiff’s proposed construction joint between the grade beam and the slab.
(b) By a letter dated January 7,1959, the contracting officer responded to the plaintiff’s proposal with the following-determination :
b. Of number 2 priority to you was the proposal to-pour the foundation walls and floor slabs separately, rather than monolithically as required by the contract documents. The manner in which you propose to accomplish this was set forth in a letter and sketch prepared by Donald E. Warren Co., Engineers of Los Ange-les. I regret to advise you that a construction joint will' not be permitted. The Chief of Engineers has already called to our attention deficiencies in family housing caused by this type of construction. By permitting construction joints between the floor slab and the foundation wall there has resulted cracking of the asphalt tile floor where it extends across the joint.
252. (a) By a letter dated January 12,1959, the plaintiff' submitted another detail proposing a construction joint between the floor slab and the foundation grade beams.
(b) By a letter dated January 29, 1959, the contracting-officer responded to the plaintiff’s request as follows:
Your proposal has been thoroughly reviewed with my-staff and it is my determination that your proposed use-of a construction joint will not be permitted. Existing - construction criteria and foundation conditions in the-. Fort Hood area will not permit a deviation from the contract drawings on construction of the floor slabs and. foundation walls.
253. The Government’s resident engineer orally discussed; with an officer of the plaintiff corporation the matter of the use of construction joints between the foundation grade, beams and the floor slab. It was the position of the resident-engineer that, due to the soil conditions in the area, with a, number of houses being located in cut and a number of them on fill, and due to a possible differential settlement of the, foundations, the house slabs and foundation beams should be¡ placed in one continuous operation.
*584 254. (a) On February 20,1959, tlie plaintiff requested permission to make a construction joint between tlie carport and the house at each unit, and submitted a detailed drawing showing its proposal. Under the date of March 3,1959, the plaintiff submitted a further detail for the making of a construction joint between the carport and the building.
(b)By a letter dated March 26, 1959, the defendant approved the use of a construction j oint between the carport and -the building. There was, however, no approval given for the use of a construction joint between the foundation grade .'beams and the floor slab of the house.
255. The single-pour system of pouring the slab, footings, .and beams in the same pour, which the plaintiff was required -to employ, gave rise to many problems, as indicated below:
(a) Form costs were increased because forms were damaged by exposure to weather, since they had to be left in place 'longer than usual.
(b) 'Forms were damaged by workmen who had to do -mechanical and waterproofing work in the areas, and forms 'had to be repaired or replaced.
(c) There were increased problems where there were different elevations called for in the building plans, especially in -the areas of carports and storage areas, which required extra 'bracing and tieing of forms.
(d) Extra concrete had to be used because the narrow -mounds of dirt caused by the trenches and excavations for -the duct work in the footings gave way when the footings -were poured.
(e) The 'drain fill would fall into the open trenches because of the trafile from the mechanical workers, and it was necessary to remove such fill from the trenches.
(f) Steel and membrane workers also bad to work in this .area, making it impossible to control the concrete yield in a -normal 4-inch slab section.
(g) There was a great deal of concrete lost around the duct work.
(h) The single-pour system caused a waste of manpower because men could not be working continually, but would have to wait for concrete to set before they could proceed to . finish it and do other work.
*585 Heater-Boom Areas
256. The basic contract and the plans therefor were designed for the installation of asphalt or vinyl tile on the floors of the houses. However, one of the additive alternates awarded to the plaintiff provided for the furnishing of oak flooring in lieu of asphalt tile in 137 officers’ quarters. Additive Alternate Q stated as follows:
Furnish oak flooring in lieu of all asphalt tile in family quarters listed below; including sleepers, flooring material and finish, and changes of elevation of concrete subfloor ncessary to make all types of finish floor members flush. (The elevation noted on grading plans for the concrete foundation slab refers to the Living Boom area regardless of the type of finish floor.)
257. Detail S on plate 406 and sheet 430-C under the contract showed the concrete furnace room slab at the same level as the other portion of the concrete slab. Details M-414 and 0-414 under the contract indicated that the concrete furnace room slab was to be raised to the same level with the oak flooring in the officers’ quarters. These details were inconsistent.
258. Upon instructions from the defendant’s resident engineer, the portions of the slabs in the furnace rooms of the officers’ quarters were placed at the same elevation as the portions of the slabs which were to receive the hardwood floors.
259. On August 4, 1959, after a conference was held with the plaintiff’s general superintendent and principal officer, together with inspectors Harrison and Cloudt, the resident engineer required that the portions of the slabs in the furnace rooms of the houses containing hardwood flooring in Mortgage Areas 1 and 2 be reworked, raising the heater closet finished floor area 25/ie inches.
260. The order mentioned in finding 259 meant that slabs in 75 units had to be raised so as to be flush with the hardwood flooring, rather than with the top of the slab under the hardwood flooring. This work was accomplished by the plaintiff.
*586 The Waterproof Membrane
261. (a) The heating duets for the houses were placed in trenches within the perimeter of the foundation slab. Under the plans and specifications, the entire concrete slab was to be waterproofed by a tar membrane consisting of felt or fabric saturated in coal-tar pitch. The purpose of the membrane was to stop the percolation of water and thus prevent moisture from going through the concrete and causing the floors of the houses to sweat, and was also to prevent moisture from getting into the underfloor heating and air-conditioning duct work.
(b) The specifications and the drawings required that the waterproofing membrane be placed under the heating ducts.
262. At the first building, the plaintiff experienced difficulty because of the method of application of the waterproof membrane required by the specifications. This difficulty was related to the defendant. There were periodic discussions with Messrs. McKnight, White, Cloudt, and Harrison.
263. It was extremely difficult for the plaintiff to install the specified waterproof membrane underneath the heater ducts because of the membrane’s stiffness. Also, the coal-tar materials specified had a low melting point of approximately 60° F., and as the weather warmed up, the material began to melt. The surface became sticky and impossible to work on, and the plaintiff was forced to sprinkle cement over the membrane.
264. The rough-in plumbing work required the plumbing laborers to have access to the area over which the slab was to be poured. Work on the forming and the membrane and the rough-in plumbing all had to be done before the slab was poured. Because of these requirements, it took from two weeks to a month from the time the trenches were dug for the concrete work until the time when the slab was ready to pour.
265. (a) On November 20, 1958, the plaintiff requested a change in the waterproof membrane from a tar membrane to a polyethylene membrane, and offered a credit of $7,500 to the Government for this.
*587 (b) This request was disapproved by the defendant on November 26, 1958.
(c) On December 2, 1958, the plaintiff requested reconsideration of its prior proposal. The plaintiff’s request was again denied.
266. On February 9, 1959, the plaintiff proposed a change in the waterproofing membrane system by placing the membrane over the ducts instead of under the ducts, and the plaintiff offered the defendant a credit for this. On the following day, the plaintiff’s request was denied.
267. The first house slab was poured by the plaintiff on February 18, 1959. Thereafter, the pouring of house slabs continued from February 18 until approximately March 11, 1959.
268. The plaintiff constantly objected to placing the waterproof membrane underneath the heater ducts, even though the specifications required it, because the method was impracticable.
269. On March 11,1959, the plaintiff shut down the pouring of the house slabs and requested a conference to discuss problems with the waterproofing. The plaintiff had been experiencing considerable difficulty in placing the waterproofing membrane under the heating and air-conditioning duct work and getting the membrane to lie flat on the earth. Also, there were problems in getting the drainage fill (gravel) to remain under the membrane without having the sides of the trenches for the duct work to cave in. There was also damage from the various trades working within the perimeter of the foundation and walking across the membrane and puncturing it.
270. (a) On March 17, 1959, the Government’s resident engineer in a letter to the plaintiff outlined a proposed change to the contract that would relieve the plaintiff from the necessity of placing the waterproofing under the ducts, as shown on the contract drawings.
(b) One of the items contained in the proposed change was the encasing of all joints and fittings in the duct work with concrete.
*588 (c) The resident engineer’s letter further requested that the plaintiff furnish a proposed credit for the making of the change.
(d) By a letter dated March 21, 1959, the plaintiff proposed a credit to the Government in the amount of $10,006.32 for the change.
(e) On March 26, 1959, the resident engineer wrote the plaintiff, advising that a modification of the contract was being prepared in accordance with the change outlined in his letter of March 17,1959, and adopting the credit outlined in the plaintiff’s letter of March 21,1959.
(f) On March 30,1959, the formal modification of the contract for the change was forwarded to the plaintiff. The formal modification of the contract was subsequently signed by the plaintiff.
271. As a result of the change mentioned in finding 270, the plaintiff was thereafter permitted to place the waterproof membrane over the ducts for the heating and air-conditioning system, instead of being required to place the membrane underneath the duct work.
The Water Pipes
272. (a) On December 1, 1958, the plaintiff’s plumbing subcontractor forwarded to the plaintiff a proposal to change the water piping system so that the water pipes would be run under the slabs instead of above them, in order to eliminate the danger of freezing and the bursting of pipes.
(b) On January 30, 1959, the plaintiff forwarded a similar proposal to the defendant, proposing to install the water piping below the slab and setting forth various alternative proposals for price increases to the contract in connection with the change. On the same date, the plaintiff submitted an alternative proposal to change the plumbing on the job at no increase or decrease in the contract price.
(c) On February 5, 1959, the plaintiff submitted another proposal to change the installation of the water piping, with a different increased cost submission.
(d) Four days later, on February 9, 1959, the plaintiff stated that it proposed to start placing concrete for the *589 buildings on February 11, and requested a decision concerning the revision of the water lines.
(e) On February 10, 1959, the Government’s resident engineer advised the plaintiff that the Government had not yet made a firm decision on the plaintiff’s proposals, and, therefore, that the exact location of the water lines had not been fixed. The resident engineer further stated that, on the first buildings, he would specify the exact location of the water piping on an individual building basis.
(f) Subsequently, on or about March 20,1959, one of the plaintiff’s proposals to change the water lines was adopted, and a formal change order was issued, which change order the plaintiff accepted and signed.
(g) The building-by-building approach concerning the placement of the water lines, prior to the change mentioned in pargraph (f) of this finding, hampered the attempts by the plaintiff to build the houses on a production-line basis.
The Forms
273. (a) Paragraph 1-3(a) of the contract specifications stated in part as follows:
* * * When concrete is deposited against excavated surfaces, such surfaces shall be clean cut, plumb, and true to the form line. The earth shall be well compacted and shall not spall or deform during concrete pouring operation. Undercutting will not be permitted. * * *
(b) This specification conformed to the custom in the construction industry of pouring concrete against excavated surfaces in line with forms.
274. The plaintiff attempted at the beginning of the job to set forms on top of the trenches and to pour concrete against the soil, but was instructed by Inspector Harrison to form to the bottom of the trenches.
275. The forms for the concrete work were put in line with instruments and were adequately braced to hold the weight against them and preserve alignment and elevations. After the subcontractors had finished their work inside the perimeters of the buildings, the forms were checked again to make sure that the alignments and grade were correct.
*590 276. Upon occasion, the plaintiff was unreasonably required to put in additional bracing to the extent of every 4 feet before being allowed to pour the concrete slabs.
277. Forms will always bulge to some degree from the weight of the concrete that is poured.
Delay in the Pouring of Concrete
278. The plaintiff had the capacity to pour concrete for 5 units per day in connection with the first 15 units, and for 10 units per day thereafter.
279. During most of the job, the defendant had only one concrete inspector, Mr. Boswell, who had the responsibility of inspecting subbases, waterproof membrane, reinforced steel, mesh, alignment, and correction of forms, and also had the responsibility of inspecting the concrete being poured.
280. Inspector Boswell would not allow more than one slab to be poured at a time, and insisted upon personally observing all phases of the concrete pour. The plaintiff’s numerous requests to pour more than one slab at a time were refused by Mr. Boswell and his superiors.
281. On one occasion, the plaintiff poured concrete for 12 units in one day, over Inspector Boswell’s objections. Despite the fact that the units poured were in good condition, except for the usual minor imperfections which could easily have been repaired, the defendant refused to allow the plaintiff to pour concrete for any units the next day. Mr. Boswell insisted that the plaintiff would not be able to pour 12 units a day, and thereafter the plaintiff never did pour 12 units a day.
282. Toward the end of the job, Mr. Boswell was given another inspector as a helper because Mr. Boswell had complained that he had too much work to do.
283. The plaintiff’s production schedule was hampered by the concrete inspector’s insisting that all patchwork be done on the concrete for a particular unit before the contractor was allowed to proceed to the next unit. This requirement was contrary to the accepted and sound construction prac *591 tice of continuing pouring operations and doing patchwork as a separate project.
284. The plaintiff’s production was further hindered by the defendant’s insistence that the plaintiff, before pouring concrete, remove minute splinters of wood and pieces of drainage fill which had fallen into the excavation. The amounts which the plaintiff was required to remove were insignificant, and the drainage fill itself was not foreign to the concrete mix. In order to do the job as the defendant required, the plaintiff’s laborers had to crawl on their hands and knees and remove handfuls of gravel.
Unnecessary Eepairs
285. (a) The plaintiff was required by the defendant to repair normal hairline cracks that had no structural significance.
(b) The plaintiff was required by the defendant to patch honeycomb on unexposed surfaces of the concrete.
(c) The plaintiff was required by the defendant to patch an entire section of the concrete whenever any patchwork was done, so that the patch would not be noticed.
Wasting of Concrete
286. On one occasion, the plaintiff was required to dump concrete which had been sitting for 45 minutes, although paragraph 3-17 of the specifications stated that a period of 1% hours was allowed for concrete to be placed.
Unstable Sides of Trenches
287. The contract plans did not provide sufficient support for the dirt between the forms for the grade beams and the excavation for the ducts, and the earth would fall away when an attempt was made to install the heating ducts in the manner called for in the specifications. The plans required the perimeter ducts to be placed too close to the grade beams. The dirt would not hold up, and it became necessary to dig *592 out all the dirt and encase the ducts with the beams in concrete.
288. Because of the defect in the plans, the contractor tried slip-forming, and dug wider trenches to take care of both the duct and the beam, pouring solid concrete around the ducts and the beams. This resulted in additional concrete being used.
289. On December 4,1958, the plaintiff requested approval to move the perimeter duct work inward 18 inches away from the outside footing of the foundations. On the same day, the plaintiff’s request was granted by the Government’s assistant resident engineer.
290. The problem of the collapsing dirt was also alleviated when the waterproof membrane was placed over the heating ducts.
291. The plans provided for many fingers of air-conditioning ducts going into the plenum, which resulted in islands of dirt with not enough support to stand by themselves. It was necessary for the plaintiff to pour the entire area surrounding the plenum box with concrete in other to obtain a satisfactory result.
Sheet-Metal Thimbles
292. Sheet-metal thimbles were installed by the plaintiff at the intersections of the plenums and ducts pursuant to the requirement of the defendant, although not called for in the plans and specifications.
Tolerance
293. Throughout most of the job, the defendant’s personnel insisted on a zero tolerance in inspections for both floor level and floor alignment in the concrete and forming work.
294. A perfect slab in concrete work is virtually impossible to obtain, and the tolerance customarily used in the construction industry is % inch in 10 feet, which the plaintiff *593 requested throughout the job 'but which was refused by the defendant.
295. Toward the end of the job, on January 15,1960, the Government’s resident engineer changed the defendant’s position and advised the plaintiff that “a tolerance of % inch in 10 feet will be allowed.”
Olmm, %3 — 0learning of Masonry
296. (a) Under the contract, the plaintiff was required to furnish masonry for the housing units. The plaintiff submitted, and the Government approved, a buff brick as one of the types of brick to be used on the pro j ect.
(b) Paragraph 4-8 of the specifications required the cleaning of the brick, after erection, with muriatic acid. The specification further stated that “Immediately after cleaning, the masonry surfaces shall be thoroughly rinsed down with clean water, leaving the masonry clean, free of mortar smears, and with tight mortar joints throughout.”
297. On several of the buildings, the Government inspectors discovered green stains on the buff brick after the plaintiff had cleaned such brick with muriatic acid. The inspectors required that the stains be removed.
298. (a) As a result of the incident mentioned in finding 297, the plaintiff’s superintendent proposed to the defendant’s assistant resident engineer that sandblasting equipment be used to clean the buff brick of the green stains. The assistant resident engineer agreed to the use of the sandblasting equipment.
(b) The sandblasting work proceeded successfully for a portion of Mortgage Area 1. The sandblasting removed the stains from the buff brick. However, as the work reached the end of Mortgage Area 1, it was noted by the defendant’s personnel that some of the windows in the houses were being pitted by the sandblasting operation. The plaintiff was immediately notified, and the plaintiff was required to replace the pitted glass.
*594 (c) Thereafter, from Mortgage Area 2 onward, the plaintiff took precautionary steps to protect the windows during the sandblasting operation.
Olaim 2$ — Grinding of Concrete Floors
299. The plaintiff was required to install concrete sub-floors on the 500 units built under the contract.
300. (a) Paragraph 3-20 of the specifications under the contract provided in part as follows:
3-20. Slabs on Grade. — The subgrade shall be brought to an even plane and compacted solid. Drainage fill shall be deposited to the indicated thickness, and compacted and graded reasonably level. * * * Concrete shall be deposited to the required thickness, and finished as specified in paragraph “Floor Slab Finishes” below.
(b) Paragraph 3-22 of the specifications under the contract provided in part as follows:
3-22. Floor slab finishes. — Floor slab finishes shall be finished as specified below. The dusting of surfaces with cement will not be permitted.
(a) Monolithic Finish. — Cement finish floors and concrete subfloor under asphalt and vinyl asbestos tile shall be finished by tamping the concrete with suitable tools to force coarse aggregate down from the surface, then screeding with straightedges and rough-floating to the required finish level. While the concrete is still green, but sufficiently hardened to bear a man’s weight without deep imprint, it shall 'be floated so as to leave the coarse aggregate visible. Sufficient pressure shall be used on floats to bring the moisture to the surface. The concrete shall then be steel troweled smooth and left free from tool marks.
(b) Rough Slab Finish. — Concrete subfloor under oak strip finish flooring shall be finished by tamping the concrete with suitable tools to force the aggregate down from the surface, then screeding with straightedges and floating to a level and reasonably uniform surface.
301. In the early part of 1960, when the houses were being finished and the plaintiff was preparing portions of the con *595 crete floors to receive vinyl tile, the defendant’s concrete inspector checked the finished concrete floors in a number of the kitchens of the houses. The inspector took the position that no tolerance as to the levelness of the concrete floors was permissible, and he marked the places on the floors where the concrete slabs were not level.
302. The plaintiff commenced grinding the marked portions of the concrete floors with a grinding machine in an attempt to achieve the degree of levelness required hy the defendant’s inspector.
30i3. (a) On or about January 13, 1960, the plaintiff requested a tolerance of % inch in 10 feet with respect to the levelness of the concrete floors.
(b) On or about January 15,1960, the defendant’s resident engineer advised the plaintiff that a tolerance of % inch in 10 feet would be allowed.
304. On January 27, 1960, the plaintiff’s principal officer visited the job site and protested the grinding of the concrete floors that were to receive vinyl tile. At that time, the floors were checked by a supervisor for the defendant in the presence of the plaintiff’s officer, and it was agreed that the grinding could be discontinued, since there were no excessive humps or depressions in the floors and the portions marked for grinding were in areas where furniture might normally be expected 'to be placed.
Claim 25 — Lvmber amd Plywood
305. Section 8 of the specifications under the contract provided in part as follows:
8-3. Materials/ Lvmber and Woodwork. — Lumber shall conform to Federal Specifications MM-L-736 and MM-L-751. At the contractor’s option, lumber for the various uses shall be one of the species listed for the purpose and of the grade indicated. Stress-grade lumber shall be used where so indicated on the drawings or specified.
*596 (a) Framing and Structural Lumber.—
Use Species
(1) Beams Girders Baiters 4-inch wide joists or rafters 1,500 f, 1200 c, 1,600,000 E. (Unless otherwise indicated on the drawings). Any stress-graded species.
(2) Joists Headers 1,200 F, 900 C, 1,600,000 E. (Unless otherwise indicated on Any stress-graded species.
(3) Studs Plates Caps Bucks Sleepers Collar beams No. 2 Cypress, tidewater red Hemlock, eastern Larch Pino, northern, white, Norway, ponderosa, and southern Spruce, eastern, Engel-'‘Standard” Light framing (WOLIB) mann Douglas fir, coast and inland Fir, white Hemlock, west coast
(4) Boof Sheathing Furring Backing Bibbon Boards Bidge Boards Bracing Sap Common No. 3 (WPA) Bedwood Cedar, western red No. 2 Cypress, tidewater red Pine, southern '‘Standard” Boards (WOLIB) Douglas fir, coast Hemlock, west coast Spruce, Sitka Fir, white No. 3 Douglas Fir, inland Hemlock, eastern Larch Pine, Idaho white, lodge-pole, northern white, Norway, ponderosa, and sugar
No. 2 Construction Sap Common Spruce, eastern and Engelmann Poplar, yellow Bedwood
❖ *
8-6. Lumber.—
(a) Grading. — Grading shall conform to the requirements of Federal Specifications MM-L-736 and MML-751.
(b) Grade Mark/mg. — Each piece of yard and structural lumber shall bear the official grade mark of the appropriate inspection bureau or association; or in lieu thereof, each shipment shall be accompanied by a certificate of inspection issued by the appropriate inspection bureau or association, or other agency approved as competent by the contracting officer.
*597 (d) Moisture Content. — Boards and dimension lumber not over 4 inches in nominal thickness to be incorporated in the structure, except finish material and flooring, shall be kiln-dried or air-dried and moisture content shall not exceed 19 percent. Upon application of the contractor, the contracting officer at his discretion, may permit the contractor to furnish boards and dimension lumber having moisture content in excess of 19 percent, subject to the following conditions:
(1) That the lumber be suitably piled under cover for air drying on the site at the contractor’s expense.
(2) That the lumber be air-dried to a moisture content not m excess of 19 percent prior to placement in the structure.
(3) That no increase in construction time will be required.
Moisture content of lumber over 4 inches in nominal thickness shall conform to the rules of the association under which it is graded and may be incorporated in the structure without further seasoning. Exterior and interior finishing lumber and flooring shall be kiln-dried and at time of delivery to the building site, the moisture content shall not exceed 12 percent for materials 1 inch or less in thickness, and shall not exceed 14 percent for materials over 1 inch in thickness. Millwork, which is assembled or built-up or more than one piece at the mill, except doors, shall have a moisture content not in excess of 12 percent.
(e) Storage. — Lumber delivered to the site shall be carefully piled off the ground in such manner as to insure proper drainage, ventilation and protection from the weather.
306. Paragraph 2~b of the Standard Grading and Dressing Bules for Douglas Fir, West Coast Hemlock, Sitka Spruce, Western Eed Cedar Lumber, March 15, 1956, provided in part as follows:
GENEEAL GEADING PEOVISIONS * * * 2-b. The inspection of lumber is the visual analysis, with regard to end use, of each piece. As a result, a reasonable difference of opinion between inspectors is recognized. A parcel or shipment of lumber is considered on grade if on reinspection ninety-five percent (95%) or more is found to be of the grade specified. This inspection tolerance is anticipated in the establishment of working *598 stresses for stress grades. In mixed parcels or shipments, each grade and kind is considered separately. The grade of lumber, as determined by the inspector, applies to the size, form, condition or degree of seasoning at the time of original inspection; any subsequent change in the lumber must be disregarded in determining the accuracy of the original grade.
307. Paragraph 66 of the General Grading Provisions of the Standard Grading Bules for Southern Pine Lumber (I960) provided in part as follows:
The grading of lumber cannot be considered an exact science because it is based on a visual inspection of each piece and on the judgment of the grader, but the provisions of these rules are sufficiently explicit to establish five percent (5%) below grade as a reasonable variation in judgment between inspectors and graders.
308. Paragraph 4.4.4.3 of the Commercial Standard CS 45-55 for Douglas Fir Plywood provided in part as follows:
Grade C Veneer may contain knotholes not larger than 1 inch in least dimension; open pitch pockets not wider than 1 inch; splits not wider than %6 inch that taper to a point; worm or borer hole not more than % inch or iy2 long; knots, if tight, and not more than iy2 inch in least dimension; and plugs, patches, shims, sanding defects, and other characteristics in number and size that will not impair the serviceability of the panel.
309. Paragraph 4.4.4.4 of the Commercial Standard CS 45-55 for Douglas Fir Plywood provided in part as follows:
Grade D Veneer (may be used in interior type) shall contain no knot holes greater than 2% inch in maximum dimension, no pitch pockets more than 2 inch wide by 4 inch long, or of equivalent area if of lesser width, and no splits wider than % inch. Splits at % inch wide at widest point may be % panel length; those not more than 14 inch at widest point may be half panel length; and those not more than s/16 inch wide may be full panel length, but all splits shall taper to a point at one end. Any number of plugs, patches, shims, worm or borer holes, sanding defects, and other characteristics are permitted provided they do not seriously impair the strength or serviceability of the panel.
*599 Grade Stamps and Certificates
310. Early in the job, a number of shipments of pine lumber arrived at the job site without being grade-marked, and certificates furnished by the plaintiff with respect to such lumber were mill certificates, not inspection bureau certificates.
311. The Southern Pine Inspection Bureau maintains a continuous inspection service. Shortly after the arrival at the job site of the lumber mentioned in finding 310, Mr. Griffin, an inspector from the Southern Pine Inspection Bureau, checked the pine material and graded the lumber. Mr. Griffin rejected a portion of the material and passed other portions, regrading the material and applying his stamps thereon. On subsequent shipments, the Southern Pine Inspection Bureau representative similarly inspected and graded the lumber brought onto the job.
312. A Government inspector, Mr. Blackmore, rejected a substantial amount of pine lumber that had been graded by Mr. Griffin, even though Mr. Griffin’s examination was accomplished with a ruler, a moisture meter, and a book of lumber grader’s rules.
Beams
313. (a) At the commencement of the job, the plaintiff received from its supplier beams that contained an excessive amount of moisture. In order to remove the excessive moisture, the plaintiff proceeded to air-dry the beams by stacking them in such a way that sticks separated the beams. After the beams were air-dried, the defendant would not permit the plaintiff to use many of the beams because they were discolored at the places where they had rested on the sticks during the air-drying process, or because there were minor cracks in the beams. The usefulness of the beams for structural purposes was not affected by the discoloration or by the cracks.
(b) Other air-dried beams were rejected by the defendant because they were scant and undersize.
314. After the rejection of the air-dried beams, as indicated in finding 313, the plaintiff procured kiln-dried beams for the job.
*600 315. Early in the job, Government personnel requested that the beams in the plaintiff’s storage area be covered with tarpaulins in order to protect the beams from the rainy weather that was being experienced at the time. As a result of the beams being covered with tarpaulins, some of the beams became moldy and discolored. The plaintiff was not permitted subsequently to use such beams without cleaning off the discoloration.
Plywood
316. Paragraph 8-4(m) (3) of the specifications provided that the plywood sheathing to be used on the buildings “Shall be interior type conforming to CS 45, Grade C-T), Int., * * * or equal to Douglas Fir Plywood Association ‘Plyscord’.”
317. Paragraph 4A.4.4 of Commercial Standard CS 45-55, the applicable specification, stated in part that “Grade D Veneer (may be used only in Interior type panels) shall contain no knotholes greater than 2 y2 in. in maximum dimension ‡ * H:
318. Plywood was inspected by the defendant’s inspectors, and much of it rejected although it bore an association grade stamp. The rejection often occurred after the material had been installed in structures.
319. In rejecting plywood, the defendant’s inspectors measured knotholes with rulers.
320. The plaintiff had a grader named Fagan from the plywood mill reinspect the plywood material because of the repeated rejection of plywood by the defendant’s inspectors, but the defendant’s resident engineer and the inspectors refused to accept the results of Mr. Fagan’s inspection.
321. After Mr. Fagan’s inspection, an inspector named Smith from the United States Plywood Company reinspected the plywood, but the defendant’s resident engineer said he would not accept this inspection.
322. The defendant’s resident engineer finally allowed plywood to be used if it was approved by a laborer named Taft Webb, whose primary job was to drive a water truck. Mr. Webb made a visual inspection, and rejected less than 5 percent of the plywood inspected by him.
*601 323. The evidence does not show that the defendant rejected any plywood that actually complied with the pertinent specifications as to size of knotholes.
Rafters and Joists
324. For all members of the roof designated as rafters on the plans, the Government required the plaintiff to install No. 1, 1500-F, material in the buildings.
325. One type of building on the project was the deck and beam building. With respect to these buildings, the plans referred to the roofing members as “roof j oists.” These “roof joists” were to be 4 inches by either 6 or 8 inches wide. For these “roof joists,” the plaintiff was required by the defendant to install No. 1,1500-F, material.
326. For the first group of conventional buildings to be framed in the project, No. 1 lumber and No. 2 lumber of the same size were delivered to the job site, one for use as rafters and the other for use as ceiling joists. The workmen on the job failed to distinguish between the two grades of lumber, and installed them indiscriminately. When the Government inspectors noted that some No. 2 material had been installed as roofing members, the plaintiff was required to remove the No. 2 material and replace it with No. 1 material.
327. In the construction industry, it is generally considered that the difference between a rafter and a joist is that a rafter is on a pitch in excess of 3 and 12, while a joist is a flatter member and has a pitch of 3 and 12 or less.
328. The “roof joists” for the deck and beam houses did not have a pitch in excess of 3 and 12.
329. The defendant did not require the plaintiff to use No. 1 material for ceiling joists.
Ridge Boards
330. (a) The plans and drawings showed that the ridge at the intersection of the roof framing members was supported by a ridge member designated as a “Ridge Beam.”
(b) The Government required the plaintiff to furnish No. 1, 1500-F, material for the “Ridge Beams.”
*602 Carport Posts
331. Neither the plans nor the specifications expressly named the type of material to be used for posts supporting the beams on the carports. The plaintiff interpreted the specifications as permitting No. 2 pine to be used for carport posts, because the specifications dealing with vertical framing members allowed such material to be used.
332. (a) On February 9, 1959, the plaintiff wrote the defendant’s resident engineer, requesting advice as to the material to be used as posts or wood columns supporting the carport.
(b) Under the date of February 26, 1959, the resident engineer replied in part as follows:
Your attention is invited to Paragraph 8-3 (b) (4) of the specifications which states that exterior posts for buildings (not turned) shall be clear all heart redwood.
In view of the above, all posts used on the exterior of the building, i.e. for carports, stoops, porches, etc shall be clear all heart redwood.
333. The plaintiff was required by the defendant to use clear all-heart redwood for the carport posts, instead of using 4x4 structural framing lumber as it planned to do.
334. There were decorative posts designated in the plans as 4x4 items.
335. The normal practice in the construction industry is that vertical support members, such as posts for carports, may be No. 2 grade.
Claim 26 — Carp entry
Studs
336.Paragraph 8-12 of the specifications provided in part as follows:
8-12. Framing. — Framing lumber and other rough work shall be closely fitted, accurately set to required lines and levels, and rigidly secured in place. * * * Studs and joists shall be sized to give true surfaces for wood and gypsum board finish. * * *
*603 337. Paragraph 642 of the Standard Grading and Dressing Buies for Douglas Fir Lumber of the West Coast Lumber Inspection Bureau (March 15, 1960) provided in part as follows:
642. WABP. — Any deviation from a true or plane surface, including crook, bow, cup or any combination thereof.
a. Crook is a deviation edgewise from a straight line drawn from end to end of a piece. It is measured at the point of greatest distance from the straight line. In “STANDARD” grades of framing, joists, planks, small timbers and studs, crook of approximately %" based on a 2" x 4" — 8' or V/2" based on a 2" x 4" — 16' is allowed. In higher grades, approximately % as much is permitted. In lower grades, approximately % again as much crook is allowed. Proportionately more or less crook is allowed in other sizes and lengths.
338. Page 122 of the STANDAED GEADING EULES FOE SOUTHEBN PINE LUMBEE (1960) provided, among other things, that the “allowable crook for number 2 pine lumber is % of an inch in an 8 foot piece of lumber.”
339. The specifications under the contract permitted the use of Douglas Fir or Southern Pine studs. The plaintiff used Douglas Fir for studs throughout the units built under the contract.
340. The studs were the supporting members for the gypsum-board walls that were placed thereon. Gypsum wallboard, sometimes called sheetrock, is a rigid material and has very little flexibility. The specification with respect to the installation of the wallboard (paragraph 9-8) provided that “Dependence on nails to draw the wallboard against the framing will not be acceptable.”
341. The Government inspectors inspected the framing of the studs forming the walls, using a straightedge. Where the studs or other framing were not perfectly straight, the inspectors required the plaintiff to correct the same by the use of a method called “scabbing.”
342. The strict requirements of the inspectors forced the plaintiff to employ extraordinary construction procedures in order to secure the approval of framing.
*604 343. Any stud that did not comply with the defendant’s “zero tolerance” requirement had to be scabbed or removed. The scabbing operation consisted of cutting and straightening a stud and installing a 4-foot piece of 1 x 4 lumber on each side of the stud. The plaintiff was not permitted to scab-more than three studs in a row; and if, after scabbing three-consecutive studs in order to meet the defendant’s requirement as to straightness, the plaintiff was required by the-inspectors to take corrective action as to the next stud in the row, it was necessary for the plaintiff to remove such-stud completely and replace it.
344. The studs which the plaintiff was required to remove-had been installed in a good and workmanlike manner. In order to remove and replace the studs, the plaintiff had to loosen or take out fire blocks, take out the old stud, install a new stud and toenail it back in place, and then reinstall the fire blocking. This sometimes involved the removal and re-installation of plumbing or electrical wiring as well.
345. The plaintiff was required on occasion to tear out walls, which had been completed and painted, because of the inspectors’ requirements of “zero tolerance.”
Strongbacks
346. Paragraph 8-12 of the contract specifications provided in part as follows:
* * * Bafters and joists shall be set with crown edge-up, and bottom edges shall be free from pronounced, defects. Studs and joists shall be sized to give true surfaces for wood and gypsum board finish. * * *
347. Paragraph 8-12 (b) of the specifications stated in part as follows:
(b) Oeilmg Frmmig. — * * * Size and location of “strong backs” shall be as noted on the floor plans. * * *
348. The floor plans for the Fort Hood project did not contain any indication for the use of strongbacks.
349. A strongback is customarily used in areas where the span of the ceiling joists is so long that the ceiling may sag. The strongback is a special kind of framing which supports the ceiling joists.
*605 350. Despite the plaintiff’s objections, the plaintiff was required by the defendant to put in strongbacks over the ceiling joists of every house which had ceiling joists.
Fascia Material
351. Paragraph 8-20 of the specifications stated in part as follows:
* * * Exterior trim and millwork shall be in long lengths, with joints staggered and concealed or in unobjectionable locations. * * *
352. No specific minimum length for fascia material was prescribed in the specifications.
353. Exterior lumber does not come in uniform lengths. It is common practice for a mill to ship fascia material in lengths varying from 4 feet to 20 feet.
354. It is the usual practice to have staggered and random lengths in the installation of fascia material, i.e., to use a long piece and then a short one, rather than to use all long pieces.
355. The shortest fascia material that the plaintiff was permitted by the defendant to use on deck and beam houses at Fort Hood was 7y2 feet. The shortest fascia material that the plaintiff was permitted to use on conventional-roofed houses was 6 feet, except for isolated instances.
356. The plaintiff on occasion was required by the defendant to remove fascia boards approximately 4 feet long that had already been installed, and replace them with longer material.
357. The fascia material which the plaintiff was required to remove because it was deemed by the defendant to be too short had been installed in a workmanlike manner.
Closet Doors
358. Paragraph 2(c) of the general provisions of the contract in pertinent part states:
* * * The Eligible Builder shall check all Drawings and Specifications furnished him immediately upon their receipt and shall promptly notify the Contracting Officer of any discrepancies. The Eligible Builder *606 shall compare all Drawings and verify the figures before laying out the work and shall be responsible for any errors which might have been avoided thereby. * * .*
359. Paragraph 15-17 of the specifications required the plaintiff to furnish for the closets folding doors which were “Slimdor” or “Amweld” folding doors, or equal.
360. Under the date of January 3, 1959, the plaintiff submitted descriptive data and a sample of a metal folding-door manufactured by the Eoberts Manufacturing Company. Shortly thereafter, the defendant approved the door for use on the project, and stamped its approval on the plaintiff’s submission. The stamp contained the following statement:
Approved as to general layout; dimensions and quantities not checked. Approval does not relieve contractor of responsibility for errors which may exist as contractor shall be responsible for dimensions & design of adequate connections, details & satisfactory construction of work.
361. One of the last items of work in the houses, as they were being completed, was the installation of the closet doors. Upon the installation of the doors, it was ascertained that in many instances the doors did not fit the previously framed-in openings.
362. On January 4, 1960, the plaintiff’s superintendent wrote the defendant’s resident engineer as follows:
Eeference is made to the closet openings on the various house plans where there is to be installed a metal folding doors [sic].
We have been changing some of these openings after they are finished to the correct size in order to receive one of the different sizes specified. It has been discovered that on several of the floor plans, the architects dimensions are in error in as much as the finished opening dimensions do not coincide with the finished openings as recommended by the door manufacturer.
An early reply to this condition is necessary as this re-working must be accomplished at additional cost to the Government since we have complied with the dimensions as noted on the floor framing plans.
*607 363. By a letter dated January 15,1960, the resident engineer advised the plaintiff that its letter had been referred to higher authority for decision.
364. By a letter dated January 21,1960, the resident engineer advised the plaintiff in part as follows:
In compliance with reply from higher authority you are hereby advised that in accordance with Clause 2 of the General Provisions of the contract, it is the responsibility of the contractor to install the doors in question regardless of error in dimensions all at no additional cost to the Government.
365. The doors were made of metal and could not be reworked. The doors might fit but they would not close. Consequently, complete installations had to be ripped out in order to allow proper spacing for the closet doors.
366. The plaintiff reworked the closet door openings in order to make the closet doors fit. In doing so, the plaintiff was permitted to use ^4-inch gypsum board (i.e., “sheet-rock”) instead of the %-inch specified by the contract.
367. The plaintiff did not compare the dimensions of the doors and the door openings shown upon the plans when it received the contract. The discrepancy in the fitting of the doors was first discovered in the latter part of the job, when an attempt was made to install them.
Closet Shelves
368. Plate 414 of the contract drawings showed a section and an elevation for closets containing a closet shelf, a wooden strip for clothes hooks, and a clothes pole. Below these details there appeared the following statement: “Typical closet, storage & coats.”
369. Next to the details mentioned in finding 368 were two more details labeled “Walk-in closet.”
370. Under the date of July 10,1959, the plaintiff’s superintendent wrote the defendant’s resident engineer and stated in part as follows:
Beference is made to our conversation of Friday morning, July 10, 1959, concerning interpretation of closet details and floor plans.
*608 It is our understanding that on the floor plans where the word “Closet storage and coats” appear that we are to install shelving as indicated in details A414 _ and B414. On floor plans where “walk-in closets” are indicated, we will follow details C414 and D414. If this interpretation is correct, we would appreciate your verification.
It has also been understood that in closets where there are partitions, this partition shall run continuously through the bottom shelf and stop under the top shelf and anchored at this point.
371. By a letter dated July 15,1959, the resident engineer replied:
Eeference is made to your letter dated 10 July 1959, concerning clarification of shelving for closets, storage and coats, and walk-in closets.
This office concurs with your above referenced letter in that shelving for closet, storage and coats, shall be as indicated on Detail A/414 and B/414. Shelving detail for walk-in closets shall be as indicated on details C/414 and D/414.
In those closets in which a support partition is to be installed, approval is given to run tins partition continuously through the bottom shelf and stop under the top shelf.
372. Thereafter, the work went forward on the closets. The plaintiff installed shelves, hook strips, and poles in all of the closets shown on the floor plans as storage and coat closets or walk-in closets.
373. Storage closets customarily do not contain hook strips, shelves, and poles.
374. The plaintiff was instructed by the defendant to install closet shelving by the normal nailing process.
375. Starting with Building 120, the plaintiff nailed the shelves to the hook strips in order to help prevent warping.
376. In Mortgage Area 2, the plaintiff was instructed by the defendant to stop nailing the shelves, and the plaintiff was required to go back and knock out the shelves and reinstall them without nails. During the knocking-out process, a lot of shelving was damaged and had to be replaced.
377. Later, the plaintiff went over the same closets again, nailed the shelves down, caulked the shelves after they were renailed, and repainted them.
*609 Interior Trim
378. Paragraph 8-28 of the contract specifications stated in part as follows:
* * * Interior finish shall be machine-sanded at the mill and sandpapered smooth at the building when necessary. * * * Interior trim to be set against gypsum board or wood in the building shall be run with hollow backs. Joints shall be made in an approved manner to conceal shrinkage and be tight. * * * Wood finish shall be set straight, plumb, or level, in perfect alignment * * * and shall be closely fitted. * * * Finish shall be nailed to backup and drawn tight. * * *
379. Paragraph 18-7(c) (2) of the contract specifications provided in part as follows:
(2) Puttying and, Glazing: After the priming coat has been applied, nail holes, cracks, and other depressions shall be filled flush with putty, colored to match the finish coat and sandpapered smooth. * * *
380. Plate 414 of the drawings contained details for the interior trim. .The two largest pieces, which were the base and picture mold, were hollow-back pieces. Four other pieces of smaller trim showed flat-back material.
381. On March 22,1959, the plaintiff submitted shop drawings of the interior trim which it intended to supply, following the details shown on the contract drawings. These were approved by the defendant on April 9,1959. Thereafter, the contractor had the redwood trim manufactured and delivered to the job site.
382. In some instances, the interior redwood trim which was to receive natural finish arrived on the job site with waterstains thereon. The plaintiff was required to replace or repair this trim.
383. (a) Under the date of December 30,1959, the plaintiff wrote as follows to the defendant’s resident engineer:
Eeference is made to plate No. 414 of the contract drawings with respect to the full size trim details as outlined.
As you know, we submitted shop drawings on the trim as shown on this plate and it was approved by your office. _ Since that time, it has been brought to our attention that Section 8, Page 8-22, Paragraph 8-28 of the *610 contract specifications state and we quote: “Interior trim to be set against gypsum board or wood in the building shall be run with hollow backs.”
All of the trim for the complete contract has been manufactured according to the details on plate No. 414. We respectfully request an early reply indicating which of the two contract documents govern.
(b) The reply of the defendant’s resident engineer was dated January 14, 1960 and stated in part as follows:
Trim will be as indicated in details on Plate 414, and the various types of trim will be installed as shown on the applicable plate drawings.
It is the intent of Paragraph 8-28 of the specifications that trim to be set against gypsum board or wood in the building will have hollow backs where this type of trim is shown to be installed by the drawings. The type of trim without hollow backs will be installed as detailed and shown on the drawings, regardless of the statement referenced.
384. On November 24,1959, following an inspection of the first group of houses, the defendant’s resident engineer notified the plaintiff of the following alleged deficiencies in the trim:
a. Door trim is not being installed to the height required by the plans. The head trim in many instances is not full width.
# * ❖ * ❖
e. Picture mold, baseboards and door trim are not closely fitted and drawn tight.
¥ $ $
k. Eeveal of trim between roof beams and other trim is not uniform and is not in perfect alignment.
$ $ ‡ $
r. A lot of interior and exterior trim and millwork is not being primed on all sides and edges prior to installation.
385. On December 16,1959, when most of the housing units in Mortgage Area 1 were nearing completion, the resident engineer wrote to the plaintiff, noting a number of alleged deficiencies in the houses thaJt required correction. Among the alleged deficiencies noted were the following:
*611 a. Interior door and beam trim, closet shelves, brackets, exterior siding and exterior trim are being installed without being properly primed.
b. Damaged door jambs and trim are receiving finish coat of paint without being replaced or properly repaired.
c. Trim is receiving finished painting with hammer marks and scratches existing.
d. Trim having raised grain is not being sanded smooth prior to finish painting.
e. Where the baseboard is cut too short, it is being filled with putty. A tight fit is required.
*****
m. The proper size and shape trim of some window wall units is not being used.
386. The use of flat-back rather than hollow-back interior trim caused cracks ¡to appear around the trim. The trim was installed in a good and workmanlike manner.
387. The inspectors would take a business card, and if they could slip it into the crack behind a trim, they would demand that the crack be caulked. In a number of instances, the plaintiff was required to color the filler material to match the finish of the redwood.
388. In some instances, the plaintiff was required to hand-sand the interior redwood trim due to raised grain or rough edges on it.
389. In some instances, the plaintiff was required to bleach redwood trim because of objections by the defendant to natural color variations in the redwood.
390. Initially, the plaintiff set the nails in the redwood trim. This procedure involved taking a little punch and setting the nails slightly below the surface of the wood so that the places might be puttied and not seen.
391. In a conference at Building 13, the defendant’s resident engineer instructed the plaintiff not to set the nails as plaintiff had been doing, and plaintiff immediately discontinued that practice.
392. While the plaintiff was working in Mortgage Area 3, the plaintiff was ordered by personnel of the defendant to set the nails in the trim. The plaintiff was instructed to go back *612 and reset nails in units that had been completed since discontinuing the practice.
393. As a result of the contradictory instructions mentioned in findings 391 and 392, most of Mortgage Areas 1 and 2 and all of Mortgage Area 3 had to be reworked.
Bird Blocking
394. Bird blocking is put in deck and beam housing. A bird block is a piece of wood that goes in between two rafter beams at the intersection of the interior wall and the roof beams.
395. The usual and customary manner of installing blocking in deck and beam houses is to install it with the rafters, before the roof decking goes on. It is easier to put in at this time, and it acts as a spacer, and it holds the beams, keeping them from twisting and warping at the plate line and at the ridge line.
396. The defendant’s inspectors at Fort Hood required that the bird blocking be put in after the dry wall was installed in the buildings.
397. Under the method required by the defendant’s inspectors, the plaintiff had to cut the pieces and insert them in between the beams in order to cover the openings between the beams and the decks. It was necessary to do the job on a scaffold, using little sawhorses. This was more difficult and time-consuming than if the bird blocking bad been installed in the usual and customary manner. Also, in instances where ceilings were soiled in the process of installing the bird blocking in accordance with the method required by the inspectors, it was necessary to go back and clean the ceilings.
398. (a) The record does not show any protest by the plaintiff to the defendant’s resident engineer or to the contracting officer regarding the inspectors’ requirement that the bird blocking be put in after the dry wall was installed.
(b) This requirement originated with, or was confirmed by, the resident engineer after he was told of the plaintiff’s objections to placing the bird blocking after the dry wall was in.
*613 Fire Blocking
399. A fire block is a horizontal member in a wall section. It is placed between the studs.
400. Paragraph 8-12 (a) of the specifications stated in part as follows:
* * * Partitions in each story of exterior walls shall be provided with one row of horizontal blocking the full width of the studding, cut-in and securely nailed. * * *
401. Detail B-407 on Plate 407 of the contract plans showed the blocking on the exterior wall, together with the following note: “2 x 4 blocking at midpoint.”
402. The usual and customary method of fire-blocking is to use 14%-ineh precut blocks. They are set at approximately midheight, and are nailed offset from each other the width of the block, so that the nailing will be easy. They are usually installed before the wall is raised and while it is lying on the floor nailed together.
403. The plaintiff discussed with the Government’s carpentry inspector the placing of fire blocking in an alternate fashion, with the blocks nailed offset from each other between studs, but permission to do this was denied.
404. The defendant’s inspector required that the fire blocks be nailed at exactly 4 feet and % inch from the bottom of the plate up to the center of the block. It was necessary for the plaintiff to make measurements and then nail the blocks exactly in line, by a toenail process.
405. The method of fire-blocking imposed upon the plaintiff by the defendant was not the usual ‘and customary procedure, and it took a longer period of time than the customary procedure would have taken.
Other Blocking
406. Blocking was required by the defendant in instances where it was not called for in the plans and specifications. For example, the plaintiff was required to block in between joists where they ran perpendicular to walls. Also, the defendant’s inspectors required blocking for the installation of medicine cabinets and other cabinets at any place where trim could not be nailed on.
*614 Siding
407i. The contract plans and specifications provided for various kinds of exterior finish for the houses. Some of the houses were finished with brick exteriors, while others had wood siding applied to them. Among the wood sidings provided for were various kinds of redwood and cedar types.
408. The siding was installed by the plaintiff in accordance with the plans and specifications.
409. End-splitting and shrinkage are inevitable and normal in redwood, the material of which much of the siding was constructed.
410. Some siding was ordered by the defendant to be removed after installation because of the occurrence of the inevitable and normal end-splitting and shrinkage, and not because of poor workmanship on the part of the plaintiff.
411. In order to remove one piece of siding, it was often necessary to remove other members, and sometimes the other members were damaged in the removal and replacement process.
Caulking
412. Although the specifications did not require caulking at the intersection of the 2x2 redwood or cedar member and the beam underneath the wood siding, the plaintiff was required by the defendant to perform such a caulking operation.
Fences
413. The plaintiff was required by the defendant’s resident engineer to build the number of fences shown on the landscape plans, although the plot plans indicated a lesser number of fences.
Multiple Inspections
414. The plaintiff was subjected to continuous inspections of the same framing work 'by different inspectors. Sometimes, items approved on a previous inspection would be disapproved on a subsequent inspection.
*615 Absence of Grade Stamp
415. The lumber delivered to the building sites in the field had been graded as conforming to the specifications, and had been properly grade-marked.
416. The plaintiff was required by the defendant on occasion to remove from buildings lumber that had been installed but which did not bear a grade stamp after installation. The inference is warranted that the grade stamp had been cut off the end of the lumber during the carpentry work.
417. The lumber that the defendant ordered to be removed (see finding 416) did not show any signs of being defective.
Claim %7 — Painting Roof Overhang
418. Under the terms of the contract, the plaintiff was required to paint certain portions of the exterior of the units built under the contract.
419. Paragraph 6-6 (c) of the specifications under the contract provided in part as follows:
(2) Anchoring Felts. — Anchoring or roofing felts, unless specified otherwise, shall be m accordance with Table II.

TABLE II

Boofing Laid Directly on Roof Decks
* * * * *
Fiber board, up to 3 inches on insulrock Petrical or tectrum with factory applied felt backing
(3) Nails and Fasteners.Petrical, tec-trum, insulrock or fiber board decks.
420. Section 8-4(1) of the specifications under the contract related to “Insulated Structural Roof Decking” and provided in part as follows:
The decking shall be molded insulating slabs composed of wood fibers or shavings and portland cement or an inorganic, insoluble hydraulic cement, composed of chemically pure magnesium oxide, mineral salts, and other *616 inert additives, molded under pressure; or shall be molded of wood fibers, processed to form a homogeneous board conforming to the applicable requirements of FEDEEAL SPECIFICATION LLL-F-321. Since the project location is below the 40th Isotherm, a built-in vapor barrier will not be required. The_ decking shall be fabricated with a tongue-and-groove joint on the long edges, but may have a square cut on the ends. The long edges shall be beveled to form a Y-groove on the exposed ceiling surface, and the ceiling surface shall have a, factory applied finish paint coating of white, offwhite, or light gray. Complete detail of physical properties, specifications, and samples shall be submitted to the contracting officer for his written approval prior to shipment of material to the job site. Decking shall be noncombustible throughout its entire thickness.
421. Paragraph 18-9 of the specifications under the contract covered the subject of exterior painting and provided in part as follows:
(a) General. — Exterior painting shall include the finishing of all millwork, wood siding, ferrous metal, galvanized metal, uncolored asbestos board noted to be painted. Items completely finished at the factory shall not be painted.
*****
(g) Finishes. — Exterior finishes shall be as noted on the “EXTEEIOE FINISH SCHEDULE” on the drawings, and as described in paragraph 18-11 “Paint Finishes.”
422. Plate No. 428 of the drawings under the contract, under the EXTEEIOE FINISH SCHEDULE, described the finish for the exposed insulating roof decking and contained this notation: “(No Paint Eequired for Portland-cement-binder type deck).”
423. The binder required under the original specifications was the “Portland-cement-binder type” referred to on plate 428 of the drawings.
424. No roof decking on the market was available that conformed to the non-combustibility requirement set out in paragraph 8-4(1) of the specifications.
425. Contract change No. 2, dated February 26, 1959, and approved by the Federal Housing Administration in May *617 1959, was entered into for each of the five mortgage areas and substituted the words “fire retardent” for “non-combustible” in paragraph 8-4 (1) of the specifications.
426. The material furnished by the plaintiff, approved by the defendant, and installed as the roof decking on the deck and beam houses was 3-inch Johns-Manville insulated roof decking. This material was primarily composed of pressed wood fibers bound together with an asphalt binder and a cellulose binder. The underside of the roof-decking material, in looks, appeared the same as acoustical ceiling panels and came from the factory with a coat of white paint.
427. The edge of the roof decking and the surface of the roof decking were not treated in such a way as to withstand the weather, and the material did not give the appearance of being able to withstand the weather. The published literature on the roof-decking indicated that it was not completely finished at the factory for exterior use.
428. The painted surface of the underside of the roof decking was painted with a water base paint and required a lead and oil base paint to protect it from the weather
429. (a) The Johns-Manville 3-inch insulated roof decking was not a Portland-cement-binder type decking.
(b) The Johns-Manville 3-inch insulated roof decking was not an item completely finished at the factory.
430. On or about May 7, 1959, a controversy arose with respect to the painting of the exposed underside of the insulated roof deck.
431. On January 21, 1960, the plaintiff’s painting subcontractor protested to the plaintiff regarding the requirement for the painting of the exposed exterior underside of the roof decking. On January 27, 1960, the plaintiff forwarded this protest to the contracting officer, who, in turn, forwarded the claim to the Federal Housing Commissioner.
432. (a) Under the date of February 16,1960, the Federal Housing Commissioner rendered a decision that the painting work was required, stating therein the reasons for his decision.
(b) By a registered letter dated February 17, 1960, the contracting officer sent to the plaintiff a copy of the Federal Housing Commissioner’s decision, and an indication that the *618 contracting officer adopted it. In addition, the contracting officer issued his findings of fact and decision on the controversy. The contracting officer’s decision found that the painting was required. The last paragraph of the contracting officer’s letter stated:
Your attention is invited to General Provision 8, Disputes, of the contract which provides for an appeal to the Head of the Department within 30 days from receipt of this decision, as well as the limitation on authority gtated therein. In the event you wish to exercise this right of appeal, you are advised that a forwarding of such appeal through the Galveston District Office (in quadruplicate) will expedite action thereon.
433. Under the date of March 14, 1960, the plaintiff appealed the contracting officer’s decision to the Armed Services Board of Contract Appeals. The appeal was consolidated with the plaintiff’s appeal on other claims and was ultimately dismissed by the Board on the ground of the Comptroller General’s decision B-145318 dated May 3,1961, in connection with the claim of the Anthony P. Miller Company, to the effect that appropriated funds could not be used to pay claims in excess of the amount of the statutory ceiling on the mortgage.
434. The Johns-Manville 3-inch insulated material was accepted by the defendant as factory finished in so far as the inside of the houses was concerned.

Damages

Claim 2 — Kitchen and Bathroom Cabinets
435. (a) In furnishing kitchen and bathroom cabinets, the plaintiff’s cabinet subcontractor, Anderson Cabinet Corporation, used 112 feet of pine plywood per housing unit for the backs of the cabinets. Thus, the cabinet subcontractor used a total of 3,920 feet of pine plywood in the cabinets for the first 35 housing units, after the defendant rejected the cabinets initially furnished for the first 35 housing units because of the use of Douglas fir for the backs of such cabinets. The pine plywood cost $44 per thousand feet more than Douglas fir. Hence, the cost of the 3,920 feet of pine ply *619 wood used for the backs of the cabinets for the first 35 housing units was $172.48 more than the cost of Douglas fir would have been for such cabinets. In addition, the evidence does not indicate that the 3,920 feet of Douglas fir that plaintiff had to replace was used or useable for any other purpose. At $71 per thousand feet, the cost of Douglas fir thus removed was $288.32. Therefore, the aggregate cost of replacing the fir with pine was $460.80.
(b) The cabinet subcontractor used 407 feet of shelving in constructing the cabinets for each housing unit. Therefore, the cabinet subcontractor used a total of 14,245 feet of shelving in the cabinets for the first 35 housing units. The cost to the cabinet subcontractor of using grade “C” select pine shelving was $102 per thousand feet greater than the cost of No. 2 pine lumber for the shelving would have been. Accordingly, the additional cost of using grade “C” select pine shelving in the cabinets for the first 35 housing units aggregated $1,452.99. In addition, the evidence does not indicate that the 14,245 feet of No. 2 pine lumber that plaintiff had to remove was used or useable for any other purpose. At $96 per thousand feet, the cost of the lumber thus removed was $1,367.52. Therefore, the total cost of replacing the No. 2 pine in the 35 units was $2,820.51.
(c) The cabinet subcontractor incurred additional transportation costs amounting to $657.76 in returning the cabinets for the first 35 housing units after their rejection by the defendant on account of the use of Douglas fir for the backs of the cabinets and No. 2 pine lumber for the shelving.
(d) The cost of the labor and materials used by the cabinet subcontractor in the installation of blocking in a number of kitchen cabinets amounted to $320.13.
(e) The requirement that the cabinet subcontractor use molding along the sides of the cabinets, instead of scribing the cabinets to the walls, increased the subcontractor’s costs to the extent of $740.45.
(f) The evidence in the record does not show precisely the extent of the damages flowing from' the refusal by the defendant’s personnel to allow the cabinet subcontractor reasonable tolerances with respect to the squareness of frames *620 and the levelness of doors. Therefore, a finding in the nature of a jury verdict is made that, because of such refusal, it was necessary for the subcontractor to Utilize 2,000 man-hours of labor more than would otherwise have been required; that the cost of this extra labor was $3.80 per hour ($2.75 plus 20 percent for taxes, insurance, and overhead); and that the aggregate cost of the 2,000 man-hours of extra labor amounted to $6,600.
(g) The plaintiff is entitled to recover a total of $11,599.65 on claim 2, 30 percent of which is for the use and benefit of its cabinet subcontractor, Anderson Cabinet Corporation.[2]
Claim 4 — Dishwasher Eough-In
436. (a) The cost to the plaintiff’s plumbing subcontractor, Kitzman’s Plumbing of Texas, Inc., of providing for 414 housing units a plumbing rough-in that was suitable for both the gravity-drain type dishwasher and the pump type dishwasher amounted to $14,864.88 for extra labor and materials, and overhead, that would not have been required if the subcontractor had been permitted to furnish a plumbing rough-in that was merely suitable for a pump type dishwasher.
(b) The plaintiff is entitled to recover a total of $14,864.88 on claim 4, of which 50 percent is for the use and benefit of Kitzman’s Plumbing of Texas, Inc.
Claim 5 — Pipe Insulation
437. The cost to plaintiff’s subcontractor of insulating the pipes in the furred spaces above the ceilings in the deck and beam houses amounted to $9,499.46 in extra labor and ma *621 terials. Of this sum, 50 percent is for the use and benefit of Kitzman’s Plumbing of Texas, Inc.
Claim 6 — Compression Stops
438. The plaintiff’s plumbing subcontractor, Kitzman’s Plumbing of Texas, Inc., was required to expend an additional amount of $5,905 for extra labor and materials, and overhead, in furnishing type PV supply connections, over the amount that the plumbing subcontractor would have been required to expend if it had 'been permitted to carry out its intention to use type RV supply connections on the job.
Claim 9 — Paving of Streets
439. (a) The delay in the paving of the streets, and the infiltration of mud into the base material, made it necessary for the plaintiff to replace 2,224 cubic yards of base material at a cost of $1.20 per cubic yard, or a total cost of $2,668.80.
(b) The plaintiff was required to use 15,720 gallons of primer material in connection with the repriming of the streets, at a cost of 17 cents per gallon, or a total cost of $2,672.40.
(c) The plaintiff paid a subcontractor the sum of $6,802 for removing old base material into which mud had penetrated, and the sum of $6,558 for installing new base material, or a total of $13,360.
(d) The plaintiff paid to the subcontractor mentioned in paragraph (c) of this finding the sum of $5,211 for cleaning the streets. However, if the streets had been paved when the plaintiff wished to do so, thus making it possible for the streets to be used by motor vehicles in connection with the construction of the project, it would have been necessary for the plaintiff to clean the streets and put them hi good condition prior to the delivery of the project to the defendant. The evidence does not show that the cost of such cleaning would have been less than $5,211.
(e) The plaintiff is entitled to recover a total of $18,701.20 on claim 9.
*622 Claim 10 — Roofing
440. The credit that was improperly exacted from the plaintiff in connection with the roofing 'amounted to $2,560.
Claim IB — Insulation for Refrigerant Lines
441. The installation of the insulation on the refrigerant lines in the 88 housing units where sheetrock had already been installed prior to the performance of the insulation work required 5 man-hours of labor per housing unit, at a cost of $3.35 per hour, over the amount of labor that would have been required for the performance of the insulation work in the same 88 housing units if the insulation work could have been accomplished prior to the installation of the sheetrock. Thus, the total increased cost to the plaintiff’s heating and air-conditioning subcontractor, Maplewood Sheet Metal Company, resulting from the defendant’s unreasonable delay in approving a suitable type of insulation amounted to $1,474.
Claim 16 — Size of Heater Closets
442. The evidence in the record does not show precisely the extent of the damages flowing from the circumstance that the closets which the plaintiff built for the heating and air-conditioning units in accordance with the defendant’s architectural plans were too small to accommodate the equipment which the plaintiff’s heating and air-conditioning subcontractor, Maplewood Sheet Metal Company, was required to install. Therefore, a finding in the nature of a jury verdict is made that 1 extra man-hour of labor, at a cost of $3.35 per hour, was required for the installation of the heating and air-conditioning equipment in each of the housing units, over the amount of labor that would have been required for the installation of such equipment if the closets had been adequate in size. Accordingly, a finding in the nature of a jury verdict is made that the total extra cost to the subcontractor in connection with this operation on the entire project amounted to $1,681.70.
*623 Claim 17 — Removing and Replacing Equipment
443. The evidence in the record does not show precisely how much, extra labor was required to remove, and later to replace, the heating and air-conditioning equipment in 75 housing units so that the portions of the concrete slabs in the heater rooms could be reworked. Accordingly, a finding in the nature of a jury verdict is made that the plaintiff’s heating and air-conditioning subcontractor, Maplewood Sheet Metal Company, utilized 2 man-hours of labor, at a cost of $3.35 per hour, to remove the heating and -air-conditioning equipment from each of the 75 housing units involved in this claim, and also utilized 2 man-hours of labor, at a cost of $3.35 per hour, to reinstall such equipment in each of the 75 housing units after the portions of the concrete slabs in the heater rooms had been reworked. Therefore, a finding in the nature of a jury verdict is made that the total cost to the subcontractor of removing and replacing such equipment in the 75 housing units amounted to $1,005.
Claim 18 — Special Air Duct for Heater Closet
444. The plaintiff’s heating and air-conditioning subcontractor, Maplewood Sheet Metal Company, incurred additional costs amounting to $2,137.91 in enlarging the return air duct and in adding acoustical lining.
Claim 19 — Additional Insulation
445. The additional cost to the plaintiff’s heating and air-conditioning subcontractor, Maplewood Sheet Metal Company, of insulating the inside portions of the return air ducts amounted to $1,212.85.
Claim 20 — Registers
446. The extra cost to the plaintiff’s heating and air-conditioning subcontractor, Maplewood Sheet Metal Company, in removing high-wall registers in 13 housing units and replacing them with low-wall registers amounted to $300.
*624 Claim 22 — Concrete
447. (a) The record does not contain specific information regarding the extra costs incurred by the plaintiff (1) in raising the portions of the concrete slabs in the heater rooms of 75 housing units, (2) in attempting to waterproof concrete slabs in the impracticable manner prescribed by the original contract, (3) in meeting the defendant’s unwarranted requirements with respect to forming, (4) because of the delay in pouring concrete attributable to the lack of sufficient inspectors, to the insistence of the concrete inspector that all patchwork be done on the concrete for a particular unit before the plaintiff was allowed to proceed with the pouring of the concrete for the next unit, and to the defendant’s insistence that the plaintiff, before pouring concrete, remove minute splinters of wood and pieces of drainage fill .which had fallen into the trenches prepared for the concrete, (5) because of the defendant’s requirement that the plaintiff repair normal hairline cracks in the concrete that had no structural significance, (6) because of the defendant’s requirement that the plaintiff patch honeycomb on unexposed surfaces of the concrete and, whenever any patchwork was done, that the plaintiff patch the entire section of the concrete, so that the patch would not be noticed, (7) because of the defendant’s requirement that the plaintiff dump a truckload of concrete that had been held in the truck for 45 minutes, (8) because of the instability of the sides of trenches prepared for the concrete in accordance with the specifications, (9) because of the defendant’s requirement that the plaintiff install thimbles at the intersections of the plenums and the ducts-, and (10) because of the defendant’s insistence on a “zero tolerance” with respect to floor level and floor alignment in the concrete and forming work.
(b) The plaintiff introduced evidence to the effect that the actual -total cost of performing the concrete work on the Fort Hood job exceeded by $388,223.72 the amount of the plaintiff’s estimate, as adjusted, concerning the anticipated cost of the concrete work. The defendant introduced evidence to the effect that, on the basis of an audit of the -plaintiff’s books of account, it had verified a difference of *625 $815,283.71 between the plaintiff’s estimated cost and actual cost of performing the concrete work on the Fort Hood job, although the defendant did not concede that the plaintiff was entitled to recover the $315,283.71, or any portion thereof, on claim 22. In this connection, the evidence fails to establish that the difference between the plaintiff’s estimated cost and actual cost of performing the concrete work was attributable wholly, or even largely, to unwarranted requirements or other wrongful actions on the part of the defendant. For example, the evidence indicates that much of this difference between the estimated cost and actual cost was attributable to the circumstance that the plaintiff, in preparing its estimate, expected to pour the concrete for the perimeter and grade beams in each housing unit separately from, and prior to, the pouring of the concrete for the floor slab, whereas the defendant, in accordance with the provisions of the contract, required the plaintiff to follow the monolithic or single-pour method of placing the concrete for the perimeter and grade beams and for the floor slab at the same time.
(c) In lieu of further proceedings to determine more precisely the amounts of the plaintiff’s damages on the portions of claim 22 as to which recovery is allowed, a finding in the nature of a jury verdict is made that the plaintiff’s extra costs in connection with the concrete work attributable to unwarranted requirements and other wrongful actions by the defendant amounted to a total of $105,100.
Claim 24 — Grinding Concrete Floors
448. The plaintiff’s extra costs in grinding portions of the concrete floors in an attempt to achieve a condition of perfect levelness totaled $3,236.29.
Claim 25 — Lumber
449. (a) The plaintiff’s extra costs attributable to the defendant’s actions in rejecting beams because of aesthetic considerations amounted to $1,785.38 (17,284 extra board feet of lumber purchased at a price of $107.72 per thousand).
(b) The defendant’s requirement that No. 1 lumber be used for the “ridge beams” increased the plaintiff’s costs by *626 $513.43 over what they would have been if the plaintiff had been permitted to use lumber of standard grade.
(c) The plaintiff’s extra costs in furnishing clear all-heart redwood for the carport posts amounted to $3,137.85 more than the cost would have been if the plaintiff had been permitted to use No. 2 pine lumber for the carport posts.
(d) The plaintiff is entitled to recover a total of $5,436.66 on claim 25.
Claim 26 — Carpentry
450. (a) The record does not contain specific evidence concerning the plaintiff’s extra costs incurred (1) in complying with the defendant’s requirement of a “zero tolerance” with respect to the straightness of studs, (2) in complying with the defendant’s requirement that strongbacks be installed over ceiling joists, (3) in complying with the defendant’s prohibition against the use of fascia boards shorter than 7% feet on deck and beam houses and shorter than 6 feet on conventional-type houses, (4) because of the defendant’s change in view concerning the proper manner of installing the shelving in closets, (5) in caulking cracks behind, and resetting nails in, the interior trim, (6) in complying with the defendant’s requirement that the bird blocking be put in after the installation of the dry wall, (7) in installing additional blocking not required by the specifications, (8) in removing and replacing redwood siding installed in accordance with the plans and specifications, (9) in caulking at the intersection of the 2x2 member and the beam beneath the wood siding, (10) in building fences in excess of the number provided for on the plot plans, (11) because of inconsistent inspections, and (12) in removing from buildings lumber which had been installed but which did not bear a grade stamp after installation.
(b) The evidence in the record shows that the plaintiff’s carpentry subcontractors, Na Mar Builders, Inc., and Marna Builders, Inc., initially submitted a bid in the amount of $617,509 for the furnishing of the necessary labor to perform the carpentry work; that after further negotiations, the carpentry subcontractors and the plaintiff entered into an adjustable subcontract which stated a price of $458,000 for the *627 furnishing of the carpentry labor by the subcontractors but which provided that if the actual cost to the subcontractors exceeded $458,000, the additional cost would be borne solely by the plaintiff, and that if the actual cost to the subcontractors was less than $458,000, the saving would be divided on a 50-50 basis between the subcontractors and the plaintiff; that the plaintiff’s actual cost in connection with the carpentry labor amounted to $921,714; and that the plaintiff’s costs for carpentry materials exceeded by $76,442.74 the amount estimated by the plaintiff for such materials. In this connection, the evidence fails to establish that the difference between the plaintiff’s actual costs in connection with the carpentry work and the estimated costs — irrespective of whether the difference is regarded as being $380,647.74 or $540,156.74 — was attributable wholly, or even largely, to unwarranted requirements or other wrongful actions on the part of the defendant.
(c) In lieu of further proceedings to determine more precisely the plaintiff’s additional costs attributable to the matters referred to in paragraph (a) of this finding, a finding in the nature of a jury verdict is made that such extra costs amounted to $108,000.
Interest and Overhead
451. The unwarranted requirements and other wrongful actions of the defendant increased, to an extent that cannot be determined precisely, the amount of time that would have otherwise been required for the performance of the contract and, accordingly, increased the plaintiff’s costs for interest and overhead in an amount that is not specifically disclosed by the evidence in the record. It seems reasonable to estimate such increased costs as being equivalent to 6 percent of the total amount allowed in findings 435-450, or $17,562.98.
Summary
452. As indicated in findings 435-451, the aggregate amount to which the plaintiff is entitled on the claims asserted in the petition is $310,277.48, of which the sum of $3,866.55 is for the use and benefit of Anderson Cabinet Corporation, the sum of $18,062.17 is for the use and benefit of Kitzman’s *628 Plumbing of Texas, Inc., and the sum of $7,811.46 is for the use and benefit of Maplewood Sheet Metal Company.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of three hundred ten thousand two hundred seventy seven dollars and forty-eight cents ($310,277.48), of which the amount of $3,866.55 is for the use and benefit of Anderson Cabinet Corporation, the amount of $18,082.17 is for the use and benefit of Kitzman’s Plumbing of Texas, Inc., and the amount of $7,811.46 is for the use and benefit of Maplewood Sheet Metal Company.

 Alter rejection of its claims by the contracting officer, the plaintiff had appealed to the Armed Services Board of Contract Appeals, which dismissed all of the claims on the ground that the statutory mortgage limitation of the Cape-hart Act had been exhausted.

 As indicated infra, the defendant was precluded by its own delay from taking exceptions to any of the commissioner’s findings but was permitted to offer legal argument.

 “Unless a party has requested a particular finding of fact, the court may refuse to consider his exception to the commissioner’s report for failure of the commissioner to mate such finding.”

 “[I]f any party shall fall to file a brief, within the time required by this rule or as fixed or extended by the commissioner, a memorandum reciting such failure shall be filed with the clerk by the commissioner, whereupon the court may refuse to consider any exceptions to the commissioner’s report by the party so in default.” In fairness to present Government counsel, it should be said that she did not represent the Government in this case at the stage in the proceedings in which the unexcused delay occurred.

 The Government asserted as a first separate defense in its answer that the court’s authority to allow damages for breach of a Capehart Act housing project contract is limited by the statutory mortgage limitation imposed by the Act. The commissioner correctly rejected this defense on the authority of Anthony P. Miller, Inc. v. United States, 172 Ct. Cl. 60, 63-73, 348 F. 2d 475, 477-83 (1965). The defendant does not now contest this ruling.

 In its answer to tlie plaintiff’s petition, the Government also relied on Article 8 (“Disputes”) as imposing the requirement that the builder appeal to the contracting officer. In its final brief, it implicitly (and correctly) admits that by itself Article 8, which encompasses disputes concerning questions of fact, does not bolster the argument for claims based on the assertion that the-defendant, through misinterpretations of the specifications, ordered work beyond that required by the agreement. See Len Company & Associates v. United States, 181 Ct. Cl. 29, 385 F. 2d 438, 446 (1967) ; Silas Mason Co. v. United States, 105 Ct. Cl. 27, 53, 62 F. Supp. 432, 445 (1945), cert. denied, 329 U.S. 713 (1946). Compare United States v. Blair, 321 U.S. 730, 734-35 (1944). We note that the resident engineer, after reiterating that he would require the insulation on the pipes, stated, “Any further discussion concerning this matter should be handled in accordance with Article 8, Disputes, of the housing contract.” Finding 115. This incorrect instruction neither made the “Disputes” provision applicable nor imposed a duty on the plaintiff to go tu the contracting officer himself.

 The possible implication to the contrary in H.L.C. & Associates Construction Co. v. Unites States, 176 Ct. Cl. 286, 305-07, 367 F. 2d 586, 598-99 (1966), must be read in light of our subsequent decision in Len. In B.L.C. Associates no issue was raised as to the relation of Article 9 to the non-consensual directives involved there.

 General Clause 1(b) : “ ‘Contracting Officer* means the person who executes this Housing Contract * * * and includes * * * his authorized representative.”

 According to the defendant’s exhibits, the delegation was first made in mid-1958 and periodically reaffirmed. The contracting officer testified that “this particular delegation was generally granted for military type construction and [was] not in some respects applicable to Capehart housing.” It appears, however, that the powers quoted in the text were in fact delegated for use on this Fort Hood project.

 The inspector also served as resident engineer. Although there is no specific finding, it appears that the responsibility for enforcing compliance with the contract had, at least in part, been delegated to him.

 This is not contrary to the commissioner’s findings. He found only that the plaintiff itself failed to go to the contracting officer or the resident engineer ■with its problem.

 s > variation, the plaintiff limited its total-time approach to delays in connection -with claims 1, 22, and 26. Additional infirmities of that proposal are (1) the estimates were prepared two weeks prior to trial and, therefore, admitted by the commissioner only to illustrate the mode of computation, not as probative of actual delay; and (2) the estimates showed only the delay on particular aspects of the job, not delay on the whole project.

 In addition, we have explored plaintiff’s exceptions to the amount oí damages allowed by the commissioner on claims 9, 13, and 25. All are without merit. With respect to Its exception to the recovery on claim 2, we have modified finding 435 to show an additional $1,655.84 for the Douglas fir and pine the plaintiff was wrongfully ordered to replace.

 Plaintiff’s petition was divided into claims number 1 through 20 and 22 to 28 (for a total of $1,720,909.97), plus a further unnumbered claim in the amount of $344,181.97 ‘‘for overhead, taxes, insurance, fees, interest, and profits.” Since the plaintiff did not request any findings of fact concerning claims 12 ($29,839) or 28 ($25,054.47), the commissioner, acting under Rule 57(f) (2), declined to consider them. We approve of this action and therefore reject claims 12 and 28 outright.

 The water damage to the floors from August 1959 rains (see findings 37-39, 48 and 51) is relevant only to the question of delay. The time plaintiff took to repair that damage was considered in determining the extent of the overall delay attributable to the defendant.

 “Differences from the construction hereinafter specified -will be permissible * * * provided the cabinets afford equal space and utility and appearance, but these differences must be listed for approval by the contracting officer at the same time that shop drawings are approved.” We interpret this provision, especially in the light of the reference to “material” in paragraph 10 — 10, as applying to variations in component parts as well as methods of fabrication.

 The plaintiff argues that the doors were installed under the supervision of an inspector, and, therefore, the resident engineer’s subsequent rejection constituted a breach of contract. But the inspector had no authority to approve the cabinets finally, and the plaintiff had no contractual right to rely on his acquiescence in the plaintiff’s choice of materials. See Merritt-Chapman & Scott Corp. v. United States, 178 Ct. Cl. 883, 904, cert. denied, 389 U.S. 851 (1967) ; J. C. Decker, Inc. v. United States, 117 Ct. Cl. 703, 714, 93 F. Supp. 631, 633 (1950) ; Part I supra. Nor has the plaintiff alleged or proved conduct on the part of the inspector that, regardless of his lack of authority, would amount to breach of contract through hindrance of plaintiff’s performance. See Part I supra.

 The Government pounces on the fact that samples were not required by the contract as negating the conclusion that plaintiff could, by submitting the pilot cabinet, effectively request permission to use a nonconforming component. See note 16 supra. While it is true the tender was gratuitous, the important point is that the resident engineer approved the sample and that the specifications authorized differences in construction if approved. This distinguishes Vogt Bros. Manufacturing Co. v. United States, 160 Ct. Cl. 687 (1963), where the court dealt with the issue of whether that plaintiff’s submission of a shop drawing with an unexplained variation was enough “to put the contracting officer on notice.” 160 Ct. Cl. at 714—15. Here the resident engineer’s approval of the sample, together with his failure to make any exception on the shop drawings (as was done for the masonite and birch doors), strongly indicates that he was aware of plaintiff’s plans and accepted the difference. At least in the absence of evidence that he did not realize the cabinet had a fir back, we think plaintiff was entitled to assume that its use was permissible — until plaintiff was informed to the contrary.

 under the Capehart Act “Changes and Changed Conditions” article there can be no change order without the builder’s consent. See Part I supra.

 The plaintiff also pointed to the testimony of that partner implying that the company saved no money by eliminating the gravity drain in the initial 86 rough-ins, which seems inconsistent with its present claim that installing drains in the remaining units increased its costs. Even accepting the assertion, we fail to see how it proves duress.

 The customary practice has no controlling effect upon the quality or type of fill required by the contract. The excavated material can be used as fill only If It meets the contractual standards; the possibility of an inadequate supply of acceptable excavated soil is explicitly recognized in the provisions (paragraphs 1 — 7 and 35-15) dealing with “borrow.” The question thus turns on the specific requirements of this particular contract.

 Plaintiff's contention that the resident engineer breached the contract by rejecting the smaller straps after they had been “approved” by the inspector on the job is without merit. See note 17 supra.

 Since, according to plaintiff's witness, the difference in cost between %- inch strapping plus nails and 1-inch strapping plus screws is negligible, plaintiff limited its claim to the extra labor required to replace the supports originally installed. In these circumstances we need not decide whether the resident engineer properly rejected the smaller straps and, if not, whether plaintiff would be entitled to recover extra material costs despite its failure to follow the contractual procedure.

 At trial plaintiff offered proof that the joint it proposed was not a “construction joint” as that term is used in paragraph 3-13 and that the failure of Capehart Act contract drawings to indicate a joint did not preclude a “double pour” on other Capehart Act projects. Plaintiff’s testimony defining “construction joint” was so ambiguous and conflicting that, especially in light of the contracting officer’s positive testimony that the plaintiff was proposing a “construction joint”, we cannot accept it as the basis for interpreting the clear language of the specifications. Compare Gholson, Byar & Holmes Construction Co. v. United States, supra, 173 Ct. Cl. at page 395, 351 F. 2d at page 1000. Even if we assume the relevancy of experience on other projects to the interpretation of the Port Hood contract, plaintiff’s offer on the second point is insufficient because it did not indicate whether the other contracts contained a provision comparable to paragraph 3-13 and, if so, whether the “double pour” on the other projects was allowed as a matter of contractual right or as a result of the contracting officer’s exercise of discretion under 3-13.

 The plaintiff does not allege that the defendant contributed to, or knew of, the unattainability of the decking. Compare J. D. Hedin Construction Co. v. United States, supra, 171 Ct. Cl. at pages 98-101, 347 F. 2d at pages 253-55; J. A. Jones Construction Co. v. United States, 182 Ct. Cl. 615, 390 F. 2d 886 (1968).

 Face-nailing is nailing directly from the top of the board through to the sleeper below, so that the top of the nail is exposed.

 Plaintiff asserts that it is also entitled to (i) the cost of remilling the 35 rejected cabinets and (U) the additional cost of pine plywood over Douglas fir for all 500 units. However, plaintiff failed to prove adequately that it in fact incurred the remilling expenses. And, since the basis of its recovery with respect to the cabinet backs was reliance on a sample approved by the resident engineer (see discussion of claim 2 supra) its recovery should be limited to the costs incurred before the resident engineer changed his mind and required pine. The engineer's initial approval was not an irreversible change for all 500 units but only for those 35 cabinets. To hold otherwise would permit plaintiff to receive a windfall, i.e., what it would have saved had it been allowed to continue to deviate from the contract.